The **JOHNS HOPKINS UNIVERSITY**

v.

**James M. HUTTON, Jr., et al.**

**Civ. No. 15098.**

United States District Court
D. Maryland.

Aug. 15, 1968.

Supplementary Opinion Dec. 10, 1968.

---

1166

Edmund P. Dandridge, Jr., John Henry Lewin and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

John F. King, Baltimore, Md., John A. Wilson, Michael J. DeSantis and Shearman & Sterling, New York City, for defendants.

FRANK A. KAUFMAN, District Judge.

The Johns Hopkins University (Hopkins) seeks summary judgment over the vigorous opposition of defendants. The record is voluminous; the cast of characters is numerous; and the narration of the opposing versions of an unusual financial tale could easily outlast several double features. Defendants contend that the case is too complex for summary judgment. The answer to that contention, however, is easily discerned after the material, undisputed facts are culled from the massive record and are permitted to stand alone. In such posture they compel, against the background of

applicable law, only one conclusion: This case is ripe for summary judgment for plaintiff.

The defendants are James M. Hutton, Jr., et al., copartners, doing business as W. E. Hutton & Co. (Hutton), a stock brokerage firm with its principal place of business in New York City, and with numerous branch offices, including one in Baltimore. Hopkins alleges that Hutton violated duties which it owed to Hopkins under the Securities Act of 1933 (the '33 Act), the Securities and Exchange Act of 1934 (the '34 Act) and the common law. Specifically, Hopkins alleges that Hutton made misrepresentations of, and omitted to disclose, material facts, and also engaged in fraudulent and negligent conduct. The controversy arises out of the purchase by Hopkins on March 1, 1961, of an oil and gas production payment for $1,300,000 from Trice Production Company (Trice) in connection with which transaction Hutton received a commission from Trice.

Since Hopkins began this suit on November 1, 1963, the parties have indefatigably engaged in discovery, legal and factual argument, and motion hearings. Before oral argument on Hopkins' motion for summary judgment, Hutton's chief counsel stated in his main affidavit that Hutton had deposed eleven, and Hopkins twelve, witnesses, involving 7,401 pages of testimony; that Hutton had marked as exhibits approximately 818 documents and Hopkins had so marked about 212 documents, or a total of 1,030 documents; that Hutton had served upon Hopkins two sets of interrogatories and two sets of requests for admissions and that Hopkins had served upon Hutton thirteen sets of interrogatories and seven sets of requests for admissions, embodying a total of more than 2,083 separate inquiries in such interrogatories and requests for admissions. This Court calculates that the pleadings, the motions, the discovery documents, the main and supplementary affidavits of Hutton's chief counsel, and other factual and legal memoranda and commentary to the Court exceed 12,000 pages.

There have been lengthy hearings and conferences, involving several scores of days before this Court and before a special Master who was at one time appointed with regard to objections to discovery interposed by both sides. After Hopkins filed its original complaint, Hutton answered and prayed a jury trial, Hopkins later was granted leave to file an amended complaint, Hutton answered, and Hutton later sought to file a third-party complaint against Ragnar D. Naess, et al., co-partners doing business as Naess & Thomas, Hopkins' investment counsel, for contribution as joint tort-feasors, charging Naess with statutory and common law violations. Chief Judge Thomsen of this Court denied Hutton leave to file the third-party complaint, "primarily because of the complication of issues which would result from the filing of the third party complaint, but also because of the delay and expense to Hopkins, the unreasonable expense to Naess, and the laches of Hutton." Johns Hopkins University v. Hutton, 40 F.R.D. 338 (D.Md.1966).

Hopkins' amended complaint is set forth in seven counts: (1) Section 12(2) of the '33 Act; (2) Section 10(b) of the '34 Act and Rule 10b–3 of the Securities and Exchange Commission (S.E.C.); (3) Section 10(b) of the '34 Act and Rule 10b–5 of the S.E.C.; (4) Section 15(c) (1) of the '34 Act; (5) Section 17(a) of the '33 Act; and (6) and (7) under the common law for (a) false representation and fraudulent conduct and (b) making false representations negligently and with reckless indifference as to their truth.

Hopkins' motion for summary judgment was presented with regard to each of the first five or statutory counts. Near the close of his rebuttal, during oral argument on Hopkins' motion for summary judgment, Hopkins' counsel stated that if the Section 12(2) equitable relief sought by Hopkins under count one of the amended complaint should be granted, Hopkins would consider itself fully satisfied (Tr. 458–463). Therefore, since summary judgment will

be granted to Hopkins under count one, the issues raised by the other counts are moot.[1]

Hopkins' Amended Complaint was summarized by Judge Thomsen at 40 F.R.D. 338, 340–341, supra, as follows:

In 1960, Hutton was employed by Trice to act as its adviser, broker and agent in the sale of production payments carved out of certain oil and gas properties owned by Trice. Hutton offered for sale and sold three such production payments, including the one offered for sale and sold to Hopkins, and Trice paid Hutton commissions amounting to 2% of the sales price obtained.

Pursuant to that arrangement, Hutton and Trice offered to sell to Hopkins a production payment out of certain oil and gas properties of Trice located in Texas, Oklahoma and Louisiana, described in a brochure prepared by Hutton and Trice and delivered by them to the Treasurer of Hopkins. The brochure stated that Trice desired to sell production payments in the amount of $2,700,000; that a commitment for approximately $1,400,000 had been received from a bank as a separate first production payment from certain properties; that a second production payment of approximately $1,300,000 from the same properties and from five additional properties (which would be subordinate to the bank's production payment except as to the five additional properties) would also provide for certain net profits interests; and that, based on stated esti-

---

1. Section 12(2) of the '33 Act reads as follows:

 Any person who—

 (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. [15 U.S.C.A. § 77*l*(2)].

 Section 2(1) of the '33 Act defining "security" and Section 13 of the '33 Act setting forth the limitations period applicable to Section 12, each of which figures prominently in this case, respectively provide:

 (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. [Section 2(1) of the '33 Act, 15 U.S.C.A. § 77b(1)].

 No action shall be maintained to enforce any liability created under section 77k or 77*l*(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l* (1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(2) of this title more than three years after the sale. [Section 13 of the '33 Act, 15 U.S.C.A. § 77m].

mates of the value and rate of realization of the oil and gas reserves in the properties subject to the second production payment, the purchaser thereof would realize a substantial sum in excess of its cost.

Hutton represented to Hopkins, as a further material inducement to purchase the production payment, that the estimates of future net revenues and rate of realization from the oil and gas reserves set forth in the brochure were the estimates of independent engineers who had studied each of the properties.

Hutton also recommended to Hopkins and to Naess, Hopkins' financial adviser, that they select Chester L. Brown, Vice-president of Petroleum Consultants, Inc., to make a study of the reserves and a check of said estimates on behalf of Hopkins, at Trice's expense. In making this recommendation Hutton did not reveal that the employee of Hutton who was dealing with Hopkins had been for many years an intimate friend and associate of Brown, had recently encouraged him to form his consulting engineering company and had indicated to Brown that Hutton would employ him in connection with this production payment. In early 1961, without the knowledge of Hopkins, Hutton employed Brown, at the joint expense of Hutton and Trice, to make a study and estimate of said reserves not for Hopkins but for Hutton and Trice; instructed Brown to make a report which would omit details; concealed from Brown that Hopkins had been led by Hutton to believe that Brown was an independent engineer acting for Hopkins; concealed from Brown the existence of the reports and estimates that had been made by independent engineers for Trice concerning which Hutton had made representations to Hopkins; and failed to request Brown to make any check of such reports or estimates.

While Brown was making his study and estimates for Hutton and Trice,

Hutton represented to Hopkins that Brown was making the study and estimate as Hopkins' 'independent reservoir engineer', and, acting as such, was checking the earlier reports and estimates of said reserves made by the independent engineers. Hutton represented to Hopkins that Brown's study and estimates showed that the figures previously presented by Hutton were conservative and that Hopkins could expect repayment of its investment with interest in a shorter time and could expect a greater return from its net profits interest than had been estimated by the original independent engineers. Hutton forwarded to Hopkins Brown's report which confirmed those representations.

Relying to a material degree on each of said material representations made by Hutton, Hopkins purchased for $1,300,000 the production payment and net profits interests on March 1, 1961.

On October 15, 1962, Trice filed in the United States District Court for the Eastern District of Texas, Tyler Division, a Petition for Reorganization under Chapter X of the Bankruptcy Act. In early 1963, Hopkins received a report disclosing that the reserves of oil and gas in the properties included in the $1,300,000 production payment purchased by Hopkins were substantially less than as represented by Hutton. Also in 1963, within one year prior to the filing of the original complaint herein, Hopkins learned for the first time that the alleged representations made by Hutton were false, and learned for the first time of the alleged skulduggery in connection with Brown's report.

In their answer to the amended complaint, defendants, among other things:

1. Admitted that all of the individual defendants, excluding defendants Joseph A. W. Iglehart and Benjamin D. Williams who were limited partners, were con-

ducting business under the name of W. E. Hutton & Co. (Hutton);

2. Admitted that the defendants maintained an office in the District of Maryland;

3. Conceded that this Court has jurisdiction;

4. Admitted that in 1960 Trice was a Delaware corporation having its principal place of business in Texas;

5. Admitted that in 1960 Hutton performed certain services in connection with the sale by Trice of certain production payments carved out of certain oil and gas properties of Trice; and that Hutton was paid commissions by Trice amounting to 2% of the face amount of each of three production payments sold by Trice, including the one sold by Trice to the plaintiff on or about March 1, 1961;

6. Admitted that Cliff Trice, President of Trice, and Gilbert LaPiere, an agent and employee of Hutton, met in Baltimore on September 21, 1960, with Henry Baker, Treasurer and Financial Vice President of Hopkins, at which time a $1,300,000 production payment carved out of certain oil and gas properties of Trice located in Texas, Oklahoma and Louisiana was discussed;

7. Admitted that Hutton had in their possession on December 8, 1965, a writing entitled "General Comments Pertaining to Purchase of Oil and Gas Production Payment" dated September 16, 1960; that Trice prepared that brochure; that that brochure, or a copy thereof, was delivered to Baker by Cliff Trice on or about September 21, 1960, during a conference at Hopkins in Baltimore arranged by Naess; and that Naess had received a copy of that brochure;

8. Specifically denied that that brochure was prepared by Hutton either in whole or in part;

9. Admitted that LaPiere wrote a letter to Baker, dated February 3, 1961, in which a reference is made to "my brochure of September 16, 1960"; defendants contend that the word "my" was incorrectly or inadvertently used, although not intentionally so;

10. Alleged that Petroleum Consultants, Inc. and particularly Brown were selected by Hopkins to make an independent expert study of certain properties of Trice, an estimate of the reserves therein and future profits therefrom; and that LaPiere, at the request of Hopkins, wrote a letter to Petroleum Consultants, Inc., dated January 5, 1961;

11. Admitted that LaPiere knew Brown prior to January 5, 1961;

12. Admitted that LaPiere, or someone on his behalf, wrote letters to Mark Harriman of Naess and Thomas and to Baker dated respectively January 16, 1961, and February 3, 1961;

13. Admitted that Hopkins accepted an offer made by Trice that Hopkins purchase for $1,300,000 a production payment and net profits interest carved out of certain oil and gas properties of Trice located in Texas, Oklahoma and Louisiana; and that that purchase was consummated in Texas on or about March 1, 1961;

14. Alleged that Naess and Thomas were investment counsel for Hopkins for over twenty years and in pursuance thereof, Walton Canedy, the Baltimore partner of Naess and Thomas, attended every meeting of the Hopkins Finance Committee between January 1, 1960 and the date Hopkins commenced this action;

15. Alleged that Naess was a friend and acquaintance of Cliff Trice since at least 1957; that in 1958 Naess made personal investments in Trice's oil drilling ventures; and that Naess recommended to his clients that they invest in participations in such ventures of Trice;

16. Alleged that on August 30, 1960, Trice wrote a letter to Naess and enclosed a Trice brochure dated August 8, 1960;

17. Alleged that on September 14, 1960, Cliff Trice personally called on Naess in New York and proposed the

purchase of an oil production payment by Hopkins;

18. Alleged that Trice sent Naess a Trice brochure dated September 16, 1960, the substance of which Naess communicated to his partner Canedy, asking the latter to pass it on to Baker; and that Baker indicated to Canedy he was interested;

19. Alleged that Naess arranged the meeting with Baker on September 21, 1960 at Hopkins (referred to in 7 above), attended by Cliff Trice, Canedy, and LaPiere, at which meeting Cliff Trice delivered to Baker a copy of Trice's September 16, 1960 brochure;

20. Alleged that during the Fall of 1960, Gordon Meeks, a friend of Naess, told Naess he was forming a new petroleum consulting firm with Brown, known as Petroleum Consultants, Inc. and that thereafter Naess selected Brown as Hopkins' own independent oil consultant to check the oil and gas reserves in the Trice production payment offered by Trice to Hopkins;

21. Alleged that in October, 1960, Bankers Trust Company of New York City (Bankers Trust or Bankers) purchased a $1,375,000 payment from Trice through Bankers' nominee, Oilco, Inc., under which Bankers occupied a primary position with respect to approximately 18 of the 23 wells in the production payment under consideration by Hopkins, pursuant to which the latter would occupy a primary position as to 5 wells and a secondary position to Bankers as to the aforesaid 18 wells;

22. Alleged that Naess and Thomas and Hopkins gave consideration to Hopkins' investment policy in July or August, 1960, and steps to restate that policy were taken by Hopkins Finance Committee in October, 1960; that on November 25, 1960, that Committee adopted a restatement of its investment policy pursuant to which Hopkins was authorized to invest up to 10% of its endowment funds in certain types of invest-

ments including the type offered by Trice to Hopkins; and that on January 27, 1961, that Committee met and formally considered Trice's proposal but did not at that meeting conclude consideration of that proposal;

23. Alleged that on February 1, 1961, Hopkins' legal counsel made a written analysis of the Trice production payment, which analysis indicated, *inter alia,* the speculative nature and risks involved in the Trice production payment; that on February 1, 1961, such counsel advised Baker to obtain certain reports of independent engineers, namely, those of DeGolyer & MacNaughton (D & M), Schafer and Brown, and that on February 1, 1961 such counsel told Baker they "must see" those three reports before the purchase was consummated;

24. Alleged that on February 7, 1961, at a meeting in Baltimore at the office of Hopkins' legal counsel, attended by Mitchell and Worth McCauley of Trice, Baker, and Dandridge and Cooper, members of the law firm representing Hopkins, but not LaPiere or any other Hutton representative, a February 3, 1961, Trice brochure was delivered to Baker;

25. Alleged that no representative of Hopkins, Naess & Thomas nor Hopkins' legal counsel, ever at any time prior to March 1, 1961, obtained the engineering reports of D & M, Schafer or Mercantile National Bank of Dallas;

26. Alleged that Brown, "Hopkins own consultant selected by Naess," made an independent evaluation of the properties involved in the Trice production payment and set forth his opinion in a report delivered to Hopkins, Naess and Thomas, and to Hopkins' legal counsel;

27. Alleged that Naess studied the Brown report, advised Hopkins that he had contacted Baker and the Mercantile National Bank and on February 14, 1961, wrote a letter to Hopkins recommending the purchase, which letter was read at the Hopkins Finance Committee meeting

on February 24, 1961, and made part of the minutes of that meeting. At that meeting the Committee approved the purchase of the Trice production payment and the purchase was thereafter consummated on or about March 1, 1961, at which closing Hopkins was represented by its Texas legal counsel, and at which neither LaPiere nor anyone from Hutton was present;

28. Alleged that Hopkins did not rely upon Hutton or any other defendant but upon Naess, Canedy, others in the firm of Naess & Thomas, Brown, Petroleum Consultants, Inc., Trice, Mitchell, McCauley, others in the Trice Company, Hopkins' general legal counsel in Baltimore, and its special legal counsel in Dallas;

29. Admitted that Trice, on or about October 15, 1962, filed in the United States District Court for the Eastern District of Texas, Tyler Division, a petition for reorganization under Chapter X of the Bankruptcy Act;

30. Denied each and every other allegation in plaintiff's complaint;

31. Stated that the amended complaint failed to state a claim upon which relief could be granted;

32. Alleged that "[i]f any representations were made to Hopkins on behalf of these defendants which included any untrue statement of a material fact or omitted to make the statements in the light of the circumstances under which they were made not misleading, defendants did not know, and in the exercise of reasonable care, could not have known of such untruth or omissions.";

33. Alleged that such material changes and modifications in the Trice production payment purchased by Hopkins on March 1, 1961, had been made since March 1, 1961, that Hopkins had failed to tender back, and was unable to tender back, as required by Section 12(2) of the '33 Act;

34. Pled the one year statute of limitations (See Section 13 of the '33 Act, quoted *verbatim*, supra);

35. Set out defenses numbered Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth which have no application to the first or Section 12(2) count.

On December 22, 1966, Hutton sought leave to amend its answer to the amended complaint and thereby to file a Thirteenth Defense. Over Hopkins' opposition, this Court [2] permitted that additional defense, pertaining to all counts of the complaint, including the first or 12(2) count to be filed. That defense alleges contributory negligence and assumption of risk by Hopkins and states that Hopkins' Finance Committee, its agents and representatives, failed to conform to the standards required of fiduciaries and trustees of an educational institution in approving the purchase of the Trice production payment.

Whether "summary judgment is appropriate in any case is one to be decided upon the particular facts of that case." First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

2. During the hearing with regard to the Thirteenth Defense, this Court stated on the record that it would grant Hutton leave to amend its answer in order to state its Thirteenth Defense, upon presentation of an appropriate Order. Since such Order has never been presented or signed, this Court hereby orders that Hutton's motion so to amend is hereby granted, and that the Thirteenth Defense is deemed filed and in issue in this case for all purposes, including the Summary Judgment motion under consideration in this opinion and all further proceedings in this case. In so doing, this Court is, at this point in its opinion, expressing no opinion with regard to the legal or factual effect of that defense with regard to any count of the complaint. Subsequently, in this opinion, this Court will state its views in connection with the status of the Thirteenth Defense as it relates to the First Count, in the context of this Court's consideration of Hopkins' motion for summary judgment.

The duty of the trial court, in considering such a motion, is not to decide any factual issue but rather to determine whether any factual issue exists which requires determination by the factfinder. National Screen Service Corp. v. Poster Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962); Byrnes v. Mutual Life Insurance of New York, 217 F.2d 497, 500 (9th Cir. 1954). In this case Hopkins urges this Court to make many findings of fact which this court specifically declines to do in this summary judgment context. But that does not relieve this Court of the obligation to examine the record before it under Rule 56 and to determine if there is lacking any genuine dispute with regard to material facts which in and of themselves provide an undisputed basis upon which plaintiff is entitled to summary judgment relief under Section 12(2) of the '33 Act. Such an examination requires a careful classification of those material facts which qualify as undisputed under Rule 56 standards.[3]

## FINDINGS OF UNDISPUTED MATERIAL FACTS

Based upon an exhaustive review of the entire record in this case this Court finds that the following facts are material and that there is no genuine dispute with regard to any of them.[4]

1. LaPiere was employed by Hutton, as Manager of its Oil and Gas Department, on March 1, 1957, and resigned from this position in July 1961.

2. The New York Stock Exchange notified Hutton, on or about September 20, 1957, that the Exchange had approved LaPiere's application to act as a duly qualified Registered Representative.

3. In his capacity for Hutton, as Manager of the Oil and Gas Department and as a Registered Representative, LaPiere, among other duties, was authorized to solicit underwritings and other financing from a number of oil companies, to administer from day-to-day the interests of participants in "various" oil drilling programs, to contact the public with regard to purchases or sales of stocks and bonds and investment banking relationships, and to screen and add what information he might have to programs presented by the various oil operators who approached Hutton.

4. Trice Production Co., in early August 1960, mailed copies of the first Schafer report, dated March 27, 1960, the second Schafer report, dated June 8, 1960, and the D & M (April 1, 1960) report, dated June 11, 1960, to LaPiere.

5. The $1,300,000 production payment purchased by Johns Hopkins University, on March 1, 1961, covered a combination of 23 oil and gas wells.

6. The twenty-three wells under this $1,300,000 production payment purchas-

---

3. All motions filed by Hopkins and by Hutton to strike any parts of discovery materials have been denied. Those denials are hereby reaffirmed, as are all prior rulings of this Court and of the Special Master appointed with regard to discovery questions. This Court has carefully considered each of Hutton's points in its motions to strike filed November 8, 1967. In most instances, Hutton's evidentiary contentions, even if accepted by this Court, would have no legal effect in view of the existence of independent relevant and material evidence to which no objection has been or seemingly could be soundly lodged by Hutton. In the several instances in which this is not true, as for example with regard to the affidavit of Harold T. Dokupil and the affidavit of Worth T. McCauley, this Court finds no merit in Hutton's objections. In this connection this Court notes and is applying the standards set forth in Rule 56. See, inter alia, 6 J. Moore, Fed.Prac. ¶56.11 [5] 2195 et seq.; ¶56.22 [1] 2801 et seq.

4. The voluminous record in this case does not permit this Court to make individual findings of each and every undisputed material fact. However, this Court has endeavored, and believes that it has succeeded, in not omitting to find any material undisputed fact which could, in any way, require any conclusion as to any legal issue in connection with the Section 12(2) count of this case, different from the conclusion which is set forth in this opinion.

ed by Hopkins, and the estimates of their future net revenue contained in the first and second Schafer and the D & M reports are as follows:

| Well | D & M Estimate | 1st Schafer Estimate | 2nd Schafer Estimate |
|---|---|---|---|
| R. D. McDonald #1 | $1,699,536 | None | None |
| Milne #1 | 361,223 | None | None |
| Dugger #1 | 119,742 | $ 72,858 | None |
| Younger #1 | 50,473 | 30,938 | None |
| Dollar #1 | 11,829 | None | None |
| Barham-Knox #1 | 8,918 | None | None |
| Noland #2 | 27,761)[5] | None | None |
| Noland #3 | 46,256)[5] | None | None |
| Noland #4 | 38,351)[5] | 71,402)[6] | |
| | | 94,234)[6] | None |
| Windle | 259,861 [7] | None | None |
| Weatherford | 102,028 [8] | None | None |
| Dennis | 91,045 [9] | None | None |
| Nunez "A" #1 | 670,667 | 350,841)[10] | |
| | | 618,696)[10] | None |
| J. R. Clayton #2 | 4,193 | 37,230 | None |
| Woodworth #1 | 95,871 | 406,912)[11] | |
| | | 43,009)[11] | $411,696 |
| Harvey Jones #1 | 93,351 | None | 292,626 |
| Swinney #5 | 23,954 | 57,646 | 58,451 |
| Tipps #1 | 316,802 | None | None |
| Hester #1 | None | None | None |
| Dumas #1 | None | None | None |
| Skiles #1 | None | None | None |
| Vera Roney #2 | None | None | None |
| Hughes #1 | None | None | None |

5. The D & M report contains no breakdown of estimated future net revenue for each Noland well. Dollison's affidavit, p. 2, (Dollison is an engineer for D & M) states that Mackoy (East 4600), Mackoy (East 4900), Mackoy (Hickey), Mackoy (Younger) and Mackoy (3700) are the five separate reservoirs comprising the H. H. Noland lease. The total estimated net revenues for these reservoirs is shown by the D & M report to be $158,623. Dollison has affied that of this amount $112,367 is computed to be the portion attributable to Noland 2, 3, and 4. Of this amount, defendant's counsel, using Dollison's method of allocation, submitted the above D & M figures for only the Noland 2 and 3 wells. The D & M figure for Noland 4, not submitted by the defendant's counsel, is based on the same method of allocation.

6. Of the total $165,636 estimated future net revenues for Noland 4 from the first Schafer report, $94,234 of that figure is taken from a Schafer summary of estimated revenues from "Drilled Non-Producing (Behind Pipe) Locations."

7. The $259,861 figure for the Windle well is that which appeared in the D & M report. Counsel for defendants have submitted a $303,957 figure as well as a $413,722 computation for this well. The $303,957 figure is reached by adding back the portion of the capital expenditure deducted originally in the D & M report about which Ford of Trice later wrote Ketcham, suggesting that that deduction should be eliminated because certain wells, including the Windle well, had been completed since the date of the D & M re-

7. Trice Production Co. mailed Trice Production Schedules II and III, dated August 7, 1960, to LaPiere. Schedule II showed, among other things, the following estimates of future net revenues:

| | |
|---|---|
| Nunez A–1 | $670,667 |
| Jones | 292,626 |
| Woodworth | 411,696 |
| Dumas | 265,541 |
| Hester | 478,704 |
| Swinney | 58,451 |
| Hughes | 79,513 |
| Dollar | 11,829 |
| Dugger | 72,858 |
| Tipps | 327,794 |
| Weatherford | 116,604 |
| Windle | 121,128 |
| Skiles | 53,958 |
| Barham Knox | 8,918 |
| J. R. Clayton | 4,193 |

| | |
|---|---|
| Roney #2, | $ 16,518 |
| Noland #2, #3, #4 | 124,897 |
| Younger | 50,473 |
| Milne | 361,223 |
| R. D. MacDonald | 1,699,536 |
| Dennis | 128,618 |

The total estimated future net revenue shown for the above 23 wells—those 23 wells which comprised the $1,300,000 production payment purchased by Hopkins—is $5,355,744. Schedule III is virtually the same as Schedule II, but it includes estimates for six additional properties—six "minor interest" properties which LaPiere asked Trice Production Co. to strike from the schedule—and a total estimate for future net revenues of $5,367,523.

8. Trice Production Co. mailed to LaPiere a "Schedule I" dated August 7,

port and the capital expenditure made. This Ford-to-Ketcham letter was dated August 27, 1960.

Counsel for defendants also have submitted a $413,722 estimate for the Windle well. This figure is reached by recomputing the D & M report figure on the basis of fractional interests used later by Brown and Bednar in computing their estimates. Nevertheless, both the Brown and Bednar estimates referred to by counsel for defendants were revealed at dates substantially after August, 1960 (February, 1961 for Brown, and November, 1962 for Bednar), and the estimates by these individuals were substantially less than the D & M report figures ($320,299 gross, by Brown, and $50,569, by Bednar), despite the larger fractional interests involved. Bednar is an engineer who was employed by Bankers Trust, and later in 1962, by Hopkins, with regard to the Trice production payment purchased by those institutions.

8. Counsel for defendants have submitted a $90,975 figure for the Weatherford.

This figure is submitted along with the Windle recomputation and is also based on adding back a previously deducted capital expenditure and on a different fractional interest, this time smaller, utilized by Brown and Bednar.

9. Counsel for defendants present a $128,445 figure for Dennis, which like Windle and Weatherford reflects a restoration of a capital expenditure based on the August 27, 1960, Ford-to-Ketcham letter.

10. Of the total $969,537 estimated future net revenues for Nunez "A" 1 from the first Schafer report, $618,696 of that figure is taken from a Schafer summary of estimated revenues from "Drilled Non-Producing (Behind Pipe) Locations."

11. Counsel for defendants have submitted the $411,696 figure from the second Schafer report. It should also be noted that the first Schafer report contained a $406,912 figure plus a $43,009 "behind pipe" computation.

1960. That schedule showed, among other things, the following for each of the 23 wells in the $1,300,000 production payment purchased by Hopkins:

| Well | Available Analyses | Sources of Extension and Reserves |
|------|--------------------|------------------------------------|
| Nunez A–1 | D & M | D & M |
| Jones | D & M, Schafer | Schafer |
| Woodworth | D & M, Schafer | Schafer |
| Dumas | None | TPC* |
| Hester | None | TPC* |
| Swinney | D & M, Schafer | Schafer |
| Hughes | None | TPC* |
| Dollar | D & M | D & M |
| Dugger | D & M, Schafer | Schafer |
| Tipps | D & M | D & M |
| Weatherford | D & M | D & M |
| Windle | D & M | D & M |
| Skiles | None | TPC* |
| Barham Knox | D & M | D & M |
| J. R. Clayton | D & M | D & M |
| Roney #2 | None | TPC* |
| Noland #2, #3, #4 | D & M | D & M |
| Younger | D & M | D & M |
| Milne | D & M | D & M |
| R. D. MacDonald | D & M | D & M |
| Dennis | D & M | D & M |

———◆———

9. Trice Production Co. mailed to LaPiere the brochure dated August 8, 1960, entitled "Proposal for Purchase of Oil & Gas Production Payment." Among other things, this brochure included estimates of future net revenue for the same 29 wells covered by Schedule III, supra, (including the 23 covered by the $1,300,000 production payment purchased by Hopkins), and this brochure shows a total future net revenue figure for the wells of $5,083,773.

10. On or about August 5, 1960, LaPiere asked Bankers Trust, through Ketcham, to finance a $2,500,000 Trice production payment, which Bankers turned down.

11. LaPiere then, on or about August 8, 1960, called Ketcham again and offered Bankers Trust a counter-proposal in which William Hutton agreed to reduce the amount of broker's loan which Hutton had from Bankers if Bankers agreed to take part in the Trice financing. Bankers decided to go ahead with this proposal.

12. In August, 1960, Ketcham of Bankers received from LaPiere a copy of the D & M report, the second Schafer report and the Trice Production Co. "Schedule II". Ketcham prepared a resume of the D & M report, and a schedule recapitulating net revenue figures from the D & M and first and second Schafer reports.

13. Bednar, a technical consultant to Bankers Trust, reviewed the D & M and Schafer reports and expressed to Ketcham his preference for the D & M estimates, rather than those of Schafer which seemed to Bednar to take the high road.

* TPC—Trice Production Co.

14. Ford, of Trice, wrote Ketcham, in a letter dated August 27, 1960, among other things, that certain variations existed between Trice figures and the D & M report estimates for the Weatherford #1, Lee Tipps #1, Bert Dennis #1 and Emma Windle #1 wells. Ford explained that the D & M estimates, which were made before the Trice figures were assembled, were lower than the Trice figures because the D & M figures reflected a deduction of certain estimated capital expenditures; that the latter were not deducted for the Trice figures because subsequent to the date of the D & M report these four wells had been completed and those expenditures made.

15. Barnett of Trice wrote LaPiere a letter, dated August 25, 1960, which, among other things, described a possible sales pitch for putting together a syndicate to take a portion of the production payment deal, and informed LaPiere that he would receive a memo by Wood, of Peat, Marwick & Mitchell, with regard to the tax aspects of such a deal.

16. On August 30, 1960, LaPiere contacted Rowen, a partner in the law firm of Sherman, Sterling and Wright, of New York City, and asked Rowen to comment on the proposed $1,300,000 Trice production payment, especially with regard to tax matters. Rowen performed approximately 14 hours of work with regard to the Trice Production Co. matter.

17. Rowen received a letter, dated September 10, 1960, from McCauley of Trice, which letter explained that enclosed with it was a copy of a McCauley-to-LaPiere letter of the same date and a draft of a proposed production payment, which McCauley desired LaPiere and Rowen to discuss. Rowen talked with McCauley about this material in a phone call on September 15, 1960.

18. Rowen received from McCauley more production payment documents with a letter, dated October 4, 1960, which letter stated McCauley's understanding that LaPiere had obtained a committal on approximately all of the $1,300,000 production payment, and that within the next few days the first production payment (to Bankers) would be concluded.

19. McCauley also communicated, by letter dated September 12, 1960, with counsel for Bankers Trust Company (Cahill, Gordon, Reindel & Ohl, of New York City) concerning documents covering the Bankers Trust part of the Trice production payment transaction. Among other things, McCauley expressed his view that the instruments were the usual provisions in transactions such as those proposed with Bankers Trust and the Gilbert LaPiere group.

20. Ketcham wrote a memo for the Bankers credit file dated September 16, 1960, which related that Constable of Bankers Trust had spent time with D & M and with Trice reviewing the D & M engineering work, and which stated that Bankers was waiting for a revised report on the Windle well and that Bankers had told LaPiere that Bankers would make the loan and would draw papers for an amount in excess of $1,300,000 and would advance additional funds as soon as satisfactory engineering determined a loan value for the Windle well.

21. Because of Bankers' dissatisfaction with the D & M report on the Windle well, Bankers asked Bednar to make a report on that well, and the Bednar report on Windle, dated September 27, 1960, stated among other things, a net revenue figure of $193,264.

22. Ketcham wrote to LaPiere, a letter dated September 28, 1960, in which he stated that Bankers desired to limit the amount of the production payment to $1,300,000 plus the loan value of the Windle lease, and that he expected Bednar's answer on the Windle in the very near future.

23. Constable wrote a memorandum to the Bankers credit file, dated October 14, 1960, in which he stated, among other things, that Bankers loaned on that date $1,375,000 to Oilco Inc., Bankers' dummy corporation, for the purpose

of purchasing the production payment, and that this financing was done at the request of LaPiere of W. E. Hutton for their customer, Cliff Trice of Trice Production Co.

24. LaPiere, by letter dated October 17, 1960, wrote to Ketcham and expressed his appreciation for the completion of the Bankers' oil payment deal, and enclosed a $75,000 check of W. E. Hutton Co. to open a new account with Bankers for W. E. Hutton's Oil and. Gas. Department.

25. Ketcham, in a credit file memo, dated October 18, 1960, stated, among other things, that the Hutton account was opened as a partial reward to Bankers for having purchased the $1,375,000 production payment.

26. Hutton received from Trice a $27,500 gross commission for placing this production payment; LaPiere received 40% of this commission payment, or $11,000.

27. By letter to Ragnar Naess dated August 30, 1960, Cliff Trice presented Trice Production Co. plans to sell carved-out production payments in order to secure financing. In this letter, Trice stated, among other things, that LaPiere indicated Hutton's interest in securing monies for a production payment series amounting to $2,700,000 and that Trice agreed to pay Hutton a 2% finder's fee in connection with this sale; explained the mechanics of the production payment; and stated that the payments had been evaluated by the competent and conservative engineering firms of D & M and Schafer; explained Hutton's attempts to sell the $2,700,000 payment in two payments, one to a bank and another to a proposed syndicate; suggested the attractiveness of production payments as an institutional investment; asked Naess to recommend production payments to some of his clients; and enclosed a brochure, dated August 8, 1960, prepared in connection with the $2,700,000 production payment, which showed an estimated total future net revenue figure of $5,083,773.

28. On September 14, 1960, Cliff Trice and Gilbert LaPiere met with Ragnar Naess in the latter's office at which time Trice presented a production payment proposal concerning which he wanted to interest Naess' client, Johns Hopkins University; and during which meeting Naess spoke, by way of long distance, interstate telephone with his Baltimore partner, Canedy, and with Baker, the Treasurer of Hopkins, concerning the proposal, outlined the proposal to Baker and arranged for a meeting between Baker and Trice and LaPiere in Baltimore.

29. Thomas of Trice, by letter dated September 13, 1960, wrote to LaPiere a letter which included electric logs for four wells covered by the secondary production payment and enclosed a brief summary in connection with the $2,700,-000 production payment and asked LaPiere to get in touch with Trice Production Co. if he needed anything else that would assist him. The enclosed summary explained that the $5,083,773 estimated net revenue figure set forth in the brochure was a minimum figure compiled by independent engineering firms, and that additional data which had become available indicated that future revenue would amount to approximately $7,200,-000.

30. Trice Production Co. sent to LaPiere's secretary a letter dated September 21, 1960, transmitting twelve copies of a brochure dated September 16, 1960, entitled "Proposal for Purchase of Oil and Gas Production Payment," and by letter, dated September 23, 1960, twelve additional copies of this September 16 brochure were sent to LaPiere, and another twenty copies were sent to LaPiere on October 4, 1960.

31. Naess also received a copy of this September 16, 1960 brochure.

32. This September 16, 1960, brochure included comments on the proposed $2,700,000 production payments and an outline of the economic results, and stated a total future net revenue figure of $6,560,000 with eight years said to be the time required to retire principal and

interest on the $2,700,000 production payment, and estimated a return [12] of $2,905,174 to holders of the $1,300,000 production payment.

33. Trice, LaPiere and Canedy attended a meeting in Baker's office on September 21, 1960, at which time Baker received a copy of the September 16, 1960 brochure containing the $6,560,000 net revenue figure and at which time he received the calling cards of Trice and LaPiere.

34. LaPiere received a letter, dated September 23, 1960, from Ford of Trice which stated that it included a schedule showing the "8/8 reserves" (estimated total production in barrels or gas units) for each of the 23 wells covered by the $2,700,000 production payment and suggested that this schedule be included in LaPiere's and Cliff Trice's copy of the brochure to talk from, but that it was felt that those reserve figures should not be made an inclusion in all of the brochures.

35. Canedy wrote to Naess and other Naess & Thomas officials a memo, dated September 22, 1960, in which, among other things, he mentioned the September 21 meeting in Baker's office, and in which he included a suggestion to Naess that Naess and Thomas find an expert to advise Hopkins on the deal and that Baker had agreed to compensate Naess & Thomas for the added expense of such a consultant.

36. After receiving this memo, Naess expressed his satisfaction with Canedy's suggestion to him, but stated that Hopkins, and not Naess & Thomas, should employ the consultant.

37. In the first half of October, 1960, Naess had discussions with Baker in which he stated the advantages of the production payment and recommended that Hopkins employ Petroleum Consultants, Inc. to check the reserve estimates of D & M and Schafer on the wells included in the production payment which Hopkins was considering.

38. At the meeting of the Johns Hopkins University Finance Committee, on October 14, 1960, Baker outlined the production payment proposal, which the Committee decided not to pursue at that time, but which it indicated might be considered at a future date.

39. In October, 1960, Arthur Wiesenberger, a New York investment banker, wrote letters and enclosed therewith copies of the September 16, 1960, brochure, to at least five of his investment clients. The letters explained a possible Trice production payment program totalling $1,300,000 and stated that the production payment business had been brought to Wiesenberger by Gilbert LaPiere of W. E. Hutton & Co. None of Wiesenberger's clients purchased Trice production payments.

40. On October 4, 1960, Cliff Trice wrote to LaPiere at W. E. Hutton & Co., and stated to LaPiere that he had prepared (and enclosed) a list of possible participants for a production payment syndicate; that he was confident that with LaPiere's continued efforts they would be successful in selling production payments totalling $1,300,000; and that he deeply appreciated everything LaPiere had done for him and for Trice Production Co. The eleven names on the enclosed list of possible syndicate members were about evenly distributed between institutions and individuals.

41. During October, November and December, 1960, LaPiere and Trice negotiated with Bankers Trust for the sale of a $720,000 production payment to Oilco, which sale was ultimately made on January 6, 1961, and for which sale Hutton received a 2% commission, or $14,400,

12. When "return" is used in these findings, it is to be defined as the total proceeds that would be received under the production payment, i.e., repayment of principal plus interest plus any override. When "interest" is used in this opinion in connection with any discussion or reference to the production payment purchased by Hopkins on March 1, 1961, it is a short-hand way of saying "an amount equivalent to interest."

from which latter amount LaPiere received $3,600 (25% of the $14,400).

42. On November 25, 1960, the Johns Hopkins University Finance Committee issued a statement of its investment policy which, among other things, set forth a new position, namely, that in the fixed income portion of Hopkins' endowment portfolio (which portion comprised approximately 50% of that portfolio), there could be "up to 10% of portfolio in other investments" providing higher current return than from investments such as high-grade bonds or mortgages, and/or the probability of capital gain. The statement explained that such investments could include convertible bonds, leasebacks, oil payments, and certain other properties.

43. In November, 1960, I. W. Iglehart, a Registered Representative of Hutton, had phone discussions with his father-in-law, Charles F. Garland, the President of Hopkins' Board of Trustees, with regard to the disposition of Hopkins' Finance Committee toward the production payment proposal.

44. On December 7, 1960, Naess, during a meeting between Trice and himself, contacted Baker to ascertain if Johns Hopkins had any then present interest in the $1,300,000 production payment and also whether LaPiere should appear before the Finance Committee on January 27, 1961. During this December 7, 1960, meeting Naess also learned that Trice would pay the cost of the University's independent oil consultant.

45. At its December 23, 1960, meeting the Johns Hopkins University Finance Committee again discussed the production payment proposal and at that time learned that Trice Production Co. was willing to pay the cost of the University's independent oil consultant. The Committee decided to discuss the production payment at its January 27, 1961

meeting at which Naess and a representative of W. E. Hutton & Co. were to be present.

46. By letter to Harriman of Naess & Thomas, dated January 4, 1961, LaPiere explained the nature of an oil payment of the type proposed to Hopkins; explained that the seller creates a payment from the properties in an amount equivalent to the financing the properties can support, in this case, $2,700,000; and stated that the amount that the properties can support is determined by independent engineers who had estimated the reserves and income on the properties.

47. By letter to Petroleum Consultants, Inc. dated January 5, 1961, LaPiere stated that W. E. Hutton & Co. and Trice Production Co. would like Petroleum Consultants, Inc. to make a study and to estimate future net oil and gas reserves and cash projections in connection with certain properties of Trice Production Co., and requested that work be started, if possible, on January 9, and that statements be sent to LaPiere at Hutton's address.

48. Harriman, by letter dated January 10, 1961, requested that LaPiere answer certain questions raised by Baker on the production payment deal, and stated that he believed a memorandum to Harriman containing these answers would make easier LaPiere's visit to the Finance Committee meeting on January 27.

49. LaPiere then called Worth McCauley, General Counsel of Trice and conveyed these questions to McCauley and requested that McCauley write the answers to these questions in a letter to LaPiere.

50. By letter, dated January 12, 1961, Worth McCauley replied to LaPiere's request in question-answer form.[13]

---

13. In the same paragraph (No. 2) of his affidavit dated December 10, 1964, in which he affies that he supplied LaPiere with answers by letter dated January 12, 1961, Worth McCauley, as a matter of background, stated:

> During the fall of 1960 and early months of 1961 I knew that efforts were being made by Trice Production Company to sell a package of two production payments in the aggregate amount of $2,700,000, of which it was

51. By letter, dated January 16, 1961, LaPiere replied to Harriman's January 10 request in question-answer form.[14]

contemplated that a part would be sold to a bank and a part would be sold to a single investor or a group of investors. I also knew that W. E. Hutton & Co., to act through Mr. Gilbert H. LaPiere, Manager of the Oil and Gas Department of that firm, had been retained on a commission basis to offer these production payments to a bank and investors and, if possible, negotiate and make the sale of them. As General Counsel for Trice Production Company, I participated in the preparation of documents necessary for consummation of the sale of a production payment for $1,375,000 to Oilco, Inc. in

52. The question-answer portion of the LaPiere-to-Harriman letter of January 16 was identical to the McCauley-to-

October 1960, which was a part of this proposal or package. I know that efforts were being made by the Trice Production Company through W. E. Hutton & Co. to have The Johns Hopkins University purchase the remaining $1,300,000 of this package. In January 1961 I received a telephone call from Mr. LaPiere telling me that a number of questions had been raised by Mr. Henry Baker, Treasurer of The Johns Hopkins University, and requesting me to write a letter to him (Mr. LaPiere) answering these questions which he stated to me over the telephone.

---

14. This letter, written by LaPiere to Harriman, on W. E. Hutton Co. stationery, states as follows:

Mr. Mark Harriman
Naess & Thomas
Investment Counsel
2602 Mathieson Building
Baltimore 2, Maryland
Dear Mark:

In answer to the question which you have proposed relative to the John Hopkins proposed assignment of production payment and net profits overriding royalty interest, I wish to advise as follows:

As you know, Trice Production Company is a Delaware corporation with permits to do business in the States of Texas, Oklahoma, New Mexico, Louisiana, Arkansas, Colorado and Kansas. The principal place of business is Longview, Texas, where the home office is located; and the principal business of the corporation is that of exploring for, finding and marketing oil, gas and other hydrocarbons, and the operation of leasehold estates incident thereto (a leasehold estate being an interest in realty). Trice Production Company presently owns leasehold estates in the above states, some of which are producing properties, and it proposes to make an assignment of a production payment and net profits overriding royalty interest in and to these interests to John Hopkins University.

1. QUESTION: Concerning the buyer's interest, what are we buying exactly, a lien, a claim, a contract, an option, or what?

ANSWER: You are purchasing a production payment of so many dollars payable out of oil in place to be produced based upon reservoir engineer studies of what said properties will produce. This amounts to a conveyance of so much oil to produce the stated amount of dollars and to the extent of the dollars to be paid is an interest in realty.

In addition thereto, after stated number of dollars are returned a net profit amount will be paid from oil produced to repay an amount of interest; and until said amount of interest is repaid said net profit constitutes an overriding royalty interest to the extent of 50 per cent of the net profits realized from the sale of said oil. Thereafter, and after said two sums above stated have been received, there is a residual working interest which vests for the remainder of the life of the property which is an interest in the mineral estate.

QUESTION: What are the specific obligations of the seller of the payment, in this instance Trice?

ANSWER: The obligations of Trice as operator of the properties is to operate the properties as a reasonable prudent operator would operate them, which is assured by the fact that Trice retains an interest in and to said properties.

QUESTION: What can the buyer expect in terms of dollars or oil per year?

ANSWER: The buyer will get those returns in terms of dollars from oil produced as set forth in projection of production from reserves as arrived at by the

LaPiere January 12 correspondence, but for the additions noted below. Among other things, LaPiere stated that the buyer was purchasing a production payment of so many dollars payable out of oil to be produced and the then existing buyer's independent reservoir engineer, i. e., the first estimates were made by DeGayler & MacNaughton of Dallas, Texas and now being checked by Chester Brown who has completed his study of the properties in question and who is associated with the Petroleum Consultants, Inc. of New York City.

QUESTION: What happens to the agreement if allowable production is severely cut, etc?

ANSWER: Should the allowable production be cut, the projected payout of dollars invested would be extended to the extent of the cut in allowables or restrictions on production. However, the oil is there and rapidity by which payout is had would be accelerated by either increasing allowables or an increase in the price of oil and/or gas and would likewise be delayed if allowables were cut.

QUESTION: From whom are we buying the payment?

ANSWER: You are buying the properties from Trice Production Company, the corporation above stated.

2. QUESTION: How exactly is an oil payment secured?

ANSWER: An oil payment is secured by an assignment which is placed of record and constitutes a conveyance, as provided by the terms therein, and to the extent therein provided is a sale of that amount of oil in place. It is in the same status as any other conveyance of realty.

QUESTION: What determines the life of the agreement?

ANSWER: The life of the agreement in this instance would be for the life of the leasehold estates under the stages and phases above set forth.

QUESTION: Can it be terminated; if so, how?

ANSWER: It is terminated by performance in that the production payment is paid, the interest is paid, the residual vests, and as previously stated it extends for the life of the property (in this case, that is, the net profits interest).

3. QUESTION: What are the properties and what do they consist of?

ANSWER: These are leasehold properties located in Texas, Louisiana, Oklahoma and New Mexico.

QUESTION: How long have the wells been in existence?

ANSWER: The wells in question have been in existence less than two years and are considered new properties.

QUESTION: What production is current?

ANSWER: I do not know exactly what is implied in this question; however, the engineer's report, namely, Chester Brown's will show the production history on these properties by past performance and in the present producing status.

QUESTION: Is there any insurance against disaster, fire, earthquakes, etc.?

ANSWER: There is no insurance against the catastrophies above stated; however, ample insurance is carried by Trice Production Company against liability for its operations of the properties and for underground damage in said operations.

QUESTION: What experts have been engaged by whom to do what?

ANSWER: The *only experts that have been engaged are DeGayler & MacNaughton* who made the original estimate *and* now are being checked by *Chester Brown* who has been in Trice's office for some three days making a study of reserves and of said properties. [emphasis supplied].

4. QUESTION: What approximately are the figures on income, expenses, etc., for this particular deal?

ANSWER: The income projection has been set forth in a brochure heretofore furnished, it is substantiated by reservoir engineers' studies as above set forth, and the expenses will be borne by Trice Production Company in closing the deal.

QUESTION: Who are the partners and how does each rank in seniority?

ANSWER: There are no other partners participating in this deal, as it is a sole offering to John Hopkins.

5. QUESTION: Who is to be responsible for legal details, taxes, titles, etc.?

ANSWER: Taxes will be paid by the operator, Trice, as provided in the production payment and net profits overriding royalty interest. Titles have been examined by attorneys who have rendered title opinions based upon examination of records and abstracts. The preparation of papers will be made by an attorney designated by buyer working in conjunction with the Legal Department of Trice

reservoir engineer studies of what said properties would produce (this statement was also contained in the McCauley letter); explained that the buyer would get returns in terms of net revenues from production as arrived at by the buyer's independent reservoir engineers; and stated that the first estimates had been made by D & M and were then being checked by Chester Brown of Petroleum Consultants, Inc (see n. 14, question and answer 1; the McCauley letter to La-Piere included no mention of the earlier D & M estimates); that the *only* experts who had been engaged were D & M, who had made the original estimate, and Brown, who was presently checking such estimates (see n. 14, question and answer 3; the McCauley answer did not mention D & M); that Sherman, Sterling & Wright, counsel to W. E. Hutton & Co., had checked all titles and agreements to their satisfaction (see n. 14, question and answer 5; the McCauley answer did not include this reference to Sherman, Sterling & Wright).

53. The January 16 LaPiere-to-Harriman letter was forwarded by Harriman to Baker.

54. By letter dated January 24, 1961, Baker transmitted to members of the Finance Committee the LaPiere-to-Harriman January 16 letter, and the September 16 brochure, but the brochure was conveyed without the original cover page bearing the date September 16, 1960.

55. LaPiere attended that portion of the January 27, 1961, Johns Hopkins University Finance Committee meeting which related to the production payment.

56. At the January 27, 1961, Finance Committee meeting, Baker stated that based on D & M estimates of production Hopkins would receive during the first four years interest at 6% on funds invested and amortization of the principal in the total amount of about 3%; that during the next four years Hopkins would receive interest at 6% on the declining investment and return of the remainder of the principal of its original investment; that. in the next approximately ten years Hopkins would receive profits from 50% of the production from the wells until a total of $641,000 had been received; and that after the above approximately eighteen years Hopkins would receive 25% of the net profits from these properties during their remaining lifetimes; and that the total receipts, in addition to principal and interest at 6% thereon, were estimated to be $1,138,000. At this same meeting, LaPiere stated that the original D & M estimates with regard to the properties in question were now being checked by Brown of Petroleum Consultants who had been selected by Naess and whose fee would be paid by Trice Production Co. LaPiere further reported, among other things, that Brown's study indicated that the University might produce a total return of $3,005,000 instead of the original D & M estimate of $2,905,000, and that the difference in connection with those figures was due to Brown's estimate of $1,243,000 for the Residual Net Profits Interest—an increase of $100,000 over prior estimates for that interest; that Mr. Brown estimated interest and principal repayment in 6.6,

Production Company. Shearman & Sterling & Wright, W. E. Hutton & Co. counsel, has checked all titles and agreements to their satisfaction.
If there is further information desired, please do not hesitate to let me know.
Sincerely,
Gil
Gilbert H. LaPiere
Manager, Oil & Gas Department

GHL:GH
Enclosures
P. S. I thought I would also enclsoe the different instruments that have to be executed between John Hopkins and Trice Production Company so both you and Harry Baker can look them over before I get down there and if you have any questions before you can call Jim Rowen at Shearman, Sterling & Wright in New York City or Worth McCauley at Trice Production Company in Longview, Texas.

rather than 8.8 years; that the proposed production payment properties included 17 oil wells and 6 gas wells, and that Hopkins would have a first lien on five of those 23 wells; that all estimates were based on then current prices for oil and gas; that at least 6% current interest was guaranteed to Hopkins, and that if production would not be sufficient to keep this current, other provisions would be made; and that other universities had substantial investments in oil payments, although not of this particular kind.

57. At its meeting of January 27, 1961, the Finance Committee of Johns Hopkins University approved the investment of $1,300,000 in the Trice production payment and approved an appropriation of $3,000 for expenses related thereto.

58. At the end of January, 1961, Baker called Cooper of Venable, Baetjer & Howard, counsel to Hopkins, and requested him to look over certain papers regarding the production payment and to offer his comments to Baker.[15]

59. Cooper wrote a memo to the Venable, Baetjer & Howard file on the production payment, dated January 27, 1961, in which he commented on different aspects of the production payment deal and noted certain risks involved therein, but he did not give this memo to Baker.

60. Cooper, after he prepared the memo, called Baker and stated, among other things, that Hopkins should obtain the reports of D & M, Schafer, and Brown, and that it would be helpful if Hopkins would obtain the documents which Bankers Trust had used in connection with its production payment purchase from Trice.

61. After another request from Cooper to get the experts' reports, Baker, on February 6, 1961, telephoned LaPiere

and requested that he send Baker the reports.

62. On or about February 2, 1961, LaPiere wrote to Cliff Trice that Johns Hopkins University had agreed to purchase the $1,300,000 production payment at the Finance Committee meeting on January 27, 1961; that Baker or his attorney would shortly contact Trice; and that Baker had instructed him that any questions which Trice might have should be directed to LaPiere at W. E. Hutton & Co.

63. Baker received from LaPiere a letter, dated February 3, 1961, in which LaPiere stated, among other things, a summary of the Petroleum Consultants, Inc. report which included a total future net revenue figure of $7,394,000 and a return to the holder of the $1,300,000 production payment of $3,005,000, and in which LaPiere compared those figures with those in the September 16, 1960, brochure and stated that he was gratified to know that the figures presented in what he referred to in this letter as his brochure of September 16, 1960, were conservative.

64. At a meeting in Baltimore on February 7, 1961, attended by Baker, Dandridge of Venable, Baetjer & Howard and for a time by Cooper, and also by Worth McCauley and Mitchell of Trice, Mitchell gave to Baker a brochure dated February 3, 1961, entitled "Data Pertinent to Johns Hopkins Production Payment."

65. The February 3, 1961, brochure given by Mitchell to Baker stated, among other things, that some of the twenty-three wells included in the Johns Hopkins production payment had been evaluated by one consulting firm and some by another; that eight wells were evaluated by the engineering staff of Mercantile

---

15. Hutton raises the issue of the credibility of certain of the officials and advisors of Hopkins. Therefore, a question might be said to exist concerning the undisputed nature of those facts which rest on the oral testimony of officials or advisors of Hopkins, such as, for instance, Findings Nos. 58, 60 and

61. However, Mr. Wilson's affidavits show that Hutton itself seems to accept the truthfulness of each of such factual findings as are classified as undisputed in this opinion. In addition, none of such factual findings are essential to the holding in this case.

National Bank and explained the method by which the figures for the eight wells evaluated by Mercantile were calculated; stated that LaPiere had reviewed the technical data for each and every well and concluded that the reserves supporting this proposed production payment were conservative; and, that it was understood that Brown, as a result of his study, felt the reserves utilized in supporting the production payment were conservative. This brochure also showed the following list of net revenue figures and consultants for each well:

| | Net Rev. to Trice Prod. Co. | Reserves based on Following Consultants Reserves |
|---|---|---|
| Nunez A #1 | $ 672,465 | D & M |
| Harry Jones #1 | 334,497 | Schafer |
| Woodworth #1 | 516,111 | Schafer |
| Swinney #1 | 104,674 | Mercantile |
| Dollar #1 | 15,085 | D & M |
| Dugger #1 | 196,676 | D & M |
| Tipps #1 | 304,377 | Mercantile |
| Weatherford #1 | 91,469 | D & M |
| Windle #1 | 394,319 | Mercantile |
| Barham-Knox #1 | 40,219 | D & M |
| J. R. Clayton #2 | 36,062 | Schafer |
| Noland #2, #3, #4 | 179,760 | Schafer |
| Younger #1 | 32,833 | Schafer |
| Milne #1 | 220,981 | D & M |
| R. D. McDonald #1 | 2,041,979 | D & M |
| Bert Dennis #1 | 123,757 | D & M |
| Vera Roney #2 | 19,140 | Mercantile |
| Dumas #1 | 385,500 | Mercantile |
| Hughes #1 | 79,435 | Mercantile |
| Skiles #1 | 47,525 | Mercantile |
| Hester #1 | 723,136 | Mercantile |
| | $6,560,000 | |

66. At the February 10, 1961, meeting of the Johns Hopkins University Finance Committee, it was reported, among other things, that Hopkins, through Venable, Baetjer & Howard, had retained the law firm of Carrington, Johnson & Stephens of Dallas, Texas for certain work with regard to the production payment purchase; that reserves for each of the wells had been analyzed first by either D & M, Schafer, or the Mercantile engineering staff, second by LaPiere of Hutton, and third by Brown of Petroleum Consultants (selected by the University's investment counsel to make a report); and that it was planned to have Naess make further investigations with Bankers Trust and to study the Brown report, and then make recommendations to the University.

67. By letter to Baker dated February 14, 1961, Naess stated that Mercantile National Bank in Dallas held Cliff Trice in high regard; that he had found the assumptions in the Brown report to be reasonable; that he had spoken with Ketcham and had learned that Trice came highly recommended; that Constable of Bankers had spent some time going over the D & M reports, but had not personally made independent estimates; that the number of leases underlying the

Bankers loan was less in number than those underlying the Hopkins loan; that Naess had known Trice for quite a few years and held him in high regard; and, that considering everything, Hopkins should purchase the production payment.

68. LaPiere received a letter from Baker dated February 14, 1961, with enclosures. In that letter Baker stated that he was enclosing excerpts from the Hopkins Finance Committee meetings of October 14, 1960, December 23, 1960, January 27, 1961, and February 10, 1961, having to do with Hopkins' proposed production payment purchase through LaPiere. Also, in that letter, Baker asked LaPiere to let him know if there was anything in those excerpts which indicated a different understanding on Hopkins' part than LaPiere and Trice Production Co. had in mind.[16]

69. By letter dated February 24, 1961, LaPiere conveyed to Baker a balance sheet as of November 30, 1960, and explained the Trice financial picture, and also stated that Hopkins would look to the oil and gas reserves for its guarantee, for no matter who operated the properties, Hopkins' call would be on the reserves.

70. At the February 24, 1961, meeting of the Johns Hopkins University Finance Committee, the Naess letter of February 14, 1961, recommending the purchase by Hopkins was read, mechanical details relating to expenses of the purchase were discussed, and the Treasurer (Baker) was authorized to make the investment which it was understood would be settled for by about March 1, 1961.

71. On March 1, 1961, the closing for the purchase by Johns Hopkins University of the $1,300,000 Trice production

payment was held at the offices of Hopkins' Texas counsel. The production payment agreement between Hopkins and Trice is included in the record in this case.

72. Hopkins'· Texas counsel, at about the time of settlement, received a letter from Trice Production Co. dated February 23, 1961, which stated, among other things, that Trice guaranteed 6% interest per annum on the unpaid monthly balance of $1,300,000 until the Oilco production payment would be liquidated and terminated; that Hopkins would be reimbursed for certain state income taxes and for the Dollar well, should it not go into production; and that that Trice undertaking was in consideration of Hopkins' purchase of the production payment and net profit overriding royalty interests.

73. By letter to William Hutton of W. E. Hutton & Co. dated March 6, 1961, Cliff Trice stated his belief that Hutton had received Trice Production Co.'s $26,000 check for commissions on the $1,300,000 oil payment sale to Johns Hopkins University and expressed his appreciation to Hutton, W. E. Hutton & Co. and to LaPiere for helping Trice with its problems in converting short-term debt to long-term.

74. W. E. Hutton & Co. received a $26,000 check from Trice Production Co., dated March 7, 1961, and this check contained a description which stated that it was for a commission in connection with placement of Trice's $1,300,000 production payment with Johns Hopkins University by LaPiere.

75. Hutton's Customer's Ledger, "Prepaid Expense Trice Oil Payment Syndicate #1" itemizes as follows ex-

---

16. Baker has testified that LaPiere telephoned him on February 15, 1961, and stated that he thought the minutes were all correct. Baker also produced his file copy of his February 14 letter to LaPiere on which appeared a notation, dated February 15, 1961, and initialled by Baker, to the same effect as Baker's testimony. Because of questions of credibility, the Court does not include

the substance of Baker's testimony and notation in these undisputed findings of fact. At the same time, the Court notes that there is nothing in the record to suggest that any evidence might be produced at trial showing that LaPiere wrote an answer to Baker's letter, or that LaPiere did not respond orally in the manner Baker noted.

penses totalling $5,479.80 which Hutton subtracted from the gross commission of $26,000 in order to arrive at a net commission of $20,520.20:

| | | |
|---|---|---|
| | Expenses incurred through Dec. 21, 1960 | $1,933.31 |
| 1/24/61 | Tel. Calls | 126.72 |
| 1/26/61 | Amer. Airlines | 399.19 |
| 2/ 3/61 | Hilton Credit | 59.60 |
| 2/ 8/61 | Tel. calls, Oil Dept. | 229.79 |
| 2/14/61 | G. LaPiere travel | 16.70 |
| 2/21/61 | Pet. Cons. Inc. [$3429.00 | |
| 3/ 8/61 | Minus Ck. Trice Prod. $1,714.50] | 1,714.50 |
| 3/ 9/61 | Fee paid to I. D. (sic) Iglehart oil commission | 1,000.00 |
| | | $5,479.81 |

———◆———

76. LaPiere was paid by Hutton 25% of the net from the $26,000 commission which Hutton received from Trice, so that after deductions for expenses, LaPiere received $5,130.05 in connection with the sale of the $1,300,000 production payment to Johns Hopkins University.

77. By letter to Pelley of Bankers Trust, with a copy to Ketcham, dated February 27, 1961, William Hutton stated that Hutton had been engaged through LaPiere in a refinancing program for Trice over the preceding four months; that in addition to the two prior production payments purchased by Bankers Trust, LaPiere had discussed a third deal involving approximately one million dollars, with Bankers; that Hutton was disappointed that Bankers did not wish to refinance the whole Trice picture; that Hutton continued to have confidence in Trice and would go forward in refinancing Trice; that it would be helpful to Hutton if Bankers would further consider the proposed one million dollar payment; and that Hutton would thus be allowed more time to direct its attention to other institutions to assist it in the overall financing.

78. Bankers refused to participate in further Trice financing because of irregularities found by Constable of Bankers on a visit to Trice on or about March 2 or 3, 1961, and Ketcham and others from Bankers communicated this decision to William Hutton at a meeting on March 9, 1961, at which meeting they also expressed warnings to Hutton to treat the Trice Production Company situation and LaPiere with great care.

79. During the years 1956–1962, partners and relatives of partners of W. E. Hutton & Co. invested over $1,000,000 in Trice Production Co. oil drilling programs, and clients and customers of W. E. Hutton & Co. invested over $2,000,000 in such programs.

80. After receiving a letter, dated March 28, 1961, from LaPiere requesting that he prepare a report for Trice and W. E. Hutton & Co. on certain wells with regard to a proposed new production payment, Brown prepared the report and billed Trice $6,865 for this work, half of which amount was paid by Hutton and half by Trice Production Co.

81. On April 11, 1961, Keusch and LaPiere of Hutton attended a meeting at which Trice presented to Bristol, financial advisor to Princeton University, a proposed production payment for sale to Princeton University, and at which meeting Bristol received a pamphlet, dated March 13, 1961, which described, among other things, Hutton's prior assistance to Trice in the sale of three production payments and Hutton's view of the advantages of a production pay-

ment investment. Princeton did not purchase this proposed production payment because of, among other reasons, an existing defect in Trice working capital.

82. Trice proposed a similar production payment to Guardian Life Insurance Co. and by letter to Trice dated May 31, 1961, LaPiere explained the delays in completing the proposed Princeton and Guardian purchases of payments and also a proposed University of Pennsylvania production payment purchase, as being caused by the necessity of taking time to indoctrinate financial officials of those institutions in the ways of oil payments.

83. In a letter to Trice dated June 15, 1961, LaPiere further explained Guardian's delay in making a purchase by stating that it was necessary to educate Guardian on the principles of an oil payment which, as had been the case with Johns Hopkins University, would be a long tedious matter. Guardian ultimately did not purchase a Trice production payment.

84. LaPiere left the employ of W. E. Hutton & Co. in July, 1961.

85. After he left Hutton's employ, LaPiere, by letter to Trice dated July 19, 1961, described Hopkins' satisfaction at their payment purchase which "we" had presented.

86. By letter to McCauley dated April 12, 1961, Baker stated, among other things, that he understood Trice remittances to Hopkins were first to be credited to the interest due account, that the balance was to be applied to the principal account, and that Hopkins would at least receive the 6% interest payments.

87. By letter to Baker, dated April 19, 1961, McCauley confirmed Baker's understanding stated in the Baker-to-McCauley letter of April 12, 1961.

88. In reply to a letter dated August 3, 1961, from Patterson of Hopkins, Thomas of Trice by letter dated August 14, 1961, presented a schedule which showed that interest owed by Trice to Hopkins was in arrears by over $4,000 through April 25, 1961; and that by June 26, 1961, when interest was no longer in arrears, $569.19 of the payments made to Hopkins had been applied to reduction of principal.

89. By letter to Patterson dated September 18, 1961, Thomas stated that insufficiencies in interest designated on a Trice schedule for April, May, June and August were due to the fact that several of the leases dedicated to the production payment had been underproduced due to a maritime strike, but that this underproduction would be made up in the future.

90. While Hopkins received slightly more than the $6,497.15 interest due to it for the period June 27, 1961, to July 26, 1961, it received almost $200 less than the $6,496.97 interest due it for the period July 27, 1961, to August 25, 1961.

91. With the exception of the period from November 27, 1961, to December 26, 1961 (when it did not receive more than $250 of the interest due it), Hopkins received between approximately $60 and $1500 more than the interest due it for each monthly period from August 26, 1961 to January 26, 1962.

92. As of December 31, 1961, Hopkins had not yet received any revenue from "Pone Gas Unit #1," and from the Dollar well (which had been plugged and abandoned since April 1961), two of the wells covered by its $1,300,000 production payment. Of the wells covered by this payment, nine were either underproducing or not producing as of this time.

93. On January 15, 1962, Trice Production Co. began to negotiate directly with Hopkins for the sale of a second production payment in the amount of $1,000,000.

94. During these negotiations Hopkins and Naess became aware of certain insufficiencies, some substantial, in Trice payments on the Bankers Trust production payment, and that more wells in that payment had underproduced than

overproduced as compared with the engineering estimates furnished to Bankers prior to purchase. Trice's financial situation including the possibility of a Trice bankruptcy was also discussed.

95. Hopkins also became aware, during these negotiations, that the time of payment for both the Bankers and Hopkins production payments would be delayed six months beyond the time estimated for payout.

96. During this period of negotiations, Hopkins also received reports and information disclosing the need of Trice Production Co. for cash and revealing Trice Production Co.'s current assets to be between 3.1 and 3.2 million dollars, and current liabilities to range from approximately 7.7 to approximately 21 million dollars, the latter amount including approximately 13 million dollars in Trice Production Co. notes payable (which notes were represented as having a three-five year maturity period).

97. On February 14, 1962, Hopkins purchased the $1,000,000 production payment from Trice Production Co.[17]

98. From January 27, 1962 to June 26, 1962, Hopkins received amounts in excess of the interest due Hopkins on its $1,300,000 production payment for each of the five monthly accounting periods during this time. Those amounts ranged from approximately $430 to approximately $1900 in excess of the interest due Hopkins.

99. From February 26, 1962 to June 26, 1962, Hopkins received $1991.72 in revenue from its second, or $1,000,000, production payment, and on June 29, 1962, Hopkins received $26,147.06 on this payment.

100. In the first half of June, 1962, Hopkins received from Trice Production Co. two checks totalling in excess of $24,000, as payments on its first and second production payments, and both of these checks were returned for want of sufficient Trice funds after Hopkins had attempted to put them through for payment.

101. On July 13, 1962, Hopkins elected to have Trice Production Co. segregate the funds due Hopkins on the two production payments in an escrow bank account established for Hopkins, rather than implementing a procedure which would have had purchasers of oil and gas from wells covered by the Hopkins production payments make payment directly to Hopkins for their purchases attributable to wells underlying the Hopkins production payments.

102. In July, August and September, 1962, Hopkins was aware that the "Pone Gas Unit #1" of its first production payment, and that the Henry and Carpenter wells of its second production payment, were not then producing.

103. Hopkins was aware in October, 1962, that it had received no revenue from the Butler well of its second production payment.

104. At the July 13, 1962 Hopkins Finance Committee meeting it was reported that Hutton believed that Hopkins' investment was safe but that Hutton recommended that Hopkins arrange for purchasers of production from wells covered by Hopkins' production payments to pay the purchase price for such production directly to Hopkins. At that meeting it was also disclosed the University's investment and legal counsel and Baker were disposed not to implement such a direct payment method at that time but to have Trice immediately deposit Hopkins' share of receipts into an escrow bank account.

105. For the five monthly accounting periods from June 27, 1962, to November 26, 1962, Hopkins received an amount equal to or more than the interest due it on its first production payment for only one of those periods, and substantially less than the amount due to it in

17. In this case Hopkins makes no claim on Hutton for any liability in connection with Hopkins' February 14, 1962 purchase from Trice. Indeed, Hutton does not seem to have acted in that transaction which was negotiated and consummated directly between Hopkins and Trice.

connection with that payment during the other four.

106. Hopkins received less than the amount of interest due it on its second production payment for monthly periods beginning July 1962 and ending October 1962.

107. Hopkins received no revenue for the months of July and August, 1962, from sales from the Hughes and Roney wells covered by its first production payment, and Hopkins was aware of this situation prior to the end of October, 1962.

108. Hopkins was named as a defendant in a suit brought by Strawn Drilling Co. against Trice on July 27, 1962, in which suit Strawn asserted a mechanics' lien for approximately $10,000 of drilling costs with respect to the Butler lease under Hopkins' second production payment; and for which Trice Production Co. agreed to pay the legal costs incurred by Hopkins in this suit.

109. Hopkins received a letter dated August 24, 1962, from a Mr. Loeb, an investor in one or more of Trice's ventures, who informed Hopkins of trouble he was having with regard to his investment in Trice programs, which among other things, included the return of Trice checks marked "No Funds."

110. Hopkins received a letter dated August 27, 1962, from its Texas counsel, which letter advised Hopkins, among other things, to watch the Trice situation closely.

111. On September 7, 1962, Hopkins learned from Hutton representatives that Cliff Trice had formed a finance committee with some of his creditors which would meet on September 10, 1962; that Hopkins should be represented at that meeting in order to protect itself; and that the possibility existed of certain Trice creditors forcing Trice Production Co. into a reorganization or bankruptcy.

112. After the September 10 meeting, Hopkins was informed by its Texas counsel, on September 12, 1962, that a committee of certain Trice Production Co. creditors had taken voting control of Trice Production Co. through a voting trust from Cliff Trice, and that the committee intended to cut down Trice expenses; that Hopkins should not be seated on the committee but should stay in close touch with it; and, that Trice would need approximately $1,000,000 to work out of its problems.

113. Hopkins received a Dun & Bradstreet Analytic Report, dated September 11, 1962, which stated, among other things, that a financial committee, composed of representatives of four major Trice suppliers, an attorney, and three principal investors and/or directors of Trice had been formed; that Trice's financial condition appeared to be deteriorating, with heavy debt well in excess of worth; that suits were outstanding against Trice; and that at least one supplier was holding N.S.F. (not sufficient funds) checks.

114. At the Hopkins Finance Committee meeting on September 14, 1962, it was reported, among other things, that arrangements were then being completed for all purchasers of oil and gas from wells covered by Hopkins' production payments to implement the direct payment method; that a finance committee had been formed to improve the Trice financial position; that Hopkins had received all interest due it through July, 1962; that there would be delays in return of Hopkins' principal beyond original estimates because of late starts in runs to purchasers; that Hopkins was going to keep more detailed records with regard to each well and expected to get a new schedule from its oil consultant predicting the approximate times when it could look forward to receiving estimated principal repayments; and that, while the Trice investments were requiring a great deal of time to supervise, it was believed that they would work out satisfactorily for Hopkins and that the returns would justify the effort and risk.

115. On October 15, 1962, Patterson of Hopkins wrote to Helvenston, revenue accountant of Trice, and, among other

things, requested that the latter explain the wide variations of revenue from individual wells under both production payments.

116. During the latter part of September and much of October, 1962, Hopkins received communications and correspondence advising it of the precariousness of Trice Production Co.'s financial situation, of various law suits brought against Trice, of an involuntary petition in bankruptcy filed against Trice, and of a petition filed by Trice for a Federal Bankruptcy Act Chapter X reorganization, this last communication being part of a Dun & Bradstreet report received by Baker on October 16, 1962.[18]

117. By mid-December, 1962, the Hopkins Finance Committee had learned that it would probably not recover the full principal and interest on its production payments; that the Trustee of Trice Production Co. was seeking to have Trice creditors, participants, and production payment owners agree to remit, for a period of six months, 20% of the proceeds attributable to their respective interests to enable the Trustee to continue his operation of Trice Production Co.; and, that Hopkins had agreed to this arrangement on the condition that the other parties would so agree.

118. By signing, on January 16, 1963, a "Supplement to Assignments of Production Payment," Baker agreed for Hopkins, among other things, that approximately 20% rather than 10% of the proceeds attributable to Hopkins under its production payments would be payable to the Trustee of Trice Production Co. as payment for its conducting Trice operations; that Hopkins would be liable for certain expenses involved in the Trice operation, and the amount of such expenses incurred by Hopkins would be added on to the principal amount of Hopkins' production payment; that Hopkins waived its right to operate properties covered by its production payments; that Hopkins would have the

18. The narrative which follows, in this footnote, is taken from an affidavit of Henry S. Baker, dated February 13, 1967. This material has not been refuted. Nevertheless, the Court does not include it among its undisputed findings because Hutton has challenged Baker's credibility and because there has been no opportunity for Hutton to cross-examine Baker with regard to this material. At the same time, the following is included in this footnote in order to round out somewhat the narrative which unfolds in the undisputed findings of fact.

Baker's affidavit states the following: On November 6, 1962, representatives of Hopkins met with Pelley of Bankers Trust in Baltimore and discussed possibilities for protecting the production payments of Hopkins and Bankers Trust Co., and confirmed that Dandridge and Patterson of Hopkins would go to Dallas, Texas, to meet with Pelley and Stephens, so that they could further familiarize themselves with the Trice situation and ascertain what further steps should be taken to protect the University's investment. Patterson and Dandridge went to Dallas on November 7, 1962, and there Hopkins agreed to share with Bankers Trust the cost of having William Bednar check the physical condition of all the wells subject to the Hopkins and Trice production payments, and of having him make an up-to-date report on the oil and gas reserves subject to these production payments. In January, 1963, Hopkins received a report by Bednar, which showed the estimated future net revenues for the wells covered by the original Hopkins production payment to be less than as they were originally represented to the University.

The Bednar Report, marked for identification as Defendants' Exhibit 193 and received when the deposition of Chester L. Brown was taken October 7, 1964, states estimated production figures (for the wells covered by Hopkins' $1,300,000 production payment) which if considered in the light of production of those wells up to that time, would result in ultimate total production substantially less than any of the prior total estimates presented to Hopkins prior to or after March 1, 1961. The Court places no reliance on anything contained in the Bednar report because it was not introduced in evidence, and because neither party has deposed Bednar or introduced any affidavit made by him. The above statements attributed to Bednar are noted only for the purpose of setting forth the alleged background in connection with Baker's affidavit of February 13, 1967.

power to veto unitization and abandonment decisions; and that this agreement would last for a period of six months.

119. Bankers Trust and its dummy corporation, Oilco, Inc., executed a substantially similar agreement in January of 1963.

120. Baker agreed for Hopkins to the unitization of the Dugger well, which was one of the wells underlying Hopkins' first production payment, with other wells in the Shamburger Lake Unit Field by executing, on January 22, 1963, a ratification agreement which ratified a Unit Agreement and Unit Operating Agreement which affected the unitization.

121. Another one of the wells covered by Hopkins' first production payment, the Nunez, was unitized with other wells in the Theall Field Unit, Louisiana, in April of 1962.

122. The Nunez well was abandoned in early 1963, and in the place of production from Nunez, Hopkins took production from other wells in the Theall Field Unit.

123. After a hearing, which Hopkins' representatives did not attend, an Oklahoma State Commission ordered that the Jones, Woodworth, Dumas and Hester wells covered by the March 1, 1961 payment would be unitized along with ninety-two other wells into the Joiner City Unit, effective May 1, 1965, and on May 19, 1965, Hopkins executed a document ratifying, adopting, and confirming division orders for the Joiner City Unit.

124. The Dollar well of Hopkins' first production payment was plugged and abandoned in April 1961. If Hopkins had timely made claim against Trice for recoupment of $1,500 under the terms of the Trice guarantee, Hopkins could have required Trice to pay that amount to it.

125. The Dennis well of Hopkins' first production payment was plugged and abandoned on January 29, 1962.

126. On July 1, 1965, the Clayton well of Hopkins' first production payment was plugged and abandoned.

127. The following is taken from one or more of the above 126 findings of fact:

## SUMMARY OF CERTAIN OF THE OMISSIONS AND MISSTATEMENTS MADE BY LAPIERE TO HOPKINS

A. *Omissions by LaPiere*

1. D & M estimates for 18 wells totalling $4,021,860.

2. One set Schafer estimates covering 7 of the above referred to 18 wells and totalling $1,783,766; total D & M estimates for those same 7 wells was $1,003,251.

3. Another set of Schafer estimates covering 3 of the above referred to 18 wells and totalling $762,773; total D & M estimates for those same 3 wells was $213,176.

4. A Trice schedule dated August 7, 1960, stating a total estimated future net revenue figure of $5,355,744.

5. Another Trice schedule dated August 7, 1960, showing that the estimates were made solely by D & M for 14 wells, by both D & M and Schafer for 4 wells, and no available analyses for 5 wells.

6. A Trice brochure dated August 8, 1960, showing a total future net revenue figure of $5,083,773 for 29 wells, 23 of which were included in the production payment purchased by Hopkins on March 1, 1961.

B. *Misstatements by LaPiere*

1. By letter dated January 16, 1960, that the only experts that had been engaged were D & M, who had made the original estimates, and later Chester Brown.

2. By oral communication on January 27, 1961, that D & M estimated a return of $2,905,000 as Hopkins' share of the revenue to be produced from the 23 wells.

## SUMMARY JUDGMENT

The core question before this Court is whether plaintiff is entitled, upon the undisputed facts, to summary judgment un-

der Section 12(2) of the '33 Act. The answer to that question requires consideration of (1) Rule 56 of the Federal Rules of Civil Procedure, and (2) Section 12(2) of the '33 Act.[19]

After carefully reviewing the record in this case, this Court concludes under Rule 56 that there are undisputed facts which entitle Hopkins, as a matter of law, to the relief it seeks under Section 12(2). To be sure, many of Hopkins' claims of undisputed fact, in the amended complaint, in motions and in written and oral argument, cannot, in this Court's opinion, be so classified when one carefully examines the record in this case.[20] Such facts, not being undisputed, do not and cannot form any part of the basis of the grant of summary judgment herein. But, regardless of how a jury would dispose of those claims, and even if a jury were to find, upon special interrogatories, for instance, against Hopkins with regard to each and every one of Hopkins' said disputable factual contentions, the facts which in this case are undisputed would nevertheless require judgment, as a matter of law, for Hopkins. In this case no genuine issue, with regard to facts necessary and material to a decision under Section 12(2), remains for trial. As the Supreme Court stated in Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

> Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.Rules Civ.Proc. This rule authorizes summary judgment "only where the moving party is en-

19. Rule 56(c) provides in part:

 \* \* \* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

 Rule 56(e) states:
 (e) *Form of Affidavits; Further Testimony; Defense Required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response,

by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Rule 56(f) provides:
 (f) *When Affidavits are Unavailable.* Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

20. For instance, Hopkins alleges that LaPiere selected Brown and withheld from him the fact that he was *Hopkins'* independent engineer, let him believe that he was an aid to the seller, i.e., Trice, and withheld full disclosure of material data in the D & M and Shafer reports. Hopkins would in effect depict LaPiere in this and in other contexts as an evil man. This Court rejects such allegations in connection with its consideration of Hopkins' motion for summary judgment in view of the existence of possible contrary inferences and questions of credibility involved in resolving them.

titled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." [citation omitted, 368 U.S. at 468, 82 S.Ct. at 488].

In *Poller,* a five-to-four decision, the Supreme Court reversed the grant of summary judgment by the District Court, and affirmance thereof by the Court of Appeals for the District of Columbia. The plaintiff, in *Poller,* charged that defendants had entered into an unlawful conspiracy to eliminate a radio station from the broadcasting field in Milwaukee. The question before the Supreme Court was whether plaintiff's treble damage suit, based on alleged Sherman Act violations, should have been disposed of by granting defendants' motion for summary judgment. Writing for the majority, Mr. Justice Clark stated:

> * * * We look at the record on summary judgment in the light most favorable to Poller, the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. [footnote and citations omitted]. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice." [368 U.S. at 473, 82 S.Ct. at 491].

Dissenting on behalf of himself, and Justices Frankfurter, Whittaker and Stewart, Mr. Justice Harlan, after noting the considerable amount of pre-trial discovery, wrote:

> This crucial issue, therefore, turns on proof of the respondents' motives. Had petitioner proceeded to trial and introduced no more evidence of motive than was revealed by the pretrial depositions and affidavits, the case, in my opinion, could not well have been permitted to go to the jury. There being no extrinsic evidence of an unlawful purpose, and CBS' executives having unequivocally denied any purpose to eliminate petitioner as a competitor, the jury would be left with no affirmative evidence of any intent to restrain trade. The possibility that the jury might disbelieve the respondents' assertions of innocence is not enough to forestall the entry of summary judgment in their favor. [citation omitted].

> Despite the ample opportunity afforded him by the availability of pretrial discovery procedures, petitioner, as will be shown, was able to produce no evidence to support his charges that a conspiracy, narrow or far-reaching, had been hatched. He should not be permitted to proceed to trial just on the hope that in the more formal atmosphere of the courtroom witnesses will revise their testimony or that a clever trial tactic will produce helpful evidence. Courts do not exist to afford opportunities for such litigating gambles. * * * [368 U.S. 479–480, 82 S.Ct. 494–495].

The most recent pronouncement in depth by the Supreme Court concerning the use of Rule 56 is set forth in First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), a five-to-three decision involving a civil anti-trust treble damage action instituted eleven years before reaching the Supreme Court. Cities Service, one of the defendants, was granted summary judgment in the District Court because no genuine issue existed as to any material fact, 38 F.R.D. 170. The Second Circuit affirmed, 361 F.2d 671, as did the Supreme Court. The plaintiff bank complained not only of the alleged improper application of Rule 56 but also because, after eleven years, defendant Cities Service had not filed a

formal answer, and because plaintiff had not been permitted sufficient discovery opportunities. Commenting on *Poller*, Mr. Justice Marshall, for the majority in *Cities Service*, wrote:

* * * This Court held [in *Poller*] that where there was substantial factual evidence tending to show the existence of a conspiracy to eliminate a competitor and where the crucial question was motive, summary judgment was prematurely granted against the plaintiff, notwithstanding the fact that there was also substantial evidence tending to show the nonexistence of conspiratorial behavior.

At first glance the present case seems to present substantial similarities to the situation in *Poller* in that the issue as to Cities' motive in failing to conclude a deal with petitioner is likewise basic to the litigation here. However, there are crucial differences between the two cases. In *Poller* the competitive relationship between CBS and the plaintiff was such that it was plausible for the plaintiff to argue that CBS had embarked on a plan to drive him out of business. In this case, as Waldron has admitted right along, the business relationship between him, Cities, and the other defendants was such that it is much more plausible to believe that Cities' interests coincided, rather than conflicted, with those of petitioner. * * * [391 U.S. at 285, 88 S.Ct. at 1591].

Concluding his discussion of the summary judgment issue in *Cities Service*, Mr. Justice Marshall stated:

Rule 56(e) of the Federal Rules of Civil Procedure states that "when a motion for summary judgment is made and supported * * * an adverse party may not rest upon the mere allegations or denials of his pleading, but his response * * * must set forth specific facts showing that there is a genuine issue for trial." Petitioner contends that the lower courts misapplied Rule 56(e) in this case and erroneously placed the burden on him to show that there was a material issue of fact for trial, rather than first requiring respondent Cities Service, the movant, to demonstrate the absence of a "genuine issue as to any material fact" under Rule 56(c). However, it should be noted that the decisions below did not purport to discuss burden of proof at all. Therefore petitioner must demonstrate that, regardless of what was specifically held, the effect of the decisions below was to so shift the burden of proof.

It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. The case at hand presents peculiar difficulties because the crucial issue of fact to petitioner's case is also an issue of law, namely the existence of a conspiracy. What Rule 56(e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him. [footnote omitted]. Yet the analysis of the facts undertaken above demonstrates that, due to the absence of probative force of Cities' failure to deal with Waldron as being in itself evidence of conspiracy, petitioner's position is, in effect, that he is entitled to rest on the allegations of conspiracy contained in his pleadings. Thus petitioner repeatedly states that Cities has never disproved its participation in the alleged conspiracy, despite the fact that the only evidence of such participation is his allegation that the failure to deal resulted from conspiracy.

Essentially all the lower courts held in this case was that Rule 56(e) placed upon Waldron the burden of producing evidence of the conspiracy he al-

leged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible to the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint. [391 U.S. at 288–290, 88 S.Ct. at 1592–1593].

█ Mr. Justice Black's dissent in *Cities Service*, on behalf of himself, Mr. Chief Justice Warren and Mr. Justice Brennan, states that the majority's judgment therein "cannot possibly be reconciled with" *Poller*, and emphasizes disagreement with the grant of summary judgment against a plaintiff who was afforded "very limited" discovery opportunities over an eleven year period of litigation as contrasted with those which the defendant was permitted to enjoy. (391 U.S. at 299–307, 88 S.Ct. 1575). This latter problem is not present in this case, in which Hutton, opposing summary judgment, has been afforded every opportunity for discovery. Both sides have put this case through the wringer, over and over again, and all relevant evidence has seemingly been obtained, except from one key character in the drama, namely Gilbert LaPiere. Each side could well say that the other could have deposed, or otherwise discovered from, LaPiere, or perhaps have obtained an affidavit from him. The record reveals no reason to believe he is or was at any time unavailable for the taking of his deposition. But while no inference whatsoever is drawn by this Court against Hutton because it did not depose LaPiere, or otherwise discover from him, or obtain his affidavit, Hutton is not entitled to a denial of Hopkins' motion for summary judgment merely because LaPiere might be available to testify and controvert at trial any of the facts which are at this time undisputed on the record. Cf. *Cities Service*, supra.

The situation with regard to LaPiere is not too unlike that which existed in H. B. Zachry Co. v. O'Brien, 378 F.2d 423 (10th Cir. 1967), where the Tenth Circuit affirmed summary judgment for plaintiff, in a construction subcontract action, insofar as issues of liability were concerned. In *Zachry*, the Court noted that two persons, defendant's superintendent and plaintiff's managing partner, had entered into a contractual arrangement; and that only the two of them had the required knowledge of the material facts necessary to resolve the one genuine issue in the case, i. e., whether defendant's superintendent had authority to bind defendant and what he had told or not told plaintiff's managing partner in this regard. The latter's deposition was taken. On the other hand, the defendant's superintendent gave no testimony, either by deposition, interrogatories or affidavit, and was absent in South America (preparing a job for defendant) during the discovery period and also at the time of the summary judgment hearing. The Court, after noting the answer of one of defendant's officers to an interrogatory in which that officer stated that he was advised by defendant's superintendent that the latter was without authority to enter any contract on behalf of defendant, in effect held that such an answer does not meet Rule 56 standards and does not create a genuine factual dispute. The Court cited Bumgarner v. Joe Brown Company, Inc., 376 F.2d 749 (10th Cir. 1967), cert. den., 389 U.S. 831, 88 S.Ct.

99, 19 L.Ed.2d 90 (1967),[21] in which it was stated:

> \* \* \* Neither conclusionary allegations nor general denials perpetuate an issue of fact under Rule 56, and if such undisputed facts effectively pierce the sham of false generality of claims, the case is ripe for summary disposition. [citations omitted]. Nothing contained in Poller v. Columbia Broadcasting System, Inc., [citation omitted] is to the contrary and appellants' [plaintiffs'] reliance thereon is misplaced. [376 F.2d at 750].

Despite the complex nature of this litigation, there is no "genuine issue" to be tried in order to accomplish "even handed justice" (See Poller v. Columbia Broadcasting System, 368 U.S. at 473, 82 S.Ct. 486), and no such issue arises as a result of the "conclusionary" allegations and denials contained in the pleadings and papers filed by defendants. In classifying certain facts as undisputed, and in refusing so to classify other facts, this Court has followed the dictates of the Supreme Court in United States v. Diebold, Inc., 369 U.S. 654, at 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and, in refusing to find certain facts to be undisputed, has drawn all possible factual inferences in favor of defendants. See also: Phoenix Savings and Loan, Inc. v. Aetna Casualty & Surety Co., 381 F.2d 245 (4th Cir. 1967); Pierce v. Ford Motor Co., 190 F.2d 910 (4th Cir. 1951). The facts which this Court is classifying in this opinion as undisputed are established almost entirely by documentary evidence or by non-hostile, non-party witnesses. Where an issue of credibility or of motive is involved or connected with any fact classified as undisputed, this Court is satisfied that the factor of credibility or of motive is minimal. Further, no fact classified as undisputed which is connected in any way with credibility or motive is in any way controlling. Cf. Poller v. Columbia Broad-

casting System, supra; Cram v. Sun Insurance Office, Ltd., 375 F.2d 670 (4th Cir. 1967).

Hutton's continued assertions that there are disputed facts does not make undisputed facts into disputed facts. In Zoby v. American Fidelity Company, 242 F.2d 76 (4th Cir. 1957), summary judgment granted by Judge Hoffman, D.C., 137 F.Supp. 38 in a breach of contract action involving complicated facts was affirmed by the Fourth Circuit. On appeal the plaintiff-appellant contended, among other things, that there was a genuine issue of fact whether defendants had an economic interest in the subject matter of the suit, and that, assuming that they had such interest, there was a genuine issue of fact whether defendants' conduct was motivated by wrongful and fraudulent intentions. Noting this contention, Judge Sobeloff wrote in *Zoby:*

> \* \* \* It is well settled, however, that to resist a motion for summary judgment, the party against whom it is sought must present some evidence to indicate that the facts are in dispute, where the moving party's evidence has shown otherwise; [footnote omitted] and as to the foregoing matters, the record reveals no such evidence. His bare contention that the issue is disputable will not suffice. [242 F.2d at 80].

In this case, Hutton's "bare contention" that there are disputed facts, no matter how often repeated, does not suffice to block summary judgment.

Prior to its decision in *Zoby* the Fourth Circuit had expressed its views numerous times with regard to the appropriate and inappropriate use of Rule 56. In Stevens v. Howard D. Johnson Co., 181 F.2d 390 (4th Cir. 1950), plaintiff appealed from a summary judgment for defendant in an action to recover damages for breach of

---

21. In *Bumgarner*, plaintiffs' employees had claimed unpaid overtime under the Federal Fair Labor Standards Act. The District Court granted summary judgment for the defendant company and the Tenth Circuit affirmed.

a rental contract. The Fourth Circuit held

> that there were substantial issues of fact in this case upon which plaintiff was entitled to trial by jury and that the summary judgment for defendant must be reversed and the case remanded for further proceedings not inconsistent herewith. [181 F.2d at 394].

In so holding, the Court stated:

> A number of questions arise, not only in connection with the breach of the contract, but also in connection with its proper interpretation and the damages recoverable for breach. These, however, should be decided in the light of the evidence which may be adduced upon a trial, not upon the affidavits presented on a motion to dismiss. It must not be forgotten that, in actions at law, trial by jury of disputed questions of fact is guaranteed by the Constitution, and that even questions of law arising in a case involving questions of fact can be more satisfactorily decided when the facts are fully before the court than is possible upon pleadings and affidavits. The motion for summary judgment, authorized by rule 56 Federal Rules of Civil Procedure, 28 U.S.C.A., which in effect legalizes the "speaking" demurrer, has an important place in providing a prompt disposition of cases which have no possible merit and in preventing undue delays in the trial of actions to which there is no real defense; but it should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. [181 F.2d at 393–394].

The year following the *Stevens* decision, in Pierce v. Ford Motor Co., 190 F. 2d 910 (4th Cir. 1951), the Fourth Circuit considered the grant of summary judgment to defendant in a damage action resulting from the blowout of a tire on a new Ford automobile. In *Pierce,* like *Stevens,* the Fourth Circuit reversed and found that "substantial issues of fact [were] involved", and that

"so far as can be judged from the pleadings, examinations and affidavits, they are issues that will have to be passed upon by a jury." Amplifying this statement, Chief Judge Parker wrote:

> From what we have said, it is clear that there were issues in the cases for a jury to decide, and it was error to enter summary judgments for defendant for that reason. It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper. Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented. [190 F.2d at 915].

Several years after its decision in *Zoby,* the Fourth Circuit discussed the use of summary judgment in Clarke v. Montgomery Ward & Company, Inc., 298 F.2d 346 (4th Cir. 1962), in which the Court affirmed summary judgment for defendant in a malicious prosecution suit. After stating what it termed the "strict" standard of summary judgment applied in *Stevens* and *Pierce,* the Court held that the pleadings, depositions, admissions, and affidavits did not raise a material issue of fact as to the existence of probable cause for criminal prosecution, the basis of defendant's defense in that malicious prosecution action. Chief Judge Sobeloff stated that "what constitutes probable cause is a question of law for the judge to decide" and that "summary judgment may properly be entered if the facts which are undisputed make out the defense of probable cause." 298 F.2d at 348. Commenting upon a conclusory statement by plaintiff in an affidavit, Judge Sobeloff wrote that such a "bald allegation", did not raise a genuine issue in a summary judgment context. 298 F.2d at 349.

In Williams v. Howard Johnson's Inc of Washington, 323 F.2d 102 (4th Cir 1963), which was decided by the Fourth Circuit a year after *Clarke*, the plaintiff, Williams, sought damages against the defendant restaurant, under certain civil rights statutes, alleging that defendant refused to serve Williams because he was a Negro. The plaintiff moved for summary judgment and the defendant cross-moved to dismiss the complaint. The District Court dismissed the complaint. On appeal, the Fourth Circuit noted that a good faith misunderstanding as to the nature of the hearing in the District Court had led to unpreparedness on the part of both counsel at the hearing in the District Court, and that there was question as to what part of the record was to be considered by the District Court. The Court of Appeals vacated the dismissal, rather than affirm or reverse, in order to give the parties an opportunity for a full hearing in the District Court on the merits after proper notice. With regard to summary judgment, Judge Sobeloff restated the "no genuine issue as to any material fact" standard and wrote:

> * * * Where the record is such that the court is in doubt, it has the discretion to postpone consideration of the motion for summary judgment until after a hearing on the merits. The principles governing summary judgment procedure should be applied in a common sense manner to the realities of the litigation at hand. Particularly is this true where the trial court is called upon to decide a constitutional question on summary judgment on a potentially inadequate factual presentation. [footnotes omitted, 323 F.2d at 105].

The factual presentation to the Court in the case at bar has been more than adequate to reveal that all facts material to a decision are not in dispute. Unlike the situation in *Williams*, it is clear here that the parties have been properly notified, fully heard, and have been given every opportunity to complete the record.

Phoenix Savings and Loan, Inc. v. Aetna Casualty & Surety Company, 381 F.2d 245 (4th Cir. 1967), involved an action by a successor corporation against the insurer of its predecessor for losses alleged to have been suffered by the predecessor corporation because of fraudulent acts of the latter's officers, employees, agents and/or directors. The District Court granted summary judgment to the defendant insurer and concluded that the knowledge of the fraudulent nature of certain transactions on the part of certain persons who had substantially controlled the predecessor corporation had to be imputed to the plaintiff, and therefore the insurer should be discharged from any liability. The Fourth Circuit reversed, holding that the record disclosed that the question of whether the "three malefactors were employees or whether they had 'substantial control' of Phoenix, at all crucial times when the alleged frauds were perpetrated, is a question of fact in dispute between the parties." The Court noted that "a substantial doubt existed as to the actual amount of the various classes of common stock" owned by the alleged three malefactors. (381 F.2d at 250).

Writing for the Fourth Circuit, District Judge Simons stated:

> It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. Neither should summary judgment be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions. 3 Barron & Holtzoff, Federal Practice & Procedure § 1234 (Rules ed. 1958). Burden is upon party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact, and any doubt as to the existence of such an issue is resolved against him. 3 Barron & Holtzoff, Federal Practice

& Procedure § 1235 (Rules ed. 1958). [381 F.2d at 249].

Judge Simons cited Kirkpatrick v. Consolidated Underwriters, 227 F.2d 228 (4th Cir. 1955) and Pierce v. Ford Motor Co., supra, for the proposition that summary judgment "should be granted only when it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law"; and he cited Cram v. Sun Insurance Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967) and American Fidelity and Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965), for the proposition that, as stated in *Cram,* the "party opposing a motion for summary judgment is entitled to all favorable inferences which can be drawn from the evidence." 375 F.2d at 674. In *American Fidelity* and in *Cram,* ambiguities in the respective contractual instruments therein in question required factual determinations. Near the end of its opinion in *Phoenix,* the Court stated that summary judgment was not the "proper method to dispose of the complex issues of this controversy, inasmuch as there are disputes or controversies as to the historic facts and the inference to be drawn therefrom." 381 F.2d at 252.

Less than a year after *Phoenix,* Judge Simons granted summary judgment for a defendant in an anti-trust action, Ayers v. Pastime Amusement Co., 283 F.Supp. 773 (D.C.S.C., Charleston Div., 1968). The history and record of that case bear striking similarity to the situation in this case. During the "ten year period" of the pendency of the *Ayers* case "numerous depositions, exhibits, and affidavits [had]. * * * been filed by the parties, which indeed constitute[d] a voluminous record." In addition, "numerous motions [had] * * * been made and considered by the court, and orders entered which deal[t] with varied aspects of the litigation," 283 F.Supp. at 778–779.

In granting defendant's motion for summary judgment, the *Ayers* opinion notes that the plaintiffs did not offer enough evidence, either direct or circumstantial, of a conspiracy among defendant and others; that plaintiffs did not raise an issue of material fact as to lack of substantial competition between certain of its theatres and those of defendants; and that plaintiffs did not raise a sufficient issue as to the reasonableness of certain motion picture "clearances" granted defendant by certain film distributors or that such clearances were used pursuant to a conspiracy. The opinion also points out that certain affidavits and depositions presented by plaintiffs in opposition to the defendant's summary judgment motion were conclusory and were totally unsupported by recitation in them of any facts supporting such opinions.

In summarizing his view of the case, insofar as summary judgment is concerned, Judge Simons wrote:

During the extended period of this litigation the parties have made full use of the discovery procedures granted under the Federal Rules. Depositions of most available witnesses have been taken, and countless exhibits and affidavits have been filed. Nevertheless, plaintiffs have failed in their efforts to make out a *prima facie* case against Pastime. Applying the guidelines established by Amended Rule 56 of the Federal Rules of Civil Procedure, it is concluded that plaintiffs have failed to raise a genuine issue of material fact sufficient to defeat Pastime's motion for summary judgment. The evidence construed most favorably in behalf of plaintiffs would require a directed verdict against them, and accordingly the Court should enter summary judgment for defendant in each action. [citations omitted]. A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation. A mere scintilla of evidence is not enough to create an issue. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere

hope that something will turn up at the trial. [283 F.Supp. at 792–793]. See also Dressler v. M. V. Sandpiper, 331 F.2d 130 (2nd Cir. 1964), in which Judge Irving R. Kaufman wrote that if the respondent "were permitted to avoid summary judgment", the attempt of summary judgment procedure "to screen out sham issues of fact would become devoid of practical significance", and "litigants would be enabled to postpone the inevitable to another day—precisely what summary judgment was intended to avoid." 331 F.2d at 133.[22]

22. In Robin Construction Company v. United States, 345 F.2d 610 (3rd Cir. 1965), Judge Freedman, writing for the Third Circuit, expressed similar but more detailed views of Rule 56, as follows:

> In Proctor v. Sagamore Big Game Club, 265 F.2d 196 (3 Cir. 1959), we affirmed the entry of summary judgment in favor of the defendant where plaintiffs failed to challenge the defendant's affidavits except to say that they "expect to prove facts" showing the existence of an agreement which they did not produce and that they had "a well-founded supposition" to support their claim. We quoted from the opinion of Clark, J., in Engl v. Aetna Life Ins. Co., 139 F.2d 469, 473 (2 Cir. 1943), that a party who resists summary judgment cannot hold back his evidence until the time of trial: "* * * [W]e have often held that mere formal denials or general allegations which do not show the facts in detail and with precision are insufficient to prevent the award of summary judgment."
>
> The purpose of summary judgment would be defeated if a party who has obtained by discovery and from affidavits information which he should seek to amplify or test by further discovery, merely rests on a statement of ignorance of the facts. Indeed, subdivision (f) of Rule 56, by affording an opportunity for continuance of an application for summary judgment so as to permit affidavits to be obtained or depositions to be taken or discovery to be had, indicates that absent such effort it is idle to attempt to shrug off the facts which his adversary has presented. As has often been pointed out, one who resists summary judgment but does not contradict the operative facts in his adversary's affidavit must utilize discovery, and suspicion alone without discovery is not enough. See Schneider v. McKesson & Robbins, Incorporated, 254 F.2d 827 (2 Cir. 1958). It is true that Rule 56(f) also authorizes the court in appropriate cases to refuse to enter summary judgment where the party opposing the motion shows a legitimate basis for his inability to present by affidavit the facts essential to justify his opposition; but to take advantage of this provision he must state by affidavit the reason for his inability to do so and these reasons must be genuine and convincing to the court rather than merely colorable. It is not enough to rest upon the uncertainty which broods over all human affairs or to pose philosophic doubts regarding the conclusiveness of evidentiary facts. In the world of speculation such doubts have an honored place, but in the daily affairs of mankind and the intensely practical business of litigation they are put aside as conjectural. In the words of Judge Learned Hand in De Luca v. Atlantic Refining Co., 176 F.2d 421, 423 (2 Cir. 1949), cert. denied 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950), where doubt was sought to be cast upon records on file in the office of the Secretary of State of New York relating to the appointment of the Secretary as agent for service of process on a foreign corporation: "True, it may be too strong to say that it is impossible to conjure up any conceivable answer to them. The original may have been forged; the authentication may be false; there may be a 'surrender of authority' on file which the custodian failed to find. But if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer."
>
> The allegation in the complaint of the agency or authority of those who committed the tort was met by the factual averments of the answers to interrogatories and the defendant's affidavit. The challenge which these facts call for if there is to be a genuine issue is not met by a simple reference to the complaint. The line of decisions of this Court which in the past permitted a litigant to be sheltered against summary judgment by the allegations of his pleading, no matter how much they may have been challenged by detailed and specific affidavits or disclosures in discovery, has been overthrown by the 1963 amendments to Rule 56. One of the amendments added two new sentences at the end of

In an earlier anti-trust action set in summary judgment context, Bond Distributing Co. v. Carling Brewing Co., 325 F.2d 158 (4th Cir. 1963), the Fourth Circuit affirmed Chief Judge Thomsen's grant of summary judgment to defendant on an anti-trust count which was one of five counts in the complaint. In his opinion (32 F.R.D. 409 (D.Md.1963)) which the Fourth Circuit stated "should be read in connection" with its Per Curiam affirmance, Judge Thomsen stated that plaintiff's bare contention that an issue is disputable would not forestall a grant of summary judgment, and he then wrote with regard to *Poller,* supra:

> Although the Supreme Court in Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458, has recently stated that summary judgments are to be used sparingly in complex antitrust litigation where motive and intent play leading roles, this would seem to be an appropriate case for even a sparing use of summary procedures. [citations omitted, 32 F.R.D. at 415].

■ In Walpert v. Bart, et al., 390 F.2d 877 (1968), the Fourth Circuit, in a *Per Curiam* Order, affirmed Judge Northrop's grant of summary judgment to defendants. 280 F.Supp. 1006 (D.Md. 1967). The complaint in that case purported to state a derivative cause of action under the '34 Act, and charged the use of a false and misleading proxy statement.[23] Judge Northrop found that

---

> subdivision (e) of Rule 56: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." The Advisory Committee in proposing' the amendment declared that its purpose was to "overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matter sufficient to show that there is no genuine issue as to a material fact.' The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are 'well-pleaded,' and not supposititious, conclusory, or ultimate. [citations omitted].
> "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doc-

> trine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 Moore's Federal Practice 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, § 1235.1.
> "It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment."
> This amendment must be made fully effective. [345 F.2d at 613–615]

**23.** In *Walpert,* plaintiff's counsel submitted an affidavit in opposition to defendants' Rule 56 motion. Judge Northrop held (280 F.Supp. at 1010), that plaintiff's counsel had "failed to set forth that he had personal knowledge of the things set forth in his affidavit" and therefore, pursuant to Rule 56(e), granted defendants' motion to strike the affidavit. In the case at bar, Mr. John A. Wilson, Hutton's chief counsel, submitted, under Rule 56, a Main Affidavit (305 legal size pages) and a Supplemental Affidavit (143 legal size pages), affying *inter alia,* on the first page of the Main Affidavit:

> * * * I am one of counsel for defendants (Hutton). I am in charge of the defense of action and am familiar with the matters stated in this affidavit, and with all proceedings heretofore had herein.

Mr. Wilson included a similar opening statement in his Supplemental Affidavit. Hopkins moved to strike both Wilson Affidavits under Rule 56(e). The Court, during oral argument, stated that it would

none of the affidavits submitted by plaintiff created any genuine issue of disputed material fact and that defendants had "produced impressive and numerous * * * affidavits and exhibits attesting to their version of the facts." 280 F.Supp. at 1011. Judge Northrop held that plaintiff was barred by laches. Then, after noting plaintiff's contention that summary judgment should not be granted under the views expressed by the Supreme Court in Sartor v. Arkansas National Gas, 321 U.S. 620, 628, 64 S.Ct. 724, 88 L.Ed. 967 (1941), because all of the affidavits relied upon by defendants were their own affidavits, Judge Northrop pointed out that plaintiff had the duty under Rule 56(e) "to show the court that at trial he will be able to produce some fact to shake the credibility of the affiants. Mere hopes are not enough." 280 F.Supp. at 1013. See 6 J. Moore, Fed.Prac. ¶ 56.15[4] 2d ed. 1966.[24]

A review of the law of summary judgment convinces this Court that the grant of summary judgment for plaintiff is proper on the basis of the undisputed facts in this case.

The same basic principles that apply generally to all actions * * * rule the grant or denial of summary judgment in the private * * * type of action [under the Securities Acts]. Only a word need be added. When there is no genuine issue of material fact underlying liability, an interlocutory summary judgment as to liability

may be rendered although there is a genuine factual issue as to the amount of damages that necessitates an appropriate trial of damages. [6 Moore's Federal Practice (2d Ed.) Section 56.17 [54], Page 2667 under the heading: "Securities Act; Securities Exchange Act."]

As the Court must do in each individual action, this Court has determined that there is no triable issue of material fact in this particular case. Cf. Byrnes v. Mutual Life Insurance Co., 217 F.2d 497, 501 (9th Cir. 1954). Furthermore, additional "inquiry into the facts is not desirable to clarify the application of the law" (Zoby v. American Fidelity Co., 242 F.2d 76 (4th Cir. 1957)), since defendants, under the undisputed facts, cannot prevail in this case under any circumstances.

## SECTION 12(2)

■ The legal conclusion reached in this case becomes inescapable upon analysis of the requirements of Section 12(2) of the '33 Act and upon application of the latter to the undisputed facts in this case. Hutton violated Section 12(2) if, as a broker, it offered or sold to Hopkins, a security as defined by Section 2(1) of the '33 Act using the mails, or an instrument of, or communication in, interstate commerce to accomplish the same, by means of an untrue statement of material fact or by omitting to state a material fact necessary in order to render the statements Hutton made not misleading under the circumstances in which the

consider the Wilson Affidavits only as argument, and hereby reaffirms that position. The record clearly discloses that Mr. Wilson had no personal knowledge of the factual occurrences except those which occurred procedurally during the pendency of this case, and those latter facts are themselves disclosed by one or more parts of the record.

24. For some of the other recent Fourth Circuit cases involving summary judgment, see Harner v. John McShain, Inc., 394 F.2d 480 (1968), in which the Court reversed a grant of summary judgment on the grounds that the failure of plaintiff to exercise due care was not the

only permissible inference in that case; Nationwide Mut. Ins. Co. v. New Amsterdam Cas. Co., 376 F.2d 607 (April 3, 1967), in which the Court reversed the judgment below because the record raised a material disputed fact; Melchiorre v. California Canners and Growers, 394 F.2d 413 (1968), in which the facts were characterized as "scarcely in dispute" and in which summary judgment below for defendant was vacated and the case remanded for entry of summary judgment for plaintiff as to liability and for a new trial on the issue of damages; and Rogers v. United States, 397 F.2d 12 (May 20, 1968), in which summary judgment below was reversed.

statements were made; provided that Hopkins did not know of such untruth or omission, that Hutton knew, or in the exercise of reasonable care, could have known of such untruth or omission, and that Hopkins instituted this suit within the Section 13 limitations period. Hopkins' right to rescission rests on whether it has made a tender as required by Section 12(2) and is still in a position to consummate an exchange within such tender requirements.

### Persons Liable

Hutton admits that Hopkins purchased the Trice production payment. Hutton contends that Hutton played a part, but only a minor part, in making the sale to Hopkins. The undisputed facts speak eloquently to the contrary. Hutton, through LaPiere, took a leading role both in offering and in selling Trice production payments to Bankers Trust Company and to Hopkins. For its part in bringing about Hopkins' March 1, 1961, purchase, Hutton received from Trice a 2% commission on $1,300,000, or $26,000. After deducting expenses (including Hutton's $1,714.50 portion of a fee paid to Petroleum Consultants, Inc. and a $1,000 commission to Iglehart), Hutton paid to LaPiere a commission of $5,130.05, or 25% of the net Trice commission paid to Hutton. Beyond the shadow of any doubt Hutton, through La-Piere, was the selling or offering broker of the $1,300,000 production payment purchased by Hopkins. And as stated by Judge Magruder in Cady v. Murphy, 113 F.2d 988, 990 (1940), cert. den. 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940), Section "12(2) imposes a liability for misrepresentation not only upon principals, but also upon brokers when selling securities owned by other persons." See also First Trust and Savings Bank of Lanesville, Ohio v. Fidelity-Philadelphia Trust Co., 214 F.2d 320 (3d Cir. 1954); III Loss, Securities Regulation, 1713 (2d ed. 1961). Hence, Hutton was a "person who offers or sells a security," within the language of Section 12(2), insofar as the transaction involving the production payment purchased by Hopkins on March 1, 1961 is concerned.

In two interrogatories posed to Hutton, Hopkins has asked first, whether LaPiere had "general authority" to write certain letters with regard to the sale of the $1,300,000 Trice production payment (Int. No. 19, 2d Set, Docket No. 33, Aug. 11, 1964), and second, whether he had such authority to make statements ascribed to him in the minutes of January 27, 1961, of the Hopkins Finance Committee (Int. No. 21, 2d Set, Docket No. 33, Aug. 11, 1964). Hutton's answers to these interrogatories were as follows:

In connection with his general authority to find or assist in finding purchasers or prospective purchasers of oil production payments and to perform certain services incident to any sale of an oil production payment *such as those services indicated in defendants' Answer to Interrogatory 18 above,* LaPiere had general authority from defendant to write the letters ascribed to him in defendants' Answer to Plaintiff's Interrogatory 10 served on April 22, 1964 *in so far as there are no inaccuracies contained in said letters. As to such possible inaccuracies, defendants have no present knowledge except that reference is made in a letter, dated February 3, 1961, sent by LaPiere to Hopkins to: "my brochure of September 16, 1960." Defendants believe that reference may be misleading although not intentionally so. For, on information and belief, Trice prepared the brochure of September 16, 1960 and it or a copy thereof was delivered to Henry S. Baker, Treasurer of Hopkins, by Cliff W. Trice, on or about September 21, 1960 during a conference at Hopkins arranged by Ragnar Naess, of Naess & Thomas, Hopkins' investment consultants, who introduced Trice to Hopkins.*

*Further, on information and belief, a copy of the same or substantially the same brochure was transmitted by*

*Cliff W. Trice to Ragnar Naess and received by him with a letter from Cliff W. Trice to Ragnar Naess dated August 30, 1960.* [Ans. to Int. 19, Dkt. 39, Sept. 29, 1964].

In connection with his general authority to find or assist in finding purchasers or prospective purchasers of oil production payments and to perform certain services incident to any sale of an oil production payment *such as those services indicated in defendants' Answer to Interrogatory 18 above,* LaPiere had general authority to make statements of the general character ascribed to him in the excerpts of the minutes of the meeting of the Finance Committee of Hopkins of January 27, 1961 *provided he used reasonable care in ascertaining the truth and completeness of such statements made by him, which defendants believe that he did.* But defendants have no knowledge of the accuracy of the statements as specifically ascribed to him by Hopkins in the excerpts of the minutes of the meeting of the Finance Committee of Hopkins of January 27, 1961. [Ans. to Int. 21, Dkt. 39, Sept. 29, 1964].

The interrogatories, letters and services referred to in the above answers relate to the first Trice production payment purchased by Hopkins.

■ Hopkins objected to the underlined qualifying words in those answers as argumentative, and moved to strike them. This Court denied that motion. However, a principal cannot escape liability for his agent's "apparently authorized" acts simply because the agent acted tortiously without the authorization of the principal so to act and without the principal's knowledge. (Restatement, Agency, Second, § 257 and Comment b thereto). This case is not unlike Murphy v. Cady, 30 F.Supp. 466 (D.C.Me., S.D. 1939), aff'd. *sub nom.* 113 F.2d 988 (1st Cir. 1940), cert. den. 311 U.S.

705, 61 S.Ct. 175 (1940), where liability under Section 12(2) was imposed on defendants, fifteen in number, who constituted a brokerage firm, because of certain false material statements made by their head trader who was an employee and not a partner.[25]

This is not a case like Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967) cert. granted, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 (March 4, 1968), cert. dism. 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85, in which the Ninth Circuit reversed the District Court's holding of ostensible authority and quoted from and relied upon Restatement, Agency, Second, § 258, Comment c for the proposition that "[a] principal is not liable in deceit for unauthorized representations made to a person who has reason to believe that they are not of the sort authorized * * *." The facts in *Kamen* would seem to have called for the application of the principle enunciated in that Restatement Comment, for the Court stated as a fact that the purchaser did not act as a

reasonably prudent person in concluding, and asserting his belief, that the purported agents were possessed with the ostensible authority to offer to him the transaction and promises which they did. The proposed guaranteed profit sales so far departed from propriety and were patently of a sufficiently unusual nature in the light of Aschkar's knowledge and experience as to put him on warning and require him to take some steps to inquire into the extent of authority of the agent. We are constrained to hold that the finding that the agents had ostensible authority was clearly erroneous. We reverse. [382 F.2d at 696].

The Court made the above-quoted statement in holding that the defendant brok-

25. A reading of the opinion at 113 F.2d 988, supra, would seem to indicate that status of Lynch. Furthermore, the testimony set forth in the trial transcript (at pp. 119–20), which is included in the official First Circuit as well as the District Court files in that case, establishes beyond question the fact of Lynch's position as an employee.

erage house was not liable for the acts of its employees under rules of common law agency.

*Kamen,* however, involved a second and additional issue in connection with which the Ninth Circuit sustained the refusal of the trial court—and dismissed plaintiff's cross-appeal from that refusal—to grant relief for violations of Section 12 (2) of the '33 Act and certain sections of the '34 Act. With regard to Section 12 (2), the Ninth Circuit, referring to Section 15 of the '33 Act and its '34 Act counterpart, stated in *Kamen* that no liability under 12(2) existed because the employer was not "a participant" in the fraudulent activities of the employees, nor did it have "any reasonable grounds for believing that such activity was taking place." 382 F.2d at 696–698.[26]

 While this Court accepts the factual analysis set forth in *Kamen,* this Court respectfully does not believe that Section 15, relating to "controlling" persons applies to the employer (brokerage house)—employee relationship.

Section 15, as originally enacted in 1933, read as follows:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. [15 U.S.C.A. § 77*o*].

In 1934 the following words were added to Section 15:

* * * unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist. [15 U.S.C.A. § 77*o*].

 What legislative history there is does not indicate that Congress intended Section 15, originally or as amended, to serve as a limitation on liability.[27] The

---

26. The Court stated in *Kamen* at 697:
 In support of the above contention, cross-appellant cites several cases where the employer was held liable for the acts of his employee where the particular activity was deemed non-delegable. Such cases may be valid propositions of law but they have no application to actions maintained under the Securities Acts. Aschkar sought relief under the Securities Act of 1933. Section 15 of the Act (15 U.S.C. § 77*o*), known as the "Controlling Persons" provision and applicable here, predicates liability upon the controlling person, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." We have already concurred with the trial court in its finding that Kamen was neither a participant, directly or indirectly, in the fraudulent activities of Ross and Grossinger nor did Kamen have any reasonable ground for believing such activities were taking place. Kamen, concededly "a controlling person" is, however, not vicariously liable for the acts of the agent under the provisions of the Securities Act of 1933.
 Relief was also sought under Sections 10 and 15 of the Securities Act of 1934 (15 U.S.C. §§ 78j and 78o) and rules promulgated thereunder. Like the Securities Act of 1933, the 1934 Act contains a "Controlling Persons" provision, Section 20 (15 U.S.C. § 78t(a)). The test of liability there for the controlling person is that he must have acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action. Kamen, as a controlling person, is not liable under this section for reasons already noted. [382 F.2d 697].

27. See H.Rep.No. 152 on H.R. 5480 (Securities Act of 1933), 73d Cong., 1st Sess. 27 (1933); H.Rep. No. 1838 on H.R. 9323 (Securities Exchange Act of 1934), 73d Cong., 2d Sess. 37, 42 (1934); S.Rep. No. 792 on S. 3420 (Securities Exchange Act of 1934), 73d Cong., 2d Sess. 22 (1934); H.Rep. No. 1383 on H.R. 9323, 73d Cong., 2d Sess. 26 (1934). See also Brief for the S.E.C. as Amicus Curiae filed in *Kamen* in

section would seem, on the other hand, to have been intended to establish a "controlling person" liability which would supplement, and extend beyond, common law principles of agency and *respondeat superior*. Insofar as the liability of a brokerage house for its employees is concerned, it is interesting to note that Mr. Justice (then Professor) Douglas, and Professor Bates, in their article, The Federal Securities Act of 1933, 43 Yale L.J. 171 (1933), discussed Section 15 in the context of the liability of issuers but in commenting on the liability of brokers made no mention of or reference to Section 15.

Nor do any of the cases, other than *Kamen*, in which Section 15 is mentioned, indicate in any way that Section 15, and more particularly the "unless" provision thereof, have any application to the liability of a brokerage house for acts or omissions of its employees. Rather, Section 15 has been applied in other contexts. For instance, Whittaker v. Wall, 226 F.2d 868 (8th Cir. 1955), imposed liability on a sales representative of an issuer corporation and on the president of that corporation; and Hawkins v. Merrill, Lynch et al., 85 F.Supp. 104, 123 (W.D.Ark.1949), applied Section 15 and held Merrill, Lynch, et al. liable for activities of one of its Alabama "correspondents."

The legislative history and case law, to the extent there is any, would appear to buttress a construction of Section 15 to exclude application of the latter to an employment relationship. A contrary conclusion would in effect give blessing to a hear-no-evil, see-no-evil approach by partners of a brokerage house which is hardly in keeping with the remedial purposes of the '33 Act—purposes which the Congress and the courts have steadily stressed from 1933 to date.[28]

The facts in *Kamen* may well have been such as to preclude liability under 12(2), because the rather preposterous nature of the statements made to the purchaser (plaintiff) by the two employees of the brokerage house who engaged in the skulduggery was self-evident. But such is not the case herein. LaPiere's departure from the bounds of propriety were limited to material misstatements and material omissions. LaPiere was not engaged in selling the Brooklyn Bridge, or in a preposterous venture. Rather, he was promoting what seemed not only to Hopkins, but also to Bankers Trust, to be a reasonable opportunity to invest in a reputable company, i. e., Trice. In this connection, the undisputed facts in this case disclose that members of the Hutton family invested more than $1,000,000 in Trice's ventures during the 1957–1962 period.

 If Hutton, as the defendant in this case, is not liable under Section 12 (2) for the activities of LaPiere, the manager of its oil and gas department, because, as provided in Section 15, the Hutton partners "had no knowledge of or reasonable ground to believe in the existence of" the D & M and Schafer reports and of LaPiere's statements to, and omission to state to, Hopkins, then the

---

the Supreme Court, docket no. 4 (October term, 1968) at 13–17; Flexner, "The Fight on the Securities Act," Atlantic Monthly (February, 1934), in the Congressional Record, pp. 523–530 (January 12, 1934).

**28.** In Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953), the Supreme Court wrote:
 In response to a Presidential message urging that there be added to the ancient rule of caveat emptor the further doctrine of "let the seller also beware,"[7] Congress passed the Securities Act of 1933. Designed to protect investors,[8] the Act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale.[9] * * *

 **7.** HR Rep No 85, 73d Cong, 1st Sess 2.

 **8.** S Rep No 47, 73d Cong, 1st Sess 1. See Oklahoma-Texas Trust v. S. E. C., 10 Cir., 100 F.2d 888, 891.

 **9.** 48 Stat 74, Preamble; 48 Stat 77, 15 U.S.C. § 77d. See A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500.

partners in Hutton and in other brokerage houses like it can seemingly escape all liability under 12(2) by the simple expedient of making certain "not to know or have reasonable grounds to believe in the existence of the facts by reason of which the liability" of LaPiere or a person like him "is alleged to exist." Such a construction of Section 12(2) and 15 would in effect mean that the partners in a brokerage house who kept their eyes and ears closed to the fraudulent conduct of one of their registered representatives, could reap the harvest of that employee's conduct with impunity. Such a result would leave investors with much shallower protection than was intended by Congress in its passage of the '33 Act and the 1934 amendment to Section 15. Congress could hardly have intended to leave a defrauded investor with the impotent remedy of a 12(2) action against a relatively insubstantial employee when his employer-brokerage house would be invulnerable to suit. Congress, by the 1934 amendment to Section 15, did apparently intend to give a degree of protection to issuers or other selling parties for the wrongdoings of other persons including wrongdoing brokers, but it certainly did not intend to limit a brokerage house's duty to supervise its employees to a passive role based on information which comes or should come to the attention of its partners. Assuming, as this Court does in this opinion, that the Hutton partners "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action" in this case, the '33 Act, nevertheless, in this Court's opinion, makes them responsible for LaPiere's acts and omissions. While this Court notes the absence of any contention by Hutton's counsel that the "unless" provision of Section 15 provides a defense for Hutton, this Court is herein treating the Section 15 question at length in view of the statements in *Kamen,* supra, particularly since those statements apparently form the basis for the petition for certiorari in *Kamen* and the grant of same by the Supreme Court.[29]

### Inter-State

It is clear and undisputed that LaPiere utilized interstate telephone lines and interstate travel facilities as well as the mails in communicating with Hopkins with regard to the Trice production payment, and in making misrepresentations and omissions with regard thereto. Such conduct clearly constituted a "use of any means or instruments of transportation or communication in interstate commerce or of the mails * * *" as provided in Section 12(2). MacClain v. Bules, 275 F.2d 431 (8th Cir. 1960); Blackwell v. Bentsen, 206 F.2d 690 (5th

29. The following appears in 36 U.S.L.W. 3196 (November 7, 1967):

Questions presented: (1) Does securities dealer have non-delegable duty to comply with provisions of Securities Act and Securities Exchange Act? (2) Did controlling persons provisions of Securities Act and Securities Exchange Act lessen duties and responsibilities imposed by common-law upon employers for their employees' fraudulent conduct?

In support of the petition for certiorari in *Kamen,* the Solicitor General, acting for the S.E.C. as amicus curiae, wrote (at pp. 7–8 of Memorandum filed January 17, 1968, in the Supreme Court):

* * * It is the Commission's position that the *antifraud* sections relied on by petitioner render a broker-dealer liable for misrepresentations made by its employees in the course of their employment, and that the exceptions in the special provisions operating *to extend* liability to "controlling persons" who otherwise would not be chargeable do not limit liability in cases such as this.

And after the grant of certiorari, the Solicitor General wrote (at p. 9 of his Brief filed May 23, 1968, in the Supreme Court):

The "controlling-persons" provisions of the securities laws were not designed to deal with customary employer-employee relationships but to remove artificial barriers (by piercing the corporate veil or ignoring "dummy" instrumentalities) against liability of persons who may in fact have caused a violation. Hence, the standards adopted by those provisions are irrelevant to the civil liability of the broker-dealer firm for the frauds of its employees, committed within the scope of their employment.

Cir. 1953); Schillner v. H. Vaughn Clarke & Co., 134 F.2d 875 (2d Cir. 1943). This is true even on the basis of the narrower interpretation of the provision in Kemper v. Lohnes, 173 F.2d 44 (7th Cir. 1944), requiring that the misrepresentations, or representations containing omissions, be themselves made via interstate facilities or the mails.

### Security

■ There is no dispute as to the content of the production payment agreement between Hopkins and Trice. That agreement, entitled "Assignment of Production Payment and Net Profit Overriding Royalty Interest Dated February 23, 1961", has been submitted by both parties as an exhibit on this motion.

Nevertheless, Hutton contends that Hopkins did not purchase a "security" within the meaning of Section 12(2). In so arguing, Hutton offered the following definition of production payment:

A *production payment* * * * represents an interest in oil and gas reserves in the ground to be extracted from known wells. It is purchased for a lump sum in a single transaction. The seller-operator extracts the oil and gas from the ground and pays the proceeds over to the owner of the production payment. [Hutton's Answering Brief in Opposition to Hopkins' Motion for Summary Judgment, at footnote on Page 99].

In its consideration of whether the $1,300,000 production payment purchased by Hopkins constitutes a "security", this Court, for purposes of this motion, accepts the above statement set forth by Hutton.

Hopkins' production payment, giving to it an interest in certain oil and gas reserves to be extracted from the ground by Trice, is similar to the "investment contract" in citrus groves discussed by the Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), involving an injunction action brought by the S.E.C. for violation of Section 12(1) of the '33 Act. In *Howey*, the Court held that a combination of a land sales contract and a service contract covering units of a citrus grove development constituted an "investment contract" which is one of the definitions of a "security" in Section 2(1) of the '33 Act. Under the sales contract the investors (largely individuals without skill in the citrus growing business) purchased plots of land containing citrus trees. Under the service contract the seller retained a leasehold interest in the plots and took charge of cultivating and harvesting the land, marketing the production, and remitting the net proceeds to the investor.

In discussing that total arrangement Mr. Justice Murphy, for the Court, defined an "investment contract" to be

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. Such a definition * * * permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of "the many types of instruments that in our commercial world fall within the ordinary concept of a security." H. Rep. No. 85, 73d Cong. 1st Sess. p. 11. It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. [328 U.S. 298–299, 66 S.Ct. 1103].

In reversing the Fifth Circuit, the Supreme Court rejected the Circuit Court's suggestion

that an investment contract is necessarily missing where the enterprise is not speculative or promotional in character and where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole. The test is whether the scheme involves an investment of

money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value. See S.E.C. v. C. M. Joiner Leasing Corp., supra, 320 U.S. [344] 352, 64 S.Ct. 120, 88 L.Ed. 88. The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae. [328 U.S. at 301, 66 S.Ct. at 1104].

In S.E.C. v. C. M. Joiner Leasing Co., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), relied upon by the Court in *Howey*, the Supreme Court held that the sale of oil leasehold subdivisions by parcels, as part of a well-drilling undertaking, were sales of securities within the meaning of Section 2(1) of the '33 Act. The Court held that the case involved the sale of "investment contracts", if not undivided interests in oil and gas rights and leases, and that the '33 Act was remedial in nature and should be liberally construed. The Court recognized that the statutory terminology, "fractional undivided interest in oil, gas or other mineral rights," might well bear a narrow interpretation, and possibly not cover the type of interest involved in *Joiner*. Nevertheless, the Court emphasized that it did

> not think the draftsmen thereby immunized other forms of contracts and offerings which are proved as matter of fact to answer to such descriptive terms as "investment contracts" and "securities." [320 U.S. at 352, 64 S. Ct. at 124].

And in reply to the point that the leasehold interests in the case were real estate interests, the Court stated that

> [i]n applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. [320 U.S. at 352, 64 S.Ct. at 124].

In Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Supreme Court, in a unanimous opinion written by Mr. Chief Justice Warren, held "a withdrawable capital share in an Illinois savings and loan association" to be a security within the meaning of the '34 Act. Mr. Chief Justice Warren noted that Section 2(1) of the 1933 Act "contains a definition of security virtually identical to that contained in the 1934 Act" (389 U.S. at 335–336, 88 S.Ct. at 553) and cited and relied upon *Joiner* and *Howey*. As the Court did in those cases, the Chief Justice again stressed the remedial policies underlying the Securities and Securities Exchange Acts, and emphasized the need, in considering the term security, to construe such remedial legislation "broadly to effectuate its purpose," and stated that in so doing "form should be disregarded for substance and the emphasis should be on economic reality." (389 U.S. at 336, 88 S.Ct. at 553).

The broad remedial policies of the Securities Act would be defeated if this Court were to construe Hopkins' $1,300,-000 production payment as anything but a security. Hopkins and Bankers Trust both purchased Trice production payments, each of which to a large extent covered identical wells. From their investments, each expected a return of its purchase price plus interest and, in the case of Hopkins, additional profits as well. A reading of the production payment agreement (see especially Art. III, Subsection 1) reveals that, as a practical matter, this return would be derived solely from the efforts of Trice, which also retained an interest in a percentage of the reserves covered by the production payment agreement. This is not a case like Woodward v. Wright, 266 F.2d 108 (1959), in which the Tenth Circuit held that although the interests involved were "fractional undivided interests in oil and gas," they were not "investment contracts" because the purchasers of the interests did not look to the management and efforts of others for a return of and on their investment. Rather, this "transaction contemplates the conduct of a business enterprise by others than the purchasers, the profits or

proceeds of which the purchasers were to share." S.E.C. v. Payne, 35 F.Supp. 873, 878 (S.D.N.Y.1940). The production payment transaction disclosed by the undisputed facts in this case may reveal the sale of an unusual kind of investment device. Nevertheless, this Court holds as a matter of law that the transaction in question involved the sale of an "investment contract" and therefore a security within the meaning of the Securities Act. In so holding, this Court follows the dictates of *Howey,* supra, 328 U.S. at 299, 66 S.Ct. at 1103, and applies "a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." Cf. Continental Marketing Corporation v. S. E.C., 387 F.2d 466, 471 (10th Cir. 1967). See also, S.E.C. v. Crude Oil Corp. of America, 93 F.2d 844 (7th Cir. 1937); Blackwell v. Bentsen, 206 F.2d 690 (5th Cir. 1953)

In contending that Hopkins' production payment was not a "security," defendants have depicted the production payment transaction as a " 'one shot' bilateral contractual arrangement." Hutton supports this characterization by urging that the particular package which Hopkins purchased was offered only to Hopkins. (Hutton's Answering Brief in Opposition to Hopkins' Motion for Summary Judgment, pp. 96–97). But this contention ignores the fact that during the year prior to the purchase by Hopkins of its $1,300,000 production payment on March 1, 1961, a Trice production payment covering eighteen of the same wells included in Hopkins' production payment was purchased by Bankers Trust for $1,375,000 and another smaller production payment was purchased by Bankers Trust for $720,000. And almost a year after the closing for Hopkins' $1,300,000 production payment, Hopkins purchased a second production payment for $1,000,-000. In addition, during this span of years, Trice, and sometimes Hutton, engaged in discussions with regard to possible sales of Trice production payments

with certain other individuals and institutions. While a number of those discussions were conducted directly by Trice with prospective purchasers, it is to be noted that, insofar as the $1,300,000 production payment eventually purchased by Hopkins is concerned, at least forty-four copies of the September 16, 1960, Trice brochure, outlining that payment, were sent by Trice to LaPiere. Although this Court does not accept the argument that mere numbers should answer the question of what constitutes a "security," it does view the Trice program of financing through production payments as being of sufficient magnitude to entitle purchasers to the investor protections afforded by the Securities Act. That Trice also gave Hopkins a guarantee with regard to interest, in its letter dated February 23, 1961, does not alter the investment contract nature of Hopkins' $1,300,000 production payment agreement. Hopkins' clear intention, supported by the emphasis placed by LaPiere and Trice throughout this transaction, was that Hopkins was making an investment in oil and gas "reserves," which investment would return principal, interest, and additional profits to Hopkins. The Trice guarantee gave Hopkins additional rights, but it in no way lessened the "security" character or investment objectives of the production payment. In S.E.C. v. Payne, 35 F.Supp. 873 (S.D.N.Y.1940), the Court held that contracts for the sale and care of foxes which contained a guarantee as to minimum pup production and against certain types of damage, were investment contracts. Although the guarantee in *Payne* was of a more limited duration than that in this case, this Court holds that the guarantee by Trice does not alter the clear investment contract character of the production payment or make it into something other than a "security."

As the Supreme Court noted in S.E.C. v. C. M. Joiner Leasing, supra, 320 U.S. at 350, 351, 64 S.Ct. at 124, the fact that the Hopkins production payment is an "investment contract" does not exclude the possibility that it may also

be a "fractional undivided interest in oil, gas or other mineral rights," see Ouachita v. Willingham, 179 F.Supp. 493 (W.D. Ark., Hot Springs Div. 1959),[30] or even a "profit sharing plan." See S.E.C. v. Addison, 194 F.Supp. 709 (N.D.Tex. 1961). In any event, it is clearly a "security" within the terms of Section 2(1) of the '33 Act.

### Type of Investor

■ Hutton also argues that Hopkins is not the type of investor which the federal Securities Acts are intended to protect. But the cases are replete with instances in which sophisticated investors have been permitted to recover. And nothing in the '33 Act, in its legislative history, or in the case law, suggests that a brokerage firm can withstand liability to an educational institution, whose Finance Committee was composed of leaders in the financial world with limited oil experience (or even with great oil experience), if the manager of the oil department of that brokerage house erroneously states, or omits to state, material facts concerning oil reserves underlying interests which that oil department manager, as an employee of the brokerage firm, takes part in selling to the educational institution.

### Materiality and Misrepresentation

■ To recover under the '33 Act, Hopkins has the burden of proving that LaPiere misrepresented material facts or omitted to disclose material facts necessary to prevent LaPiere's statements from being misleading under the circumstances. The Summary, at page 1197, supra, shows the material facts which, beyond any doubt, LaPiere knew, or should and could have known, from the information provided to him, and the material misstatements or omissions of

this information which he made to Hopkins. This is true whether or not any importance is attached to LaPiere's use of the word "my" in his letter of February 3, 1961, to Baker with regard to the September 16, 1960 brochure. LaPiere, with all of the information and data available to him, had an affirmative duty to be certain that that brochure did not, when considered with all other information made available to Hopkins, misrepresent or omit material facts, regardless of the authorship of that brochure.

■ The misrepresentations and half-truths that LaPiere communicated to Hopkins are clear and undisputed. LaPiere's written communications speak for themselves. The minutes of the Hopkins Finance Committee, containing accounts of LaPiere's statements to the Committee, were submitted to LaPiere by Baker for LaPiere's check. Baker's notation on his file copy of his covering letter forwarding the submitted minutes to LaPiere indicates that LaPiere found those minutes to be accurate. Even if an attack is made on Baker's credibility, i. e., either that he falsified his notation when he made it in February 1961, or that he added it at a later date to make a case out against Hutton, LaPiere still had a duty under 12(2) to let Baker know if LaPiere knew of any material untruth or omission in the minutes. In fact, such a duty was imposed on LaPiere if, in the exercise of reasonable care, he should have known of any material untruth in or omission from the minutes. Indeed, Hutton does not offer or proffer or even allege that Hopkins ever was informed by LaPiere, through oral or written communication, of anything which would indicate that the said minutes contained any material untruth or omission. Hutton cannot avoid summary judgment and

30. See also Moses v. Michael, 292 F.2d 614 (5th Cir. 1961), in which a grant of summary judgment by the District Court for plaintiffs was affirmed. In that case, plaintiffs were assignees of undivided interests in oil and gas leases. No registration statement had been filed and the case was brought under Section

12(1) of the '33 Act. After discussing questions of whether the mails were used, and of whether a security within the meaning of 12(2) was involved, the Fifth Circuit found no genuine issue of material fact existed and resolved all legal questions in favor of the plaintiffs.

be permitted to go to a jury against the background of such a record.

■■■ The materiality of the untruths and omissions is clear. For instance, Wilson, in his Main Affidavit (at pp. 88–89)[31] states:

> * * * ⸤Hopkins' Finance Committee and its agents and representatives failed, in September 1960 and at all times prior to the purchase on March 1, 1961, to obtain and examine any of the reports and estimates made by DeGolyer & MacNaughton or Schafer Engineering. [footnotes omitted]. Had Hopkins done so, it would have been apparent, at the threshold, that DeGolyer & MacNaughton and Schafer Engineering had made no estimates of future net revenue for more than 20% of the 23 wells under Payment No. 1. Hopkins would then, undoubtedly, have terminated further consideration of the purchase, forthwith.

■■■ This Court treats the Wilson Affidavits only as argument and therefore does not view any statements therein as admissions. Nevertheless, even treating the above only as a concession for purposes of argument in connection with the Thirteenth Defense or other defenses of Hutton, this Court finds that the statement does, at the very least, illustrate the materiality of the information possessed by LaPiere with regard to the various reports of estimates on wells covered by the production payment. Similarly, the other facts noted as misstated and omitted in The Summary, supra, are clearly material. This finding is bolstered by the fact that in considering a purchase for a Trice production payment covering eighteen of the wells included in the Hopkins $1,300,-000 payment, Ketcham of Bankers Trust prepared a resume of information contained in the D & M and Schafer reports and also included similar information in a memorandum to the Bankers credit file. "An omission is material if the undisclosed information concerns 'matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered.'" Demarco v. Edens, 390 F.2d 836, 840 (2d Cir. 1968), citing 17 C.F.R. § 230.-405(1).

In List v. Fashion Park, Inc., 340 F.2d 457, 462 (1957), the Second Circuit defined the materiality requirement, with regard to Rule 10b–5, on the basis of Restatement, Torts, § 538(2) (a) as follows: "The basic test of 'materiality' * * * is whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" See also, III Loss, Securities Regulation, p. 1431 (2d ed. 1961). Clearly, the facts omitted and misrepresented by LaPiere are those which a reasonably prudent investor would desire to know before purchasing the production payment, and which a reasonable man would consider important in deciding his course of action in the transaction.[32]

Hopkins alleges that there are other alleged omitted or misrepresented facts with regard to who selected Chester Brown, the latter's instructions when employed, and Brown's report, which allegations are sworn to by Brown. If Brown be believed, those facts would almost surely convince twenty bishops that Hutton violated Section 12(2). But because those alleged facts rest, to a not inconsiderable extent, upon Brown's credibility, this Court cannot and does not consider them in granting summary judgment. If there were not undisputed material facts in this case, unrelated to Brown, establishing material misrepresentations and omissions, this Court would consider the Brown issue as one which should go to the jury.

---

31. This passage from the Wilson Affidavit also raises the question of whether Hopkins should have itself obtained the reports discussed therein. This issue is discussed infra at p. 1221, et seq.

32. In S. E. C. v. Latta, 250 F.Supp. 170 (N.D.Cal.N.Div.1965), the Court granted summary judgment, holding that defendant was misrepresenting and withholding material facts from investors, in violation of § 17(a) (2) of the '33 Act.

### Scienter

█ The holding that Hutton through LaPiere violated Section 12(2) does not require the conclusion that LaPiere was guilty of fraud in the common law sense or that he acted with any evil or improper motive. " * * * [I]t is not necessary [under Section 12(2)] for the vendee in maintaining an action for the recovery of consideration to prove that the vendor intended to deceive him as at common law. It is sufficient if the vendor did deceive the vendee even though the vendor had no such intent." Pennsylvania Co. for Insurances, etc. v. Deckert, 123 F.2d 979, 985 (3d Cir. 1941).

In Thiele v. Shields, 131 F.Supp. 416 (S.D.N.Y.1955), plaintiff brought an action under Section 17(a) of the '33 Act and Rule 10b–5 issued pursuant to Section 10(b) of the '34 Act, to rescind the purchase of certain municipal bonds made in reliance upon false and misleading matter. Defendants moved to dismiss, alleging, *inter alia,* that since Section 12(2) of the '33 Act is subject to a municipal bond exemption, it would be inconsistent to permit civil remedies under 17(a) and 10(b). In denying the motion, Judge Irving Kaufman, then a District Judge, highlighted the breadth of the standard with regard to defendants' state of mind under Section 12(2) when he wrote:

> * * * [T]he potential civil liability for *misrepresentations* under Section 12(2) appears to be much broader than that implied from Section 17(a) (2). All that a plaintiff-purchaser need prove under Section 12(2) is that a statement in a prospectus or oral communication is *in fact* false or is a misleading omission, and that he did not know of such untruth or omission. The section expressly provides that the defendant must "sustain the burden of proof that he did not know, *and in the exercise of reasonable care could not have known,* of such untruth or omission". (Italics supplied.) On the other hand, Sections 17(a) and 10(b) (Rule X–10B–5) do not, on their face, purport to apply to a negligent misrepresentation nor, without an express provision as under 12(2), should they be construed to shift the burden of proving intention, knowledge, or negligence (if applicable) to the defendant. Cf. Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783, 786. But see First Trust & Savings Bank of Zanesville v. Fidelity-Philadelphia Trust Co., D.C.E.D.Pa.1953, 112 F. Supp. 761, 770; Sections 10(b), 17 and 12. Therefore even assuming plaintiff's allegations are based *solely* on a "prospectus or oral communication" within the municipal bond exemption to the stringent liability imposed by Section 12(2), a claim under Sections 17(a) and 10(b) would still be sustainable if knowing or intentional misrepresentation with regard to municipal bonds were alleged (and proven) by the plaintiff. That Congress intended to exempt a seller of municipal bonds from liability for failure to prove that he exercised reasonable care in investigating the truth of a representation is not inconsistent with the subjection to civil liability of the same seller after the purchaser proves that he knowingly misrepresented a fact. Cf. Fischman v. Raytheon Mfg. Co., supra. [131 F.Supp. at 419–420].

█ In other words, the buyer under Section 12(2) does not have to prove that the seller had a subjectively evil state of mind in making false statements or omissions. Further, in order to avoid liability, if all of the other elements of a 12(2) cause of action exist, a seller must show that he did not know of the misstatements or omissions, or could not have known of them, in the exercise of reasonable care. Woodward v. Wright, 266 F.2d 108, 116 (10th Cir. 1959); see also Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

█ The standards of 12(2) are clear when it comes to ascertaining whether LaPiere's conduct is actionable. What did LaPiere know? What could

he have known in the exercise of reasonable care? The undisputed facts speak loudly and clearly as to what information LaPiere had in his possession. There is no evidence in the record that LaPiere did not have, or that it would be possible to prove that he did not have, such information in his possession and that LaPiere did not know and could not have known with the exercise of reasonable diligence that he made material misstatements and material omissions in his communications to Hopkins. See Murphy v. Cady, supra, 30 F.Supp. 466 at 468; Winter v. D. J. & M. Investment & Construction Corp., 185 F. Supp. 943, 947 (S.D.Cal.Cent'l Div.1960)

### Purchaser's Knowledge

 Similarly, Hopkins has shown that it is beyond dispute that it, the purchaser of the production payment, did not know of such untruth or omission. There is no dispute that Hopkins did not see the D & M and Schafer reports, and that Hopkins did not see the various tables and schedules, based in part on those reports, which were in LaPiere's possession. There is no dispute that Hopkins did not receive or obtain reports or estimates of independent engineers which would have revealed a net revenue total for the wells covered by its $1,300,000 production payment lower than the $6,560,000 figure projected to it in the September 16 brochure.

 Hutton does allege that Naess, as an individual, and that Naess & Thomas, as a firm, knew of the August 1960 brochure and its $5,083,773 net reserve estimate, and that Naess therefore should have been put on guard when he and his firm received the September 16, 1960 brochure with the higher $6,560,000 figure. Assuming without holding that since Naess was Hopkins' investment counsellor for many years, any information known by Naess, or his firm, including information given to Naess in August, 1960, at a time when Trice and LaPiere were trying to get Naess to interest Naess' client, Hopkins, in the purchase of a Trice production payment, was

information which is attributable to Hopkins, Hopkins still was never given any information indicating that the $6,560,000 figure was not entirely that of independent engineers. From the time LaPiere and Trice visited with Baker in Baltimore on September 21, 1960, at which time Baker received the September 16, 1960, brochure containing the $6,560,000 estimate, Hopkins received no further information other than that the figure was conservative and was fully justified by the reports of competent engineers. Furthermore, it was not until Baker received the February 3, 1961, brochure from Trice that Hopkins might have learned, though even then through inaccurately reported estimates, that D & M and Schafer had not estimated all of the wells, and that Mercantile National Bank of Dallas had supplied the estimates for five of the wells. While that brochure, despite its estimate misrepresentations, may have conveyed a closer view of the basis for the $6,560,000 net revenue figure, it certainly cannot be considered a correction of the type that would obviate all prior misrepresentations and omissions with regard to the amount and basis of the estimates made to Hopkins. Cf. Loss, III Securities Regulation, 1703–04 (2d ed. 1961).

 Hutton has contended that although Hopkins did not have certain information, such as the reports of D & M and Schafer, Hopkins could and should have obtained such information. Section 12(2), however, does not put upon the purchaser, a duty to investigate. Instead, the Securities Act "relieves the purchaser from the common law obligation of using reasonable prudence * * *." Murphy v. Cady, supra, 30 F. Supp. 466 at 469. Cf. Athas v. Day, 161 F.Supp. 916, 918–919 (D.Colo.1958). The language of Section 12(2) makes that clear when it uses the words "not knowing of such untruth or omission" with regard to the position the purchaser must have been in at the time of purchase in order later to sustain an action under Section 12(2). Those words assume additional importance when contrasted with

the use of the words, "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" which are the words used with respect to the position the seller must have been in at the time of purchase in order later to resist liability under Section 12 (2). Congress, in enacting Section 12 (2), put a burden on the seller to investigate but no such burden upon the buyer. See, Restatement of Torts, § 538, Comment on Subsection 3:(k), and § 540 with regard to absence of the purchaser's duty to investigate. See also Tentative Draft No. 11, April 15, 1965, of that Restatement on § 540.

In Dale v. Rosenfeld, 229 F.2d 855 (2d Cir. 1956), the issue of duty to investigate arose. In that case the Court found that the prospectus in question misrepresented that an underwriter had agreed to undertake a "firm commitment" to underwrite when in fact it had only agreed to use its "best efforts" to sell certain shares. The Second Circuit held that the misrepresentation was a violation of Section 12(2). In response to the defendant's contention that plaintiff had a duty to investigate, Judge Swan, for the Court, wrote:

> Nor can we accept the argument that the statement in the prospectus that "A copy of the Underwriting Agreement may be examined at the offices of the Underwriter" imposes on a purchaser the necessity of examining it to see whether it may supply information the omission of which made the prospectus misleading. Nothing in the words of the prospectus suggested such necessity. If an issuer or underwriter could so simply avoid the risk of a misleading prospectus, the legislative purpose of requiring full disclosure would be defeated and the statute would have little utility.[5]

[5]. Cf. Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 98 L.Ed. 168.

> Availability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus. "Readiness and willingness to disclose are not equivalent to disclosure."[6]

[6]. Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969, 976; see also Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 195 F.2d 838, 843–844 * * *. [229 F.2d at. 858].

This is not a case like Ouachita Industries, Inc. v. Willingham, supra, 179 F.Supp. 493, in which the Court found that the plaintiff had examined all of the records pertinent to the oil interest which plaintiff was purchasing, and that the plaintiff "knew prior to the execution of the assignment * * * the true status of the property of defendants' partnership." (179 F.Supp. at 506). In the case at bar, even though Naess had purchased interests in, and/or had acquired knowledge of, Trice oil ventures prior to September, 1960, including the Trice production payment which Hopkins purchased in March 1961, and even if it is assumed that Naess and anyone connected with his firm are the same as officers of Hopkins, still neither Naess nor anyone connected with his firm, nor anyone in the Hopkins group, ever was given the D & M or Schafer reports, or the Trice schedules—the key pieces of information relating to the reserve estimates communicated to Hopkins. At the suggestion of Hopkins' legal counsel, Baker asked LaPiere for these reports. LaPiere did not supply them to Hopkins, nor did Hopkins see them prior to a year before the commencement of this action. Hutton is not relieved of liability because Hopkins did not press LaPiere harder to produce the reports as requested. On the contrary, LaPiere's failure to do so constituted another material omission.

 The Thirteenth Defense of Hutton would attempt to bar Hopkins on the basis of Hopkins having contributed by its own negligence to its failure to uncover whatever, if any, misstatements or omissions were made by LaPiere. The defenses of contributory negligence or of assumption of risk, however, are not available to a defendant at common law with regard to actions of deceit, and certainly are not available to a defendant under Section 12(2) of the '33 Act. In fact, as discussed infra, the only

defense under Section 12(2) based specifically on the conduct of the plaintiff is that plaintiff did have knowledge of the untruth or omission. Having induced Hopkins to buy and having made material misstatements and omissions, Hutton clearly cannot be permitted in this case to defend by saying that the other information which Hopkins received, or the speculative nature of the transaction, adds up to Hopkins having known of the untruths or omissions.

### Reliance

▮ Furthermore, reliance need not be proved by the plaintiff in order to maintain an action under Section 12(2). Demarco v. Edens, 390 F.2d 836, 841 (2d Cir. 1968); Athas v. Day, 161 F. Supp. 916, 918–919 (D.Colo.1958); III Loss, Securities Regulation 1702–03, 1705–06, n. 72 (2d. ed. 1961).

* * * The Congress intended * * * to "throw the burden of disproving responsibility for reprehensible acts of omission or commission on those who purport to issue statements for the public's reliance" [citation omitted]; and it did not impose the burden of proving reliance on the false statement as a condition of recovery. [Woodward v. Wright, 266 F.2d 108 at 116 (10th Cir. 1959)].

The absence of reliance as an element of a 12(2) case clearly makes such a case more susceptible to disposition by summary judgment.

In Rogen v. Ilikon Corp., 361 F.2d 260 (1st Cir. 1966), plaintiff sued defendant corporation and others under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder, claiming that as a result of a concealment of material facts he sustained damages in the sale to defendant corporation of stock he had held in that corporation. The District Court, 250 F.Supp. 712, granted a motion by defendants for summary judgment on the grounds that there was not, taking the evidence most favorably to plaintiff, any material misrepresentation or non-disclosure and that there was no reliance by plaintiff on such

non-disclosure. The First Circuit reversed, holding that a trier of the facts could have found, on the evidence most favorable to plaintiff, both material non-disclosure by defendants and reliance thereon by plaintiff. In so doing, the Court commented:

We doubt that a case such as this is ordinarily well adapted to disposition on summary judgment procedure. The delicate field of fiduciary relationships where the import of non-action must be assessed in the light of surrounding circumstances may well indicate a preference for the antennae of the fact finder over the cruder instrument of summary judgment. In any event, a period of almost four years is hardly "summary". Nevertheless, we reverse reluctantly. We are cognizant at the time and effort invested by the parties, counsel, and the court. We are impressed by the marshalling of facts and argument in the district court's opinion. But the standard of review is a rigorous one and not even one chink in the armor of decision can be vulnerable to the question: taking the facts and inferences most favorable to the losing party, would a trier of fact nevertheless have to find against him? [footnote omitted, 361 F.2d at 265–266].

Unlike *Rogen*, this case, brought under Section 12(2) of the '33 Act, does not involve the issue of reliance and the varying factual inferences which the element of reliance often raises. Woodward v. Wright, 266 F.2d 108, 116 (10th Cir. 1959). In the case at bar, plaintiff need only show that it did not know of the misstatement or omission upon which it bases the within 12(2) action. Athas v. Day, 161 F.Supp. 916, 918–919 (D.Colo. 1958). In further contrast to *Rogen*, in this case, as discussed above, it is clear that the misstatements or omissions were material because a jury could only find that reasonable men in plaintiff's position would, in determining whether to purchase the production payments, have attached importance to the fact that the D & M and Schafer estimates over-

lapped and, in at least some instances, presented vastly different reserve estimates for the same well.

### Limitations

While Section 12(2) "does not require that the innocent, *before* entering into the transaction, use due diligence to investigate the facts misrepresented by the defrauder," Section 13 of the '33 Act, setting forth the statute of limitations applicable to Section 12(2), does require "that reasonable diligence be used toward discovering the fraud *after* the transaction is completed." Rosenberg v. Hano, 121 F.2d 818, 821 (3d Cir. 1941). (emphasis supplied). See also Section 13 of the '33 Act, supra.

 In this case, there is not one word in all of the pleadings, affidavits and discovery materials, other than the bare assertions of Hutton, to support a finding that prior to November 1, 1962, Hopkins, "by the exercise of reasonable diligence," could or should have discovered LaPiere's untruths and omissions. Indeed, prior to that date, the undisputed facts reveal that plaintiff was not "possessed of sufficient information to reveal" an even partial glimpse of the false and misleading nature of LaPiere's communications, let alone the "entire picture" of his misrepresentations. Cf. Gould v. Tricon, Inc., 272 F.Supp. 385 (S.D.N.Y., 1967).

In Azalea Meats, Inc. v. Muscat, 386 F.2d 5 (1967), the Fifth Circuit warned, in the context of the applicability of a state statute of limitations in a Section 10b-5 action:

> Inevitably the factual issue of due diligence involves, to some extent at least, the state of mind of the person whose conduct is to be measured against this test and it is simply not feasible to resolve such an issue on motion for summary judgment. In the landmark case of Alabama Great Southern RR. Co. v. Louisville and Nashville RR., 224 F.2d 1, 50 A.L.R. 2d 1302 (5th Cir. 1955), Judge Hutcheson, as the organ of the court, wrote: " * * * where motive, in-

tent, subjective feelings and reactions, consciousness and conscience were to be searched, an examination and cross-examination were necessary instruments in obtaining the truth, we have pointed out that and why the issues may not be. disposed of on summary judgment."

Although appellees vigorously insist that appellant's own testimony convicted it of a lack of due diligence, nevertheless there are facts in the record, and appellant assures us there will be more, which indicate that appellant in fact relied upon misrepresentations made by appellees and that its failure to file its suit prior to September 29, 1964, resulted from these untruths rather than from a lack of due diligence on its part. [386 F.2d at 10].

 In *Azalea,* the Fifth Circuit reversed summary judgment below for defendant-seller, holding that there were facts in the record which could have, with regard to the limitations issue, sustained a finding of the exercise of due diligence by plaintiff-purchaser. In *Azalea,* the Court found that facts had to be developed with regard to whether certain of defendants stood in a confidential relationship with plaintiff and, if so, the impact of such relationship on plaintiff's duty to exercise due diligence. (386 F.2d at 9). While the language in *Azalea* is strong in its reversal of summary judgment, the decision must be read in the light of the facts of that case. For Rule 56 "permits summary judgment in any case [where there is a lack of any genuine issue of material fact], and the inquiry must be whether such a judgment is appropriate in the particular case, a question which cannot be resolved by some broad judicial gloss on the rule." Wright, Federal Courts, § 99, p. 387 (1963).

In Morris v. Feldman, Fed.Sec.L.Rep. ¶ 91,427 (S.D.N.Y.1964), Judge Tenney denied plaintiff's motion for summary judgment on the basis of the existence of a disputed question of fact with regard to whether purchasers of securities,

seeking 12(2) rescission of a sale, had complied with Section 13's limitations requirements. In so holding, Judge Tenney stated that the dispute is

> as to what information was actually in plaintiffs' possession, or could have been obtained by the exercise of reasonable diligence, and when.

In this case, as discussed infra, there is no dispute concerning whether plaintiff possessed any of the D & M, Schafer or Mercantile reports or any of the relevant Trice schedules. Further, the facts are clear that plaintiff did not possess such reports or such knowledge as would have required it to obtain such reports after March 1, 1962, and before November 1, 1962.

 Whether reasonable diligence has been exercised in any given case does not, once the facts are established, involve a finding of fact, but rather the application of a standard and therefore a question of law. See Dale v. Rosenfeld, supra, 229 F.2d at 858. There is no material issue of fact to be resolved in the case at bar as to what information Hopkins had in its possession, and as to whether on the basis of that information Hopkins could, in the exercise of reasonable diligence, have known that LaPiere did not disclose to it the true information with regard to the bases for the reserve estimates made to Hopkins. Hence, in this case, only the standard—the rule of law—remains to be applied to established facts. On the state of this record, this Court has no difficulty in ruling as a matter of law that Hopkins' Section 12(2) action herein is not barred by limitations. Even if, before November 1, 1962, Hopkins could have discovered, by the exercise of reasonable diligence, that some of the oil reserves were less than estimated, this discovery would not have led Hopkins to believe that LaPiere had made false material statements and had withheld material information with regard to the bases of those estimates.

### Rescission

Whether Hopkins is entitled to rescission in this case involves no genuine question of disputed fact. The facts are clear both as to the current status of the production payment and as to the changes which have taken place in it since March 1, 1961.

 Hutton, as broker for Trice, is subject to the remedy of rescission. Rescission under Section 12(2) "can be applied without difficulty to an agent of a vendor; the agent, by misrepresentations having effected a sale, is required to take over the securities from the defrauded buyer and to restore to the latter the price he paid." Cady v. Murphy, supra, 113 F.2d at 991. See also III Loss, Securities Regulation, supra, 1714. Hopkins has made a timely tender within the provisions of Section 12(2) by the allegations in its amended complaint.[33] Cf. Moses v. Michael, supra, 292 F.2d at 619; Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269, 273, 274 (10th Cir. 1957); III Loss, Securities Regulation, supra, 1674–75 and 1720. Furthermore, unlike the plaintiff in Huglin v. H. M. Byllesby & Co., 72 F.2d 341 (8th Cir. 1934), which dealt with the Iowa Securities Law, and in which plaintiff had sold to defendant certain shares which plaintiff had, prior to such sale-back, purchased from defendant, Hopkins has not at any time disposed of the production payment and thus has not placed itself in a position in which it could not make tender.

Between March 1, 1961, and the Trice bankruptcy in October, 1962, and between the latter date and the date this suit was instituted and in fact, to the beginning of the year 1968, if not to date, Hopkins

---

33. The record does not disclose whether Hopkins did in fact tender prior to the institution of this suit. Hopkins alleges tender in a paragraph in its original and amended complaint, in which allegations of violations of statutory duty by Hutton are also made. Hutton generally denies the allegations of that paragraph. Such denial does not raise any material issue of fact in view of the legal adequacy of the tender set forth in the complaint itself.

has only taken such steps to protect its investment in the production payment as it believed advisable. There are no questions of fact to be resolved in this regard. Only the legal question remains as to whether, against the background of these facts, Hopkins has done, omitted to do, or permitted something to be done or not to be done, which has so altered the character of the production payment as to require this Court to hold the remedy of rescission unavailable to Hopkins because it cannot now turn over to Hutton a security essentially equivalent to that which Hopkins acquired on March 1, 1961.

The question of what constitutes good tender under the blue sky law rescission provisions has been answered in a number of ways by the Courts. See III Loss, Securities Regulation, supra, 1672, et seq. In one such case, the Massachusetts Supreme Judicial Court has found a tender adequate despite the occurrence of substantial changes in the security. Commissioner of Banks v. Chase Securities Corp., 298 Mass. 285, 329, 10 N.E.2d 472, 498 (1937), appeal dismissed, Chase Securities Corp. v. Husband, 302 U.S. 660, 58 S.Ct. 476, 82 L.Ed. 510 (1938).[34] It is possible that in this case this Court is asked to go even further in finding an adequate tender. And yet nothing which has taken place since March 1, 1961, has caused any substantial change in the production payment which Hopkins purchased. Hopkins' failure, in April, 1961, to press a claim under the Trice guarantee for an amount as small as $1,500 with regard to the Dollar well did not result in any material alteration of the security, the terms of which referred to the possibility of abandonment. The decision of Hopkins to sign the supplemental agreement could reasonably have been determined by Hopkins to be necessary for the very existence and maintenance of its original investment, or of a security as nearly as possible equivalent thereto. Also, the unitizations,[35] and abandonments and plugging of wells covered by Hopkins' $1,300,000 production payment were contemplated by the terms of the production payment agreement executed March 1, 1961.[36]

In finding that Hopkins has made an adequate tender, this Court looks to substance rather than form in order to enforce the broad remedial policies of Section 12(2). Compare III Loss, Securities Regulation, supra, at 1675–76. Hutton, saddled as it is with LaPiere's untruths and omissions, should not be able to shield itself from rescission by complaining that Hopkins used bad judgment in trying to protect its investment. To contend, for example, that Hopkins should have actively contested issues with regard to unitization of oil wells at certain administrative hearings, is merely to second-guess Hopkins and its advisors in their attempts to save their investment. In this connection, it is undisputed that Hopkins had the benefit of legal and engineering advice in the period between the Trice bankruptcy and the institution of this suit.

In Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965), cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), Judge Aldrich, for the First Circuit,

---

34. As Hutton has pointed out on page 111 of its Answering Brief in Opposition to Hopkins' Motion for Summary Judgment, there is a paucity of cases involving the issue of tender under Section 12 of the '33 Act. None of the cases which do involve the issue of tender under Section 12 consider the question of the effect of certain changes in the security, sought to be tendered, which took place as part of the normal course of events contemplated by the security and because of the purchaser's efforts to preserve its investment. See Repass v. Rees, 174 F.

Supp. 898, 906 (D.Colo.1959); Campbell v. Degenther, 97 F.Supp. 975, 978 (W.D. Pa.1951).

35. Unitization is referred to and/or contemplated in the undertaking in the NOW, THEREFORE, paragraph preceding Article I; Article I, Section 1; Article II, Section 1; Article III, Section 7; and Article IV, Section 11.

36. Abandonments and plugging are contemplated by Article III, Section 3 and perhaps by Article III, Section 6.

wrote that when the defrauded person is the seller, the Court in shaping a remedy should, as a general rule, give him, rather than the fraudulent party, the "windfall." 344 F.2d at 786. Noting that there were limits to this dictum, Judge Aldrich wrote:

> * * * If any artist acquired paints by fraud and used them in producing a valuable portrait we should not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale. However, those limits are not reached in the case at bar. * * * [344 F.2d at 787].

▐ Similarly, such limits are not reached in this case. How far a security can be changed in order for a tender under Section 12(2) to be impossible and rescission under Section 12(2) to be unavailable is a matter this Court need not resolve. It need only conclude that the "limits" of an adequate and timely tender were not reached by the changes in the Trice production payment purchased by Hopkins after March 1, 1961.

▐▐ It should also be noted that the language of Section 12 of the '33 Act would seem to allow a tender of a security in which changes have occurred. Under this section a damage remedy is allowed to an aggrieved purchaser *only* "if he no longer owns the security." "It is clear that if the defrauded buyer still owns the security, his only remedy under this section [12] is rescission. He cannot sue for damages unless he has disposed of the stock. See Deckert v. Independence Shares Corp., 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940)." Pfeffer v. Cressaty, 223 F.Supp. 756, 757 (S.D.N.Y.1963). In view of the broad remedial policies underlying Section 12, and the unavailability to him of Section 12(2) damage relief, a purchaser who still owns the security, and who has not unnecessarily changed it, should be allowed to tender that security and receive the benefit of the Section 12 rescission remedy. Once it is determined that Hopkins is entitled to relief under 12(2), the only remaining question is whether the remedy available is rescission or damages. Unless it be held that the changes in the March 1, 1961 production payment after that date constitute a disposal of the security by Hopkins—a conclusion which is not, in this Court's opinion, in any way supported by the undisputed facts—Hopkins' only remedy under 12(2) is by way of rescission. In this Court's view, both the provisions of Section 12(2) and the equities of this case call for the application of the remedy of rescission.

## CONCLUSION

Based on undisputed facts, Hopkins is entitled to an Order requiring rescission under Section 12(2), with respect to the first count of the complaint. That Order should provide for dismissal of all of the other counts of the complaint, contingent upon Hutton's compliance with the aforesaid Order of rescission. Hopkins is asked to prepare and submit such an Order.

## SUPPLEMENTARY OPINION

This Court has this day entered a decree in this case pursuant to the conclusions set forth in its opinion filed August 15, 1968. A number of issues have been presented in the course of the formulation of that decree. Their resolution is discussed in this Supplementary Opinion.

### Court's Power to Make Changes in its Opinion as Originally Filed

▐ After this Court filed its opinion on August 15, 1968, counsel for Hopkins suggested thirty-eight corrections and additions. Except with regard to the correction of typographical, mathematical or inadvertent errors, and except in connection with several clarifying changes, which this Court has today made, the suggestions advanced by Hopkins are herewith declined. For the most part Hopkins asks this Court to make findings of undisputed fact which cannot appropriately be made within the confines of summary judgment. Other changes requested by Hopkins would require this Court to make findings of fact, which,

while undisputed, would in no way alter or control the resolution of the legal issues raised by the Section 12(2) count in this case. Obviously, even in an opinion as lengthy as the one filed by this Court on August 15, 1968, every undisputed fact can hardly be culled from a record of thousands of pages and set forth in the opinion itself.

Hutton, in reply, not only opposes almost all of Hopkins' suggested changes, but maintains that except for correction of typographical errors and the like, this Court should make no changes in its opinion as filed.

This [writes Hutton's counsel in a Memorandum presented to this Court] is a long and complicated case and the question presently at issue is whether there exist for trial genuine issues of material fact. On appeal, the weight and emphasis the Court gave the many facts involved, its selection of certain facts as material and undisputed and its exclusion of others as being of no or little consequence, are of crucial importance. It is the Court's Opinion as written by the Court which discloses the process by which the Court resolved the manifold questions raised by the case. The comprehension and accuracy with which the Court considered and wrote its Opinion are therefore essential matters for proper evaluation on review. The Opinion as it stands is the best evidence of the Court's understanding, interpretation, and application of the facts—and the facts are the crux of decision on summary judgment. [Hutton's Memorandum dated September 26, 1968, pp. 2–3].

■ This Court, as stated above, is making certain changes in its opinion as originally filed. A memorandum referring to each such change is being placed in the Court file. This Court believes that it clearly possesses the power to recall all of its opinion as originally filed and to change it as it sees fit in its discretion. The record in this case speaks for itself. It, and it alone, compels legal results and determinations.

### Deaths of Four of the Original Defendants

■ Austin E. Casey, an original defendant in this case, died January 1, 1964. A suggestion of his death was filed in these proceedings on November 23, 1965, pursuant to Rule 25 of the Federal Rules of Civil Procedure. A. Hunt Marckwald, another original defendant herein, died July 1, 1966. A suggestion of his death was filed in this case on July 19, 1966. No motion for substitution was made by any of the parties to this case, or by the successors or representatives of either such deceased defendant, within the ninety day period after the filing of the suggestion of death as provided in Rule 25. Therefore, in accordance with the provisions of that rule, the complaint in this case is dismissed as to each of said two deceased defendants.

■ James M. Hutton, Jr. and Vernon H. Hall 2d were also originally named defendants in the instant action. The former died on December 26, 1967; the latter on July 4, 1967. Suggestions of death were filed pursuant to Rule 25 on September 4, 1968, with respect to James M. Hutton, Jr. and on September 16, 1968, with respect to Vernon H. Hall 2d. Motions for substitution of the respective executors of the estates of the said two deceased defendants were subsequently filed herein, followed by service thereof upon both of those executors. No answer and no notice of opposition with respect to either such motion has been filed in, or made known to, this Court. Therefore, the substitution as defendants herein, of James M. Hutton, III, Executor of the Estate of James M. Hutton, Jr., Deceased, and of Robyn B. Hall, Vernon H. Hall, III, and Dudley Hall, Executors of the Estate of Vernon H. Hall 2d, Deceased, is hereby ordered.

### Rate of Interest

Section 12 of the Securities Act of 1933 provides that a purchaser of a security who is entitled to relief under that section shall "recover the consideration paid for such security with interest

thereon, less the amount of any income received thereon, upon the tender of such security." This statute thus establishes a right to pre-judgment interest but does not set a specific rate.[1]

Congress, in enacting Section 12, acted against the background of both extensive state legislation and familiar equitable remedies. Hopkins urges that the maximum legal rate of the forum state must be applied and cites as authority Circle Line Sightseeing Yachts, Inc. v. Storbeck, 325 F.2d 338 (2d Cir. 1963) and Messina v. Mutual Benefit Health and Accident Association, 228 F. Supp. 865 (D.D.C.1964). However, those cases involve the construction of state and local statutes, rather than the appropriateness of incorporating state standards into a federal remedial statute with nationwide scope. The latter is the issue to be resolved in this case. For the equitable goals sought to be achieved by Section 12 could be frustrated in states with very high or low legal rates of interest if those state standards were deemed automatically controlling. "Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes." D'Oench Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 472, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring).[2] Nor does there appear to

---

1. In certain other federal statutes the Congress has fixed the rate of pre-judgment interest. See, e. g., 46 U.S.C. § 743 (4%, or higher if specified by contract, on money judgments in certain cases of libel in personam); 28 U.S.C. § 2411 (6%, or 4% in certain cases, in connection with internal revenue taxes); 28 U.S.C. § 2516 (4% on judgments against the United States in the Court of Claims which are affirmed by the Supreme Court). Also compare 28 U.S.C. § 2674 which bars pre-judgment interest in cases brought under the Federal Tort Claims Act.

2. Mr. Justice Jackson, concurring:
 * * * The federal courts have no general common law, as in a sense they have no general or comprehensive jurisprudence of any kind, because many subjects of private law which bulk large in the traditional common law are ordinarily within the province of the states and not of the Federal government. But this is not to say that wherever we have occasion to decide a Federal question which cannot be answered from Federal statutes alone we may not resort to all of the source materials of the common law or that when we have fashioned an answer it does not become a part of the Federal non-statutory or common law.
 I do not understand Justice Brandeis's statement in Erie R. Co. v. Tompkins, 304 U.S. 64 at 78 [58 S.Ct. 817, 82 L.Ed. 1188, 1194, 114 A.L.R. 1487] that "There is no federal general common law," to deny that the common law may in proper cases be an aid to or the basis of decision of Federal questions. In its context it means to me only that Federal courts may not apply their own notions of the common law at variance with applicable state decisions except "where the Constitution, treaties, or statutes of the United States [so] require or provide." * * *
 Were we bereft of the common law, our Federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself.
 *　*　*　*　*
 A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, Federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present. Board of Commissioners [of Jackson County] v. United States, 308 U.S. 343, 350 [60 S.Ct. 285] 84 L.Ed. 313, 316. [footnotes omitted; 315 U.S. at 469-472, 62 S.Ct. at 684-686].

be any convincing local policy which would compel this result. Cf. Reconstruction Finance Corp. v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946).[3] Since Congress has not seen fit either to prescribe a specific rate of interest or to express a preference for the use of the maximum legal rates in effect in the various states, this Court believes that the remedial ends of Section 12 can best be served by a judicial determination of the rate of interest required by the equitable considerations present in each individual case. Cf. Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Hart and Wechsler, The Federal Courts and the Federal System, 706–708 (1953).

Interest is imposed under the Securities Act of 1933 to compensate fairly the defrauded purchaser for the loss of the use of his money. See Collier v. Granger, 258 F.Supp. 717 (S.D.N.Y. 1966). The comparative states of the money market at the times of purchase and of rescission are important factors in determining a compensatory rate of interest. See Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F. 2d 389 (4th Cir. 1962); Montgomery-Ward & Co. v. Collins Estate, Inc., 268 F.2d 830 (4th Cir. 1959); Chesapeake & Ohio Ry. v. Elk Refining Co., 186 F. 2d 30, 36 A.L.R.2d 329 (4th Cir. 1950). Hopkins is in a different position than are plaintiffs injured by breach of contract or tortious conduct by another. Such plaintiffs may have had to borrow cash to meet expenses incurred as a result of such breach of contract or tortious conduct, because they required the use of that cash before a favorable verdict could be obtained. See Moore-McCormick Lines, Inc. v. Richardson, 295 F.2d 583, 594, 96 A.L.R.2d 1085 (2d Cir. 1961). In such cases the status quo can perhaps be re-established by the court's utilizing the interest rate charged to the injured party. In this case Hopkins was simply an investor anticipating a return on its investment. In order to place Hopkins in the position it would have been in were it not for the violations by LaPiere of the standards of Section 12, an examination is required to determine what Hopkins could reasonably have been expected to earn by a similar type of investment. This is the approach used by Judge Winter (sitting by designation as a District Judge) in Baumel v. Rosen, 283 F.Supp. 128, 148 (D.Md. 1968). Cf. Moore-McCormack Lines, Inc. v. Richardson, supra, 295 F.2d at 595; Hartford National Bank & Trust Co. v. E. F. Drew & Co., 188 F.Supp. 347 (D. Del.1960), affirmed 290 F.2d 589 (3d Cir. 1961).

The $1,300,000 production payment transaction included an undertaking to pay to Hopkins "the equivalent of interest" at the rate of six percent per annum (Article I, §§ 1, 4), plus, in addition, net profit overriding royalty interests in the property after the termination of the production payment (Article II). The Trice brochures predicted additional earnings which, when calculated, exceed the six percent figure (see Findings of Fact 32, 33 and 54). And LaPiere represented to Hopkins that those earning estimates were conservative on the basis of the information he possessed (see Findings of Fact 56 and 63). A similar Trice production payment sold the year before, calling for payment of the "equivalent of interest" at the rate of six percent per annum, was subscribed to by Bankers Trust through Hutton's brokerage efforts (see Findings of Fact 22–26). Those undisputed facts establish, at the very least, that Hutton, an experienced brokerage firm, considered six percent per annum a reasonable rate of return in 1960 and in 1961, as did Bankers Trust, an experienced investor.

3. Congress has the power to create and define the rights and remedies of parties dealing in securities in interstate commerce. The federal courts, therefore, are not invading the legislative province of the states when they apply the "federal common law" to fill in specific details which Congress has omitted. See Hart and Wechsler, The Federal Courts and the Federal System, 697–699 (1953).

Hutton has submitted to this Court certain data concerning prime interest rates during the period March, 1961–October, 1968, and has asked this Court to take judicial notice of the same. So doing, this Court notes that on March 1, 1961, the prime rate was 4½% per annum, or 1½% below 6%. At no time during the said period was the prime rate below the 4½% rate in effect on March 1, 1961. Indeed, Hutton's data shows that for almost half of that period the prime rate was at least a full percentage point above the March 1, 1961 rate of 4½%. Thus, Hutton's statistics demonstrate that if the reasonable level of return for the type of investment purchased by Hopkins was six percent in the late part of 1960 and in the early part of 1961, that reasonable level cannot be said to have dipped below six percent during the years which have intervened because of comparisons or relationships with or to prime interest rates.

This Court concludes that Hopkins could reasonably have expected to earn six percent per annum on its investment between March 1, 1961 and December 10, 1968. Therefore, this Court hereby requires defendants to pay simple interest on the outstanding consideration paid by Hopkins to Trice, at the rate of six percent per annum. Actually, it could well be argued that that rate should be higher in order to compensate Hopkins adequately. Both the net profits overriding royalty interests provisions (Article II) and the representations of Trice and LaPiere (see Finding of Fact 56) suggest a range in excess of six percent. However, this Court's decree calls for rescission, not specific performance. The rate of six percent is selected because this Court believes Hopkins could reasonably have expected a six percent return on the type of investment involved. Even though Hopkins might have earned more than six percent on the production payment it purchased from Trice if LaPiere's conduct had not violated Section 12 standards, Hopkins, in a rescission context, is only entitled to interest at the six percent rate.

It is contended by Hutton, and even apparently conceded by Hopkins, that the Maryland maximum legal rate of six percent per annum poses a rate ceiling beyond which this Court should not venture. As discussed supra, such a state maximum may or may not be binding upon a federal court acting in the context of enforcement of federal statutory requirements and policies. However, the question of a rate over and above the Maryland legal rate does not need to be answered herein in view of this Court's conclusion that six percent is the appropriate equitable rescission rate under the uncontroverted factual circumstances of this case.

### Consideration and Income as Those Words Are Used in Section 12

Hutton urges that in order to achieve a fair result this Court should direct Hopkins to pay interest to Hutton on the income which Hopkins received from the production payment from the dates each payment of income was so received. Hutton argues that despite the silence of Section 12 in this regard, as opposed to its affirmative provision awarding interest to Hopkins on the consideration, this Court has the discretionary power and duty to award such interest to Hutton so that equity will be done.

There does not appear to be any relevant legislative history on this particular question. See III Loss, Securities Regulation, 1720–21. A strict construction of the remedial language of Section 12 could lead to the conclusion that Congress intended that the benefit of interest be given only to the defrauded purchaser. It may also be argued that any ambiguities present in the statute should be resolved in favor of the defrauded party so that he, rather than the wrongdoer, should obtain any resulting "windfalls." Cf. Jannigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965); cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). On the other hand, since this statute should be read against the background of the common law of rescission which has evolved in the federal courts, it is possi-

ble that this Court has the power to construe the statute so as to provide for such relief as equitable considerations dictate. See Royal Indemnity Co. v. United States, supra; Collier v. Granger, supra. This Court need not decide whether it has such power in this case, however, because it concludes that a just result is achieved by strictly reading the terms of the statute as applied to the type of investment involved herein. In so doing, this Court is guided by the purpose underlying the rescission remedy—to place the buyer and seller (or Hutton, for Section 12 purposes) in the same positions they would have been in but for LaPiere's violations of Section 12 standards. In other words, the status quo ante should be ascertained and then restored as nearly as possible.

■■■■■ The production payment purchased by Hopkins from Hutton is not prevented from being a security by the comparative complexity of its provisions. But Section 12's rescission remedy is more easily analyzed in the context of the sale and purchase of a given number of shares of stock, pursuant to which the seller retains the consideration over the period of investment and the buyer receives during that period interest or dividends.[4] It is clear that during the investment period, the buyer has the use of the income which it receives and the seller has the use of the consideration paid by the purchasers. If the transaction has been tainted by material misrepresentations and omissions on the part of the seller, and the remedy of rescission becomes applicable, the buyer will receive the consideration he has paid, with interest at the rate which the buyer could reasonably have expected to earn by an investment of the same type. If the buyer has in fact received some income from the rescinded deal, the status quo ante will be reached by crediting the seller with the amount of income that the buyer did in fact receive. It should be noted that to award interest to the

seller on this latter amount would put the buyer in a worse, and the seller in a better, position that the status quo ante. A fair result thus comports exactly with the terms of the Section 12 rescission remedy —that the defrauded purchaser should recover "the consideration paid for such security with interest thereon, less the amount of any income received thereon."

■■■■■ Further, to award interest to a seller on the "income" received by the buyer would require, in order to reach a just result, the parallel award of interest to the buyer on the interest already imposed as compensation for the income which the buyer reasonably could have expected to earn. There is, of course, no general principle that precludes an award of interest on such income. See Railroad Credit Corp. v. Hawkins, 80 F.2d 818 (4th Cir. 1936). However, given the specific terms of Section 12, this result could be achieved only if this Court determined that it had the equitable power to, in effect, rewrite the remedial language of the statute. Judicial revision of the specific terms of a statute is of a different order than filling in gaps on points where Congress has remained silent. It should be considered only when necessitated by compelling reasons of policy reviewed in the light of the legislative purpose. Cf. Burnett v. New York Central R. R., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965); Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). This Court believes that an equitable result is achieved in this case by applying the terms of the statute to the type of investment involved herein and does not consider it appropriate to award interest to Hutton on the "income" received by Hopkins and to Hopkins on the income which Hopkins could reasonably have expected to earn. There are, therefore, no persuasive policy considerations at hand which require an examination of this Court's power to rewrite the language of Section 12.

4. For the sake of simplicity, it is assumed in this example that the market value of the stock remains constant throughout the investment period.

■ The transaction involved in this case differs from the hypothetical example set out above in that the $1,300,000 consideration paid by Hopkins was to be repaid in increments during the investment period. Proceeds from the production of the wells were to be applied first to the "equivalent of interest" payments, second to certain taxes that might be due, and third to the repayment of the primary sum (see Article I, § 2). And, as the amount of the primary sum retained by Trice was reduced, the sum payable to Hopkins as "the equivalent of interest" was to be scaled to six percent of the monthly unpaid balance (see Article I, § 4). Thus, only payments received by Hopkins as "the equivalent of interest" can be correctly classified as "income" as that word is used in Section 12. The partial repayments of the primary sum were reductions of "consideration" as that word is used in the statute. And the amounts to be applied to taxes were payments for that purpose, and are therefore not to be classified as either "income" or "consideration."

■■ Hopkins incurred a number of expenses, legal, accounting and engineering, in connection with this suit and in handling its March 1, 1961 investment with Trice. However, those expenses do not figure in the determinations of consideration, interest and income as those words are used in Section 12. But, in addition, Hopkins returned to the Trustee for Trice, pursuant to the supplemental agreement (referred to in Finding 118) the sum of $3142.36 to enable Trice to have sufficient funds to operate the properties underlying Hopkins' production payment. At a later date, Hopkins, for the same reason, paid to Trice Production Company (reorganized) the sum of $20,302.73. That these payments were in fact made by Hopkins to the Trustee and to the reorganized company is not disputed by Hutton. Nor does Hutton dispute the fact that Hopkins and Trice applied those two return payments by Hopkins as credits against income and thus as reductions of the total income received by Hopkins. This Court will also so apply them. While the terms of the production payment agreement itself (Article I, §§ 5, 8) do not literally so require, they clearly so suggest.[5] Further, equitable considerations would seem to entitle Hopkins not to be charged with having received a total figure, labelled income, which includes sums which were returned by Hopkins to Trice or its successors. Hutton argues that Hopkins should, at the very least, be required affirmatively to prove that the sums so paid were reasonable. But Hutton is in Trice's shoes and cannot complain that Hopkins paid back to Trice, out of income received from Trice by Hopkins, sums which, arguendo, Trice did not

5. Article I, Section 5 provides:
 If any of the proceeds of the sale of oil, gas and other minerals attributable to the production payment hereby granted shall be withheld for any reason whatsoever, then such proceeds shall not be deemed to have accrued to Johns Hopkins until such proceeds have actually been received by Johns Hopkins; or, if at any time either before or after the receipt of the full net aggregate amount above provided for in Section 1 hereof, Johns Hopkins shall be compelled to pay over the proceeds from the sale of any such oil, gas and other minerals theretofore received or to make any payment on account of oil, gas and other minerals taken by Johns Hopkins in kind, the amount of such proceeds or such payment (plus all amounts which Johns Hopkins shall be compelled to pay in the nature of interest, damages and penalty) shall not be deemed to have accrued or be attributable to Johns Hopkins and shall be restored to the primary sum and liquidated and paid in the same manner.
 Article I, Section 8 provides:
 None of the development or operating costs or other similar expenses incurred in operating and developing the Contract Properties or in treating or storing the oil, gas and other minerals produced therefrom, nor any part of any royalty or other burden (except the Oilco Production Payment which is an additional burden) shall be borne by Johns Hopkins, and Trice shall hold and save Johns Hopkins harmless from all such costs, expenses and liabilities.

need, in whole or in part, to continue Trice's operation of the properties underlying Hopkins' production payment. Thus, income under Section 12, as calculated in this case, should exclude the two sums of $3142.36 and $20,302.73.

In this case the amount of the consideration paid by Hopkins to Trice did not remain constant during the period between the date of purchase, i. e. March 1, 1961 and the date of the decree of rescission, i. e. December 10, 1968. Thus, it is necessary to determine the amount of consideration outstanding from time to time during that period and to calculate interest on the consideration outstanding during the fractional parts of that period which add up to the total period.

█ In this case, the "consideration" which Hopkins is entitled to receive at this time is the original $1,300,000 less the repayments of principal received by Hopkins. To that figure, there should be added interest at the rate of six percent per annum on the consideration outstanding and unreturned from time to time. From the resulting figure, there should be deducted the total of the payments received by Hopkins as the equivalent of interest. Thus, Hopkins will recover the consideration originally paid by it and not repaid to it, with interest on the consideration outstanding from time to time, less the income received by it.

### Date From Which Interest Runs

Having determined that Hopkins is entitled to prejudgment interest at a rate of six percent per annum on the consideration outstanding from time to time, this Court must now fix the date from which the award of interest begins to run. Section 12 is silent on this point.

█ Under the common law relating to fraud and deceit, that date was the date on which the fraudulent sale was made, "notwithstanding the fact that damages were not fixed, or frozen, until the stock was subsequently sold." Collier v. Granger, 258 F.Supp., supra, at 719. Since the purpose of awarding interest to the defrauded purchaser is to compensate him for the amount which he could have safely earned by the use of his money, the choice of any later date would amount to a decree of less than full compensation. Cf. Chesapeake & Ohio Ry. v. Elk Refining Co., 186 F.2d 30, 33 (4th Cir. 1950).

█ Hutton argues that interest runs only from the time that Hopkins' claim became liquidated or ascertainable. That date, Hutton asserts, was when Hopkins submitted to this Court and to Hutton, after August 15, 1968, a definitive statement of the income Hopkins received from the production payment. Compare United States v. Moore-McCormick Lines, Inc., 199 F.Supp. 522, 530 (D.Md.1961), reversed on other grounds 308 F.2d 866 (4th Cir. 1962). But Hutton is obligated by Section 12 to pay interest on the consideration paid for the security. And that amount was fixed by developments on and after the date of the sale. While Hopkins' claim may not perhaps be deemed "liquidated," as that term has sometimes been used in tort and contract law, this Court does not believe that Congress intended "the hoary distinction between 'liquidated' and 'unliquidated' claims, criticized by eminent authority well before * * * 1920,"[6] to be mechanically applied when such application would thwart the compensatory purposes of the remedial legislation set forth in Section 12.[7]

---

6. Chief Judge Lumbard in Moore-McCormick Lines, Inc. v. Richardson, 295 F.2d supra, at 592.

7. Even if the resolution of this issue turned on whether Hopkins' claim is "fixed" or "variable," or "liquidated" or "unliquidated," the result urged by Hutton would still not automatically follow. Where the plaintiff's claim was in fact fixed

and part variable, it has not been unknown for the courts to impose interest on the fixed part of the claim from the date it became due and to defer the date for interest to commence on the remainder of the claim until such time as that remainder portion should become fixed and known. See, e. g., Ward v. Hellis, 103 F.2d 519 modifying 102 F.2d 519 (5th Cir. 1939). And, in Chesapeake & Ohio

### Attorney's Fees

■ Section 11(e) of the '33 Act gives the Court discretionary authority, in a suit brought under Section 12, to require the defendant to pay "reasonable attorney fees" if it "believes * * * the defense to have been without merit." 15 U.S.C.A. § 77k(e). A Section 12 defense "without merit" is one bordering on frivolity or interposed in bad faith. Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10th Cir. 1964); Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269 (10th Cir. 1957). See Katz v. Delka Research Corp. of New Jersey, 295 F.Supp. 647 (S.D.N.Y. March 29, 1968). Although Hutton has been unsuccessful in avoiding liability under Section 12, the record does not reveal that the totality of Hutton's defense in this long and complex case bordered on frivolity or was made in bad faith.

In urging that this Court impose the cost of attorney fees on Hutton, Hopkins stresses the long delay between institution of this suit and the date of the decree. But a large part of that delay was unavoidable: both sides engaged in very extensive discovery and, as this Court notes in its main opinion, "put this case through the wringer." Hopkins focused its investigations principally upon the past activities of one person—Gilbert LaPiere—who had previously left Hutton's employ. Hutton examined closely into the actions of those agents of Hopkins and Trice who negotiated with LaPiere and had other contact with the production payment transaction. Those investigations were not mere academic exercises. They were of importance in the context of Section 12(2) in determining what Hopkins knew. Their very scope and precision made possible a decision on summary judgment. They might have had even more importance, or at least been of more benefit to Hutton, in connection with the common law and other statutory counts not based on Section 12.

Certainly some of the delays in this case were due to actions by Hutton. Nevertheless, this Court must also in fairness say that another factor was the reluctance of the attorneys on both sides to cooperate with each other, even to the extent of their being unable to reach agreement on many minor procedural questions. This Court therefore had to be an active referee over a period of quite a few years, and at one juncture found it necessary to appoint a special master to resolve discovery conflicts. To make at this time a post hoc analysis and allocate the blame for delays is an impossible task which would challenge the ability of a topflight researcher with a penchant for delving into a mountain of

Ry. v. Elk Refining Co., supra, a case involving a tort claim arising out of a railway crossing accident, the Court said:

* * * [W]e think that the judge was in error in not including in the award interest to the time of trial. The damage was done in May 1948, and the award was not made until May 1950, two years later. While not liquidated in the strict sense of the term, the damage was readily ascertainable at the time; and, if plaintiffs are allowed in the judgment only the amount of the damage that was sustained two years before the award, it is manifest that they have not been awarded full compensation. An award two years after an injury occurs is certainly not the equivalent of an award made at the time of the injury; and the great weight of authority is to the effect that full compensation for damage to or destruction of property requires that, even in the case of unliquidated demands, account be taken of the period that has elapsed between the damage and the award and that allowance be made for interest. In some states this allowance is made as a matter of legal right, in others it is within the discretion of the assessor of the damages [citations omitted; 186 F.2d at 33].

Further, in this case, the original consideration paid by Hopkins, i. e., $1,300,-000, clearly became a known, liquidated amount on March 1, 1961. The reductions, i. e. the repayments of principal, became certain and liquidated and known to Hopkins and Trice as they were paid by Trice to Hopkins. Hutton, chargable with what Trice knew, can hardly contend that Hutton did not know the amounts of those fixed, certain payments as they were made.

words exceeding, in actual physical volume, the area of many an archeological dig. This Court declines to undertake that task. The only alternative to complete denial of Hopkins' request for imposition of penalties upon Hutton would be to perform a surgical feat by taking a sword and following Solomon's edict: "Divide the living child in two, and give half to the one, and half to the other." KINGS I, 3:24–27. But Solomon ended the incident by not dividing the child. And this Court believes it inadvisable to attempt any division of blame in this case at this time.

Hopkins contends that once all the facts came to light in the discovery process, it was obvious that a finding of Hutton's liability was inevitable. The suggestion is that Hutton showed bad faith by interposing legal defenses. But it must be noted that the principal original thrust of Hopkins' suit was actual fraud alleged on the part of LaPiere. The existence of such fraud is not only not assumed by this Court but is and has been rejected in the summary judgment context in which this Court has acted. Furthermore, Hopkins instituted this action under Sections 10(b) and 15(c) (1) of the '34 Act, Section 17(a) of the '33 Act, and Rules 10b–3 and 10b–5 of the S.E.C., as well as under Section 12 (2) of the '33 Act. In addition, there are common law counts. Hutton's defenses, which this Court has rejected with respect to the Section 12(2) count, may not have been so rejected in connection with each of the other counts. Further, with respect to Section 12(2), while this Court was not persuaded by Hutton's arguments, all of those contentions cannot, in this Court's judgment, be classified as frivolous, or as bordering upon bad faith, or as being, per se without legal merit. Under such circumstances, this Court holds that it would be improper for it to impose the burden of attorney fees on Hutton and therefore declines so to do.

Hopkins also seeks the imposition of attorney's fees under Rule 37 of the Federal Rules of Civil Procedure because of Hutton's failure to comply with requirements imposed by the discovery rules. Hopkins notes that in 1965 it asked for an order requiring Hutton to pay to Hopkins reasonable expenses including reasonable attorney's fees because of Hutton's refusal to respond, as required by the discovery rules, without substantial justification or good reason. What has been said earlier by this Court in connection with Hopkins' Section 11 request applies with equal force with regard to Hopkins' Rule 37 petition. Both in 1965, and as of this date, the record discloses that it was and is almost impossible totally and entirely to assess blame on one of the parties hereto for a particular controversy between their counsel, whether related to discovery or any other item, including simple matters of scheduling.

*Form of Decree*

At this Court's request counsel for Hopkins and Hutton negotiated with respect to the form of the decree and the form of the assignments of the production payment and of the letter of guaranty, within the framework of the opinion filed by this Court on August 15, 1968. In so doing, both of the parties noted on the record their respective exceptions to a number of the determinations made by this Court and reserved their rights to appeal with regard thereto. The contentions of the parties with regard to questions pertaining to interest, expenses and attorneys fees have been dealt with supra. The parties have agreed upon the allocation of court costs subject to the right of either or both of them to request a redetermination of such allocation in the event of a remand or reversal of the decree of this Court.

Hutton requested that there be only one re-assignment document and that document include the assignment of both the production payment and the letter of guaranty. Because rescission aims to restore the status quo, by reversing intervening acts to the fullest extent possible, and because Hopkins and Trice originally utilized two separate docu-

ments, namely, (1) an assignment of the production payment and overriding royalty interest and (2) a separate letter of guaranty, this Court, while attaching little or no significance to whether there should be one or two reassignment documents, is requiring the use of two separate reassignment documents.

 Hutton contends that the warranty in the production payment reassignment document should not be limited to the production payment itself but should extend to the underlying properties. But Hopkins did not purchase any interest in those underlying properties. Therefore, Hopkins' warranty should be limited to what it did or did not do in the exercise of its dominion over what it purchased, namely, the production payment.

 Hopkins, on the other hand, contends that it should only have to warrant against those of its own acts of which Hopkins presently has knowledge. Hopkins also takes exception to the refusal of this Court to exclude as possible agents of Hopkins any officer, agent, employee or representative of Trice. This Court is requiring Hopkins to warrant against any contracts or agreements or affirmative acts of Hopkins or its agents. A seller, or a broker in the shoes of a seller, is certainly entitled, when required to accept a reassignment in the context of a decree of rescission, to know of all contracts, agreements, or affirmative acts entered into or taken by the buyer or its agents, and it is hardly unfair to place upon the buyer the burden of so informing the broker. The buyer, on the other hand, can hardly be asked to warrant against all lack of action.

Whether Trice or any of its officers, agents, employees or representatives at any time acted as agent or agents of Hopkins depends upon whether Hopkins ever constituted Trice or any of Trice's officers, agents, employees or representatives as Hopkins' agents or ever clothed one or more of them with the authority of agent. Neither this Court nor Hutton has any way of knowing whether Hopkins ever so did with regard to Hopkins' interest in the production payment between March 1, 1961 and the date of the decree herein, i. e. December 10, 1968, and whether if Hopkins ever so did, any such agent ever exercised any such authority. If any agent of Hopkins, whether Trice, or one of Trice's officers, agents, employees or representatives, or any other person or entity, ever entered into any contract or agreement or undertook any affirmative act other than those specifically listed in the reassignment documents with regard to the production payment, then Hutton is entitled to claim the benefits of the protection of the warranty set forth in those documents. However, neither the 1961 production payment agreement or anything in the record discloses anything which would appear to constitute Trice or any of its officers, agents, employees or representatives as the agent or agents of Hopkins. But this does not mean that Hutton should be deprived of the opportunity of establishing by evidence at a date or dates subsequent hereto that the contrary was true at one or more times while Hopkins owned the 1961 production payment.

*Kamen & Co. v. Paul H. Aschkar & Co.*

Since this Court filed its opinion on August 15, 1968, the Supreme Court of the United States has dismissed certiorari in *Kamen* under Rule 60[8] of that Court. 382 F.2d 689 (9th Cir. 1967) cert. granted 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 (March 4, 1968) cert. dismissed 393 U.S. 801, 89 S.Ct. 40, 21

8. Rule 60 provides, in part:
1. Whenever the parties thereto shall, by their attorneys of record, file with the clerk an agreement in writing that an appeal, petition for or writ of certiorari, or motion for leave to file or petition for an extraordinary writ be dismissed, specifying the terms as respects costs, and shall pay to the clerk any fees that may be due him, the clerk shall, without further reference to the court, enter an order of dismissal. [U.S.Sup.Ct. Rule 60, 28 U.S.C.A.].

L.Ed.2d 85 (Sept. 3, 1968). In view of the lengthy discussion of *Kamen* in this Court's August 15 opinion, it seemed well herein to note the further and final development with regard to that case.

## DECREE

In accordance with the Opinion of the Court filed August 15, 1968, as supplemented by Opinion to be filed, and upon all of the papers filed by the plaintiff and the defendants with respect to the proposed Decree submitted by plaintiff and, also, with respect to the plaintiff's application for attorneys' fees and expenses pursuant to 15 U.S.C. Section 77k and Rule 37 of the Federal Rules of Civil Procedure, and plaintiff and defendants having been heard on October 4, 1968, it is this 10th day of December, 1968, by the United States District Court for the District of Maryland, hereby

Ordered, adjudged and decreed that:

1. The defendants William E. Hutton; Joseph A. W. Iglehart; James J. Lee; William C. Miller; Earl K. Bassett; John M. Bleakie; Ernest E. Keusch; Benjamin D. Williams; John J. Anglim; Reginald N. Barnard; Justin J. Stevenson, Jr.; J. Logan Burke; James M. Hutton, III; Thomas C. Cafone; Hart Hagin; Clinton J. Coombs; Arthur T. Hamill; James M. Hutton, III, Executor of the Estate of defendant James M. Hutton, Jr., deceased; Robyn B. Hall, Vernon H. Hall, III and Dudley Hall, Executors of the Estate of defendant Vernon H. Hall, II, deceased; and W. E. Hutton & Co. a partnership, shall jointly and severally, forthwith pay to plaintiff, The Johns Hopkins University, the purchase price of the production payment hereinafter mentioned amounting to $1,300,000.00 together with interest, at the rate of six percent (6%) per annum from March 1, 1961, as follows:

On $1,300,000.00 (the purchase price) from March 1, 1961 to June 29, 1961.

On $1,299,430.81 from June 29, 1961 to July 31, 1961.

On $1,299,394.19 from July 31, 1961 to October 5, 1961.

On $1,298,818.51 from October 5, 1961 to October 31, 1961.

On $1,297,303.18 from October 31, 1961 to December 4, 1961.

On $1,296,816.46 from December 4, 1961 to January 29, 1962.

On $1,296,756.30 from January 29, 1962 to March 12, 1962.

On $1,295,704.80 from March 12, 1962 to April 2, 1962.

On $1,293,909.92 from April 2, 1962 to June 6, 1962.

On $1,291,977.89 from June 6, 1962 to June 30, 1962.

On $1,290,616.72 from June 30, 1962 to October 4, 1962.

On $1,287,387.32 from October 4, 1962 to the date of payment pursuant to this Decree, by defendants to plaintiff, less the aggregate of all income, including all amounts credited to the "primary sum" and to the "additional amounts", received by plaintiff to said date of payment by defendants: on account of the oil and gas production payment of Trice Production Company, a Delaware corporation, heretofore purchased by plaintiff, and conveyed by Trice Production Company to plaintiff on March 1, 1961, which income aggregates $313,326.52 to the date of this Decree after exclusion from income received of the sum of $3,142.36 paid by plaintiff to the Trustee in Reorganization of Trice Production Company pursuant to Supplement to Assignment of Production Payment dated as of December 31, 1962, and of the sum of $20,302.73 returned by plaintiff to Trice Production Company (Reorganized) pursuant to letter Agreement dated August 2, 1966.

2. Concurrently with and contingent upon the payment to plaintiff of the aforesaid amounts by said defendants, plaintiff, The Johns Hopkins University, shall execute and deliver to defendant, W. E. Hutton & Co., an assignment, in the form appended to this Decree as Exhibit A, defendants to pay any transfer and other taxes and recording fees and expenses which may be imposed by reason of this ordered conveyance.

3. Concurrently with the delivery to W. E. Hutton & Co. of the Assignment referred to in paragraph "2" hereof and contingent upon the payment to plaintiff of the amounts directed to be paid by said defendants in this Decree, the plaintiff shall also deliver to defendants: (a) a set of every agreement and division order mentioned in the Assignment, of which the plaintiff has copies, together with a representation that the documents delivered are all of such documents of which plaintiff has knowledge; (b) a binder of all of the closing documents received by plaintiff in the consummation of the production payment referred to in paragraph "1" hereof, together with a representation that these are the closing documents and all of them; and (c) an Assignment of all of plaintiff's right, title and interest, if any, to 2,500 shares of stock in the Trice Production Company (Reorganized) referred to in the Plan of Reorganization of the Trice Production Company; and

(d) an Assignment in the form appended hereto as Exhibit B of all of plaintiff's right, title and interest under a certain letter from Trice Production Company to The Johns Hopkins University dated February 23, 1961.

4. The plaintiff's application for attorneys' fees and expenses pursuant to 15 U.S.C. Section 77k and Rule 37 of the Federal Rules of Civil Procedure be and the same hereby is in all respects denied.

5. Costs in the amount of $10,466.14 are hereby allowed to plaintiff and shall be paid by the defendants, jointly and severally.

6. Provided defendants fully comply with this Decree, the second, third, fourth, fifth, sixth and seventh Counts of the Amended Complaint shall be dismissed as moot.

7. This Court retains jurisdiction solely for the purpose of supervising compliance with this Decree, including the Assignment provided for herein.

## EXHIBIT A

### ASSIGNMENT OF PRODUCTION PAYMENT
### AND
### NET PROFIT OVERRIDING ROYALTY INTEREST

STATES OF LOUISIANA, OKLAHOMA AND TEXAS

PARISH OF VERMILION IN LOUISIANA; COUNTIES OF CARTER AND CLEVELAND IN OKLAHOMA; AND COUNTIES OF BORDEN, BRAZORIA, GRAYSON, JACK MATAGORDA, RUSK AND SMITH IN TEXAS

Pursuant to Decree of the United States District Court for the District of Maryland, entered December 10, 1968, in proceedings entitled "The Johns Hopkins University, Plaintiff, v. James M. Hutton, Jr., et al., Defendants", Civil Action No. 15098, and in consideration of the payments from W. E. Hutton & Co., a partnership, and others, to The Johns Hopkins University, a corporation of the State of Maryland (hereinafter referred to as the "Assignor"), provided by said Decree, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby grant, bargain, sell, convey, transfer, set-over, assign and deliver to W. E. Hutton & Co. (hereinafter referred to as the "Assignee"), its successors and assigns forever all of Assignor's right, title and interest in the production payment and net profit overriding royalty interest acquired by Assignor from Trice Production Company, a corporation of the State of Delaware, by Assignment of Production Payment and Net Profit Overriding Royalty Interest dated

February 23, 1961, which is incorporated herein and attached hereto as Exhibit A–1.

Assignor warrants that there have been no contracts or agreements executed by Assignor or affirmative acts by Assignor, or its agents with respect to the aforementioned Production Payment and Net Profit Overriding Royalty Interest assigned under date of February 23, 1961, except the following:

1. Agreement with Transcontinental Pipeline Corporation, Marathon Oil Company, et al, dated as of February, 1963, with respect to the Nunez lease. Executed by Assignor March 13, 1963.

2. Letter Agreement with Marathon Oil Company with respect to the Nunez 1–A well, executed by Assignor March 14, 1963.

3. Supplement to Assignment of Production Payments dated as of December 31, 1962.

4. Letter Agreement of August 2, 1966 between Assignor and Trice Production Company (Reorganized) consisting of two letters of that date, one from Venable, Baetjer and Howard to Trice Production Company (Reorganized) and one from Carrington, Johnson & Stephens to the same addressee.

5. Ratification Agreement with respect to the Ruth Dugger lease and the Shamburger Lake unification executed on or about January 22, 1963.

6. And the following division orders:

A. Lee Tipps Estate Unit to Lone Star Gas Co. about November 11, 1965.

B. J. W. Hughes Unit to Union Texas Petroleum Company about August 31, 1962; to Continental Oil Company about September 1, 1965 and about February 1, 1968; and to Trice Production Company about July 22, 1965.

C. John Swinney, Well No. 1, to Cities Service Gas Corporation about November 18, 1966.

D. Pone Gas Unit No. 1 to Humble Oil and Refining Company about March 18, 1963.

E. Letha Hester to Sinclair Crude Oil Co. about August 6, 1962; to Sinclair Refining Company about July 7, 1965 and about January 13, 1966 (Ratification); to Signal Oil and Gas Company about August 17, 1962 and about February 28, 1966; and to Texas Pacific Oil Company about October 6, 1965.

F. Quinnie Dumas to Sinclair Crude Oil Company about August 6, 1962; to Sinclair Refining Company about September 17, 1965 and about January 13, 1966 (Ratification); to Signal Oil and Gas Company about August 17, 1962.

> [There shall be added to the Assignment before execution a list of acts subsequent to the date of the entry of the decree up to the date of the actual transfer.]

Assignor does hereby bind itself, its successors and assigns, to Assignee and to its successors and assigns to warrant and defend all and singular the aforementioned Assignment of Production Payment and Net Profit Overriding Royalty Interest dated February 23, 1961

against every person whomsoever making any claim to the same or any part thereof by, through or under Assignor, except any such person making any claim pursuant to any one or more of the documents or affirmative acts listed in the preceding paragraph hereof.

Assignor agrees that, upon request of Assignee, Assignor will deliver promptly at the expense of Assignee, proper authorizations and instructions to all present and named purchasers of oil and gas from the properties covered by said production payment or by any of the documents hereinabove listed, to make payments to the Assignee from the effective date of this assignment.

Upon written request of Assignee, its successors or assigns, Assignor, its successors or assigns, will execute and deliver such further instruments and documents as Assignee, its successors or assigns, may reasonably request in order to make this Assignment fully effective.

This Assignment shall be effective from and after the date hereof.

IN WITNESS WHEREOF, Assignor has caused these presents to be executed by its Vice President for Administration and its corporate seal to be affixed, duly attested, this day of , 196 .

THE JOHNS HOPKINS UNIVERSITY

By:————————————————————
Vice President for Administration

ATTEST:

————————————————

[Corporate Seal]

Witnesses to both of the above signatures:

————————————————

————————————————

STATE OF MARYLAND
CITY OF BALTIMORE

Louisiana

BEFORE ME appeared Bruce J. Partridge, to me personally known, who, being by me duly sworn, did say that he is a Vice President for Administration of THE JOHNS HOPKINS UNIVERSITY, the corporation which executed the foregoing instrument, and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed in behalf of said corporation by authority of its Board of Directors, and that such person acknowledged said instrument to be the free act and deed of said corporation.

Oklahoma

BEFORE ME personally appeared Bruce J. Partridge, to me known to be the identical person who subscribed the name of THE JOHNS HOPKINS UNIVERSITY to the foregoing instrument as its Vice

President for Administration and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of such corporation for the uses and purposes therein set forth.

Texas

BEFORE ME personally appeared Bruce J. Partridge, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the Vice President for Administration of THE JOHNS HOPKINS UNIVERSITY, a corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed, and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____ day of _____, 19__.

Notary Public in and for
Baltimore City, Maryland.

ASSIGNMENT OF PRODUCTION PAYMENT
AND
NET PROFIT OVERRIDING ROYALTY INTEREST
DATED
FEBRUARY 23, 1961

STATES OF LOUISIANA, OKLAHOMA AND TEXAS

PARISH OF VERMILION IN LOUISIANA; COUNTIES OF CARTER AND CLEVELAND IN OKLAHOMA; AND COUNTIES OF BORDEN, BRAZORIA, GRAYSON, JACK, MATAGORDA, RUSK AND SMITH IN TEXAS

RECITALS:

The following facts are true and correct:

Recital A. Trice Production Company (hereinafter sometimes called "Trice"), a Delaware corporation having valid and subsisting permits to do business in the States of Louisiana, Oklahoma and Texas, with its principal office in Longview, Gregg County, Texas, is the owner of the oil, gas and mineral leasehold estates and other oil, gas and mineral interests (all of which are herein sometimes called the "Contract Properties") described in Annex I and Annex II which are attached hereto and made a part hereof.

Recital B. Trice executed and delivered to Oilco, Inc., an Assignment of Production Payment (hereinafter sometimes called the Oilco Production Payment) dated October 6, 1960, assigning to Oilco, Inc., a production payment in the primary amount of $1,375,000.00 plus certain additional amounts including an amount equivalent to interest at the rate of 6% per annum on the monthly unpaid balances of such primary amount payable out of ninety per cent (90%) of the proceeds of production from Trice's properties described in Annex I attached hereto. Such Assignment of Production Payment dated October 6,

1960, has been filed for record in the various states shown below in the county or parish shown in Column (1) below, in the Book or Volume shown in Column (2) below, at the page shown in Column (3) below and in the Records shown in Column (4) below:

| Column (1) County or Parish | Column (2) Book or Volume | Column (3) Page | Column (4) Records |
|---|---|---|---|
| **LOUISIANA** | | | |
| Vermilion Parish | 430 | 301 | Conveyance |
| | Entry No. 152536 | | |
| **OKLAHOMA** | | | |
| Carter County | 404 | 245 | Records |
| Cleveland County | 346 | 2 | Records |
| **TEXAS** | | | |
| Borden County | 96 | 347 | Deed Records |
| Brazoria County | 776 | 509 | Deed Records |
| Grayson County | 921 | 412 | Deed Records |
| Jack County | 251 | 3 | Deed Records |
| Matagorda County | 358 | 425 | Deed Records |
| Rusk County | 703 | 474 | Deed Records |
| Smith County | 992 | 269 | Deed Records |

Reference is here made to such Assignment of Production Payment dated October 6, 1960, and the record thereof for a complete description of the terms and provisions thereof.

Recital C. Trice desires to assign and convey to The Johns Hopkins University, a Maryland corporation (hereinafter sometimes called "Johns Hopkins") a production payment and certain net profit over-riding royalty interests in, under and out of (and that may be produced, saved and sold from) all of the Contract Properties subject, as to the properties described in Annex I, to the Oilco Production Payment.

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) cash in hand paid and other good, valuable and serious considerations, the receipt and sufficiency of all of which is hereby acknowledged, TRICE PRODUCTION COMPANY does hereby grant, bargain, sell, assign, transfer and set over unto THE JOHNS HOPKINS UNIVERSITY the production payment interest and net profit overriding royalty interests hereinafter described in and to the oil, gas and other minerals in and under and that may be produced, saved and sold from the Contract Properties, or allocable thereto, if unitized, from and after the effective date hereof.

TO HAVE AND TO HOLD unto Johns Hopkins, its successors and assigns, forever, subject to the terms and conditions, exceptions, reservations, covenants, and agreements hereinafter set forth.

## ARTICLE I

### PRODUCTION PAYMENT

Section 1. Trice does by these presents grant, bargain, sell, assign, transfer and set over unto Johns Hopkins as a production payment undivided percentages, as hereinafter set out, of all the oil, gas and other minerals in and under and that may be produced, saved and sold from the Contract Properties or allocable thereto, if unitized, for the time (and effective separately as to those Contract Properties described respectively in Annex I and Annex II) hereinafter set out, until from the proceeds of the sale of such oil, gas and other minerals, Johns Hopkins shall have received free of cost and expense, over and above the aggregate amount of all production, severance, and other similar taxes charged against or measured by the production of oil, gas and other minerals, the aggregate of the following:

(a) The full net sum of One Million Three Hundred Thousand Dollars ($1,300,000.00) (hereinafter called the "primary sum"); plus

(b) An amount, if any, equal to all ad valorem taxes and other similar taxes assessed against and paid by Johns Hopkins and the amount of any penalty or interest on any such tax or penalty to the extent paid by Johns Hopkins with respect to the interests hereby granted; plus

(c) An Additional Amount as set forth in Section 4 of this Article I.

The undivided percentages of the oil, gas and other minerals herein granted shall be as follows:

(x) As to those Contract Properties described in Annex II only, an undivided ninety per cent (90%) from the effective date hereof until the date upon which the Oilco Production Payment is liquidated and terminated;

(y) As to all of the Contract Properties described in Annex I and Annex II, an undivided eighty per cent (80%) from and after the date upon which the Oilco Production Payment is liquidated and terminated until the production payment hereby granted is liquidated and terminated as herein provided.

Section 2. The proceeds of the sale of oil, gas and other minerals which are received by Johns Hopkins on or before the 26th day of each calendar month and after the 26th day of the preceding calendar month shall be applied on the 26th day of each calendar month first to the satisfaction of the amount provided for in paragraph (c) of Section 1 of this Article I, next to the amount, if any, provided for in paragraph (b) of such Section 1, and the remaining proceeds, if any, shall be applied to the satisfaction of the unpaid balance of the primary sum.

Section 3. All gross production, severance, pipeline, regulating, gathering, occupation, and other similar taxes imposed with respect to or measured by the production from the Contract Properties shall be deducted each month from the proceeds of the sale thereof and only the amounts remaining after such deduction shall be applied as above provided in Section 2 of this Article I.

Section 4. The Additional Amount referred to in paragraph (c) of Section 1 of this Article I shall be equivalent to interest from the ef-

fective date hereof at the rate of six per cent (6%) per annum on the monthly unpaid balance of the primary sum specified in paragraph (a) of such Section 1 (including any amounts restored to the primary sum as provided herein from the date of such restoration), and on the amount, if any, referred to in paragraph (b) of such Section 1 from the date of each outlay under such paragraph (b). Such Additional Amount shall be calculated in the same manner as interest on the bank basis is calculated, i. e., the actual number of days divided by 360.

Section 5. If any of the proceeds of the sale of oil, gas and other minerals attributable to the production payment hereby granted shall be withheld for any reason whatsoever, then such proceeds shall not be deemed to have accrued to Johns Hopkins until such proceeds have actually been received by Johns Hopkins; or, if at any time either before or after the receipt of the full net aggregate amount above provided for in Section 1 hereof, Johns Hopkins shall be compelled to pay over the proceeds from the sale of any such oil, gas and other minerals theretofore received or to make any payment on account of oil, gas and other minerals taken by Johns Hopkins in kind, the amount of such proceeds or such payment (plus all amounts which Johns Hopkins shall be compelled to pay in the nature of interest, damages and penalty), shall not be deemed to have accrued or be attributable to Johns Hopkins and shall be restored to the primary sum and liquidated and paid in the same manner.

Section 6. Johns Hopkins shall look solely to the oil, gas and other minerals in and under and that may be produced, saved and sold from the Contract Properties for the satisfaction and discharge of the production payment hereby granted, and Trice shall never be personally liable for the payment and discharge thereof; provided, however, nothing contained in this section shall relieve Trice of its liability to respond in damages for any breach of any of the covenants, agreements and undertakings herein made by Trice.

Section 7. No interest of Trice in any contract appurtenant to the operating rights with respect to the Contract Properties, nor any interest in any revenues arising otherwise than through the production and sale of oil, gas and other minerals from the Contract Properties is or shall be included as part of the production payment hereby granted.

Section 8. None of the development or operating costs or other similar expenses incurred in operating and developing the Contract Properties or in treating or storing the oil, gas and other minerals produced therefrom, nor any part of any royalty or other burden (except the Oilco Production Payment which is an additional burden) shall be borne by Johns Hopkins, and Trice shall hold and save Johns Hopkins harmless from all such costs, expenses and liabilities.

Section 9. That portion of the oil, gas and other minerals hereby assigned to Johns Hopkins shall be owned by Johns Hopkins in place and shall be delivered to the credit of Johns Hopkins at the well or into the pipeline or pipelines serving the Contract Properties, to be sold and disposed of by Johns Hopkins as it sees fit, except as limited by a unitization, operating or similar agreement or gas sales contract in effect as to the Contract Properties on the effective date hereof; provided, however, that Trice shall, nevertheless, until otherwise instructed in

writing by Johns Hopkins, continue to deliver or cause to be delivered to the credit of Johns Hopkins and free of cost to Johns Hopkins all such oil, gas and other minerals owned by Johns Hopkins at the well or into the pipeline or pipelines serving the Contract Properties, to the same party taking or receiving Trice's interest in the production from the Contract Properties and on the same terms and conditions.

Section 10. Except as set forth in Section 2 of Article IV hereof, no loss or failure of title to the Contract Properties shall have the effect of reducing the undivided percentage of the oil, gas and other minerals devoted to this production payment hereby granted or the amount thereof, nor shall any such loss or failure of title create any set off or other prejudice to Johns Hopkins, its successors and assigns, and this payment shall continue in full force and effect to the extent of the full stipulated undivided percentage thereof as applied to the Contract Properties, the title to which shall not have failed or been lost.

Section 11. Trice shall cause to be paid promptly all gross production, pipeline, severance, and all other taxes, present or future, imposed with respect to the production, gathering, transportation, or sale of oil, gas and other minerals from the Contract Properties and Trice shall render and cause to be paid all ad valorem taxes and assessments of every kind whatsoever, present or future, levied upon or assessed against the Contract Properties before the same shall become delinquent. In the event any tax or assessment is not paid by Trice when due and a penalty thereon is charged by the tax authorities, then the amount of any such tax or penalty plus any interest thereon not paid by Trice shall be part of the amount described in paragraph (b) of Section 1 of this Article I.

Section 12. When Johns Hopkins, its successors and assigns, have received in full all of the amounts specified in Section 1 of this Article I, then the production payment hereby granted shall terminate, and in that event Johns Hopkins agrees upon request to execute and deliver all necessary and proper acquittances.

## ARTICLE II

### NET PROFIT OVERRIDING ROYALTY INTERESTS

Section 1. For the same consideration Trice does hereby grant, bargain, sell, assign, transfer and set over unto Johns Hopkins as Net Profit Overriding Royalty Interests the following undivided percentages of all the oil, gas and other minerals in and under or that may be produced, saved and sold from the Contract Properties or allocable thereto, if unitized, from and after the date the "Production Payment" herein granted has been liquidated and terminated:

(a) Fifty per cent (50%) until Johns Hopkins has received therefrom a sum equal to the sum of the "Additional Amounts" received by Johns Hopkins under the production payment granted by Article I hereof and by Oilco, Inc., under the Oilco Production Payment described in Recital B above, such Additional Amounts being described in Section 4 of Article I hereof and in paragraph 2(e) of Article I of the Assignment of Production Payment dated October 6, 1960, described in Recital B above; and

(b) Thereafter twenty-five per cent (25%) for the remaining life of the Contract Properties,

after deducting therefrom the same respective percentages of all costs of developing, operating, equipping, and maintaining the Contract Properties, including the taxes applicable thereto (except income, franchise and other similar taxes) incurred after the liquidation and termination of the production payment granted to Johns Hopkins hereby and described in Article I hereof, it being the intention of the parties that Johns Hopkins shall receive, as Net Profit Overriding Royalties, the above percentages (a) and (b) of the net profits, if any, as herein defined, realized during the respective periods thereof from the ownership, maintenance, development and operation of the Contract Properties in accordance with the terms and provisions hereof.

Section 2. The Net Profit Overriding Royalty Interests do not include any right, title or interest in any of the personal property, fixtures or equipment now or hereafter placed on the Contract Properties, or in a unit in which any part or parts of the Contract Properties may now or hereafter be included, and the interests hereby granted are exclusively an interest in net profits as herein defined and Johns Hopkins shall look exclusively to the oil, gas and other minerals produced from the Contract Properties for the satisfaction and realization of the Net Profit Overriding Royalties.

Section 3. Trice shall pay all costs and expenses incurred in developing, exploring, operating, equipping, and maintaining the Contract Properties and perform all obligations which it has assumed or undertaken under each operating or other agreement affecting the Contract Properties, and shall pay the operator under each such operating agreement all costs and expenses which are properly allocated to the Contract Properties and shall cause the Contract Properties to be operated for the production of oil, gas and other hydrocarbons in a good workmanlike manner, in accordance with all applicable Federal and state laws, rules and regulations, in accordance with approved practices in the industry and in accordance with the terms and provisions of the operating agreements covering the Contract Properties, all in the manner that would be employed by a reasonable and prudent operator. Trice shall have exclusive charge and control of the marketing of all oil, gas and other minerals allocable to the Net Profit Overriding Royalty Interest and shall market such production at the same time and on the same terms as it markets its own share of the production from the Contract Properties and shall collect and receive the proceeds from the sale of such production.

Section 4. Immediately upon the termination and liquidation of the production payment hereby granted, Trice shall establish a Net Profits Account and maintain the same in accordance with good accounting practices. The books pertaining to the Net Profits Account shall be open at all reasonable times for examination, inspection, copying and auditing by Johns Hopkins or its representatives.

Section 5. Into the Net Profits Account shall be credited the proceeds of all oil, gas and other minerals accruing to the Contract Properties after the production payment hereby granted has been terminated and liquidated. All such proceeds shall be deposited in a separate bank account styled "Trice Production Company Trust Account—

Johns Hopkins" and all funds in such account shall be held in trust by Trice for the benefit of Johns Hopkins and Trice as their interests appear under the provisions hereof.

Section 6. Against the Net Profits Account shall be charged the following costs and expenses which are incurred after the production payment hereby granted has been terminated and liquidated to the extent ·such costs and expenses are properly allocable to the Contract Properties under sound accounting practices:

(a) Actual amounts expended by Trice for all direct labor (including ·fringe benefits), transportation, and other services necessary for exploring, developing, equipping, operating, and maintaining the Contract Properties and of all materials, equipment and supplies purchased by Trice and used on any of the Contract Properties and of such services, materials, equipment and supplies for any unit or units in which any part or parts of the Contract Properties is now or hereafter included; and any amounts charged to Trice for adjustment of investment in connection with the creation of any such unit or units; and that portion chargeable to Trice with respect to the Contract Properties for any amounts paid to any operator or receivable by Trice itself as operator (in lieu of overhead, administrative or other indirect costs) under any operating contract relating to any of the Contract Properties or any unit in which any of the Contract Properties may be included;

(b) Damages or losses suffered by Trice with respect to any one or more of the Contract Properties or unit interests referred to in paragraph (a) of this Section 6 caused by fire, floods, storms or from any other cause not controllable by Trice in the exercise of reasonable diligence;

(c) Expenses of litigation, liens, judgments, liquidated liabilities and claims incurred and paid by Trice involving any of the Contract Properties or incident to the development, exploration, operation or maintenance thereof provided that each such expense arose at such time and under such circumstances that the cause thereof did not constitute a loss or failure of title subject to the provisions of Section 2 of Article IV hereof;

(d) All taxes (except income, franchise, or other similar taxes) paid by Trice for the benefit of the parties hereto with respect to the Contract Properties, including, but not limited to, ad valorem, property, production, occupation and any other taxes assessed against the Contract Properties;

(e) Insurance premiums paid by Trice for insurance carried with respect to the Contract Properties or any unit in which a part of the Contract Properties is included at any time or on any personal property or equipment situated thereon or used in connection therewith together with all expenditures incurred and paid in settlement of any and all losses, claims, damages, judgments, and other expenses including reasonable legal fees relating to the Contract Properties or operations thereof;

(f) A reasonable charge for overhead to cover the proportion thereof which is properly allocable to the Contract Properties, including, but not limited to, compensation or salaries paid to officers or

employees of Trice whose time is not allocated directly to the Contract Properties, office expense of Trice and district and camp expense of Trice which is not properly allocated directly to the Contract Properties, provided that no such charge shall be receivable by Trice as to any property with respect to which it is the operator under any operating agreement providing a charge for overhead or administrative expenses and that such charge as to any property with respect to which Trice is not the operator shall not exceed that proportion of Four Hundred Dollars ($400.00) per month per drilling well and Fifty Dollars ($50.00) per month per producing well which that part of the net working interest of such property included within the Contract Properties bears to the full net working interest;

(g) All other expenditures reasonably incurred by Trice for the necessary or proper development, exploration, operation, maintenance and utilization of the Contract Properties;

(h) A charge of six per cent (6%) interest per annum on the unliquidated balances under paragraphs (a) through (g) of this Section 6 computed monthly on the bank basis, the number of days divided by 360.

Section 7. The charges provided in Section 6 of this Article II shall be reduced by the following:

(a) The proceeds of the sale or salvage of equipment installed on the Contract Properties, the acquisition of which has been charged against said Net Profits Account (and for the purpose hereof the use of any such equipment by Trice on any property other than the Contract Properties shall be treated as a sale at the fair market value at the time of its removal from any of the Contract Properties), it being understood the right to sell or to salvage said equipment shall be left to the sole discretion of Trice, and the only duty imposed upon Trice is to give credit to the Net Profits Account in event of sale or salvage of said equipment;

(b) The proceeds of all insurance collected by Trice as a consequence of the loss or damage to any one or more of the following: the Contract Properties or any part thereof or interest therein or any unit or units, which part of the Contract Properties now or hereafter is included, or the personal property or equipment located thereon which has been acquired after the commencement of the Net Profit Overriding Royalty Interests and the acquisition thereof has been charged to the Net Profits Account;

(c) The proceeds of all judgments and claims collected by Trice involving any of the Contract Properties or any part thereof included in a unit or any of the personal property or equipment located thereon or any other property the cost of which has been charged to the Net Profits Account;

(d) Any other thing of value received by Trice as a result of its ownership (as distinguished from its operation) of the Contract Properties, such as dry hole or bottom hole contributions (either in cash, property or acreage) received by Trice by reason of the drilling of a well on any of the Contract Properties.

Section 8. All credits to the Net Profits Account shall immediately be applied first to interest on the unliquidated balances of the charges made thereto under paragraphs (a) through (g) of Section 6 of this Article II, and then to the unliquidated balances of the charges made thereto under such paragraphs (a) through (g). The total net profits from the Contract Properties (or the total net losses, as the case may be) shall be determined by deducting the total charges properly made against the Net Profits Account from the total credits properly made into it, and Johns Hopkins shall participate in Johns Hopkins' undivided percentage of the net profits derived from the Contract Properties as herein provided only after and while all charges, debits, and costs properly charged against the Net Profits Account shall have been paid and a credit balance shall exist therein as of the date of distribution from such Net Profits Account. It is understood and agreed that the credit items provided for in Section 7 of this Article II shall be taken into account solely for the purpose of determining whether or not net profits exist, and that Johns Hopkins shall have no right, title or interest therein and that all payments made to Johns Hopkins on account of the Net Profit Overriding Royalties shall be made entirely and exclusively out of the proceeds of production from the Contract Properties.

Section 9. Within two (2) months after the last day of each calendar month, Trice shall furnish to Johns Hopkins a detailed statement clearly reflecting the condition of the Net Profits Account as of the close of business on the last day of such calendar month. Any deficit or loss reflected by any such statement shall be carried forward for the next and succeeding months until such deficit or loss has been liquidated. In case a net profit is reflected by any such statement, payment to Johns Hopkins of Johns Hopkins' undivided percentage of the net profits (as is applicable under Section 1 of this Article II) shall be enclosed with such statement, and Trice shall be credited with the remaining percentage thereof, so as to extinguish any credit balance existing at the end of any month. If at the expiration of two (2) years from the rendition of a particular statement Johns Hopkins has made no objection to the items reflected thereon or as to debits or credits upon which such items are based, such statement shall be conclusively deemed to be correct for all purposes, and Trice shall no longer be required to maintain any records in connection therewith or be liable for any error with respect thereto.

## ARTICLE III

### COVENANTS AND AGREEMENTS OF TRICE

Trice, for itself, its successors and assigns, covenants and agrees as follows:

Section 1. That Trice, at its own cost (irrespective of who may be the operator of any of the Contract Properties) will cause:

(a) Each lease, as to which all or some part of the interest of the lessee thereunder constitutes a portion of the Contract Properties, and each and every right of way, easement or privilege necessary or appropriate to the operation of each such lease or other part of the Contract Properties to be kept in full force and

effect by the payment of whatever sums may become payable and by the performance of whatever obligations may become performable on the part of Trice with respect thereto;

(b) Each such lease or part of the Contract Properties to be operated in a good and workmanlike manner, and in the manner most approved in the field in which it is situated, so that each producing well shall continue to produce to the extent of its capacity, and within the limits of economic operation, the full daily allowable of oil and distillate therefrom, and, to the extent that a market exists, the full daily allowable of gas therefrom;

(c) All valid laws and all valid orders and regulations of each regulatory authority having jurisdiction in the premises to be complied with in all operations;

(d) All liabilities of any nature, including all liabilities for labor and material and equipment incurred in, or arising from the administration or operation of any and each such lease or item of the Contract Properties to be paid punctually;

(e) Every part of the Contract Properties to be guarded from removal, destruction and damage, and to be protected from the commission of any act, other than the operation of the Contract Properties as hereby contemplated, as a result of which the value of any part of the Contract Properties may be lessened; Trice and the Contract Properties are to be insured against such risks as are usually insured against by prudent operators under the same circumstances; and

(f) All presently existing royalties, overriding royalties and payments out of production of record affecting the Contract Properties to be paid promptly when due.

Section 2. That Trice will furnish, or cause to be furnished, to Johns Hopkins such reports as may reasonably be requested by the latter with respect to the Contract Properties, and the operation thereof, and the production therefrom, and also such other information regarding the affairs and financial condition of Trice as Johns Hopkins may reasonably request. As soon as practicable after the close of each fiscal year, but not later than one hundred and twenty (120) days after the close of such year, Trice shall have a full and complete audit made of the Net Profits Account by the accounting firm of Peat, Marwick, Mitchell & Co., or some other nationally known accounting firm of its selection and satisfactory to Johns Hopkins, and shall furnish to Johns Hopkins a true and correct copy of such firm's report.

Section 3. That Trice will not consent to the abandonment of any portion of the Contract Properties, unless such portion of the Contract Properties in the hands of an owner of a full seven-eighths (7/8ths) working interest would no longer be capable of producing oil, gas or other minerals in commercial quantities. It is the intention hereof that Trice will be required to, and Trice covenants and agrees to, operate the Contract Properties or cause them to be operated to their economic limit as though any outstanding production payments and overriding royalty interests (including those hereby conveyed) did not exist and to continue to develop the Contract Properties or cause them

to be developed to the extent that a prudent operator would if such production payments and overriding royalty interests did not exist.

Section 4. That Trice will cause to be afforded to any representative of Johns Hopkins or of any mortgagee or trustee of Johns Hopkins the opportunity at all reasonable times to make such inspections of the Contract Properties as such representative shall deem proper.

Section 5. That the terms and provisions of the Oilco Production Payment described in Recital B above shall not be amended or altered to diminish or adversely affect the value of the production payment or Net Profit Overriding Royalty Interests hereby conveyed or the rights herein granted to Johns Hopkins without first obtaining Johns Hopkins' consent in writing thereto.

Section 6. That Trice will not without first obtaining Johns Hopkins' consent in writing convey, transfer or otherwise dispose of any part or all of the Contract Properties, and if Trice should dispose of any part or all of such Contract Properties or if the Contract Properties or any part thereof should be subject to seizure or claim by a trustee or receiver in bankruptcy or any other party by reason of any provision of the Bankruptcy Act of the United States, by reason of any voluntary or involuntary reorganization under any state or Federal statute, by reason of any receivership under the jurisdiction of any court or regulatory body, by reason of any assignment for the benefit of creditors, voluntary or involuntary, by reason of any composition of creditors, voluntary or involuntary, by reason of any attachment, garnishment or other lien or procedure, or by reason of any other procedure, similar or dissimilar to the foregoing, whether voluntary or involuntary or by operation of law, then Johns Hopkins shall have the right either itself (or through any nominee or representative) to take over the entire operation of the Contract Properties and in such event the proceeds of production shall be applied as herein provided by Johns Hopkins, its representative or nominee, after paying all expenses incurred by Johns Hopkins, its representative or nominee, and neither Johns Hopkins nor its representative nor its nominee shall be responsible to Trice or any other person for the operation of such properties except to use good faith in the application of such proceeds in accordance with the provisions of Section 8 of this Article III.

Section 7. To the extent that the terms of any operating, unitization, pooling or other agreement listed in Annex I or Annex II or any restrictions imposed by law prevent Trice from performing any of the covenants and agreements contained herein, performance of such covenants and agreements shall be excused if Trice exerts its best efforts, including, without limitation, the exercise of any rights, powers or privileges available to Trice under any such agreement, to cause all such covenants and agreements to be performed which may be legally performed. Trice warrants and represents that it knows of no provision of law or of any such agreement which would prevent Trice from complying with any covenant or agreement contained herein. Trice covenants and agrees to refrain from agreeing, without the consent in writing of Johns Hopkins, to any course of action under any such agreement which is contrary to any of the covenants and agreements contained herein.

Section 8. Should Trice fail to perform or cause to be performed any act which Trice is required to perform or cause to be performed under the terms hereof, Johns Hopkins, in addition to its damages and all other remedies available at law or in equity, may, subject to the prior right of Oilco, Inc., as to those Contract Properties described in Annex I, if such failure shall continue after twenty (20) days from the delivery to Trice of written notice thereof (except that no notice shall be required in the event of a violation of the covenants of Section 6 of this Article III), itself perform or cause to be performed such act at Trice's expense, in which event Johns Hopkins may advance funds and incur and pay bills for expenses, for such purpose, and Johns Hopkins shall succeed to all rights of Trice with respect to the possession, operation, and development of the Contract Properties and the use of equipment, machinery, plants, appliances, and personal property pertinent to the operation and development of the same, with right to sell all of the production from the same and to apply the proceeds thereof to the cost and expense of the operation and development of the same, and Trice shall reimburse Johns Hopkins upon demand for all amounts so paid by Johns Hopkins and all amounts expended by Johns Hopkins in connection with the operation and development of said property, together with interest thereon from the date of expenditure at the rate of six per cent (6%) per annum; and such amounts' plus interest shall be included in the damages recoverable by Johns Hopkins for Trice's breach.

## ARTICLE IV

### MISCELLANEOUS

Section 1. Trice reserves the right and power to pool or combine the acreage affected by the Contract Properties with other lands when in Trice's judgment it is necessary or advisable to do so in order to properly explore and develop the Contract Properties and to promote the conservation of oil and gas in and under and that may be produced therefrom, and to execute unitization agreements, unit operating agreements, and other necessary agreements to facilitate the recovery of oil or gas in the reservoirs in and under the Contract Properties in whole or in part.

Section 2. Any loss or failure of title due to any violation of any covenant hereof or resulting in a breach of any representation or warranty herein contained shall be deemed a failure of consideration and Johns Hopkins shall, fifteen (15) days after written notice to Trice, be entitled to return by Trice of a portion of the purchase price hereof (plus interest at the rate of six per cent (6%) per annum from the effective date hereof to the date of return) which it is agreed shall be equal to that portion of the $1,300,000.00 arrived at by multiplying the $1,300,000.00 by a fraction whose numerator is equal to the discounted present worth of that portion of the property so lost which is devoted to the production payment and Net Profits Overriding Royalty Interests hereby conveyed and whose denominator is the discounted present worth of that portion of the entire Contract Properties devoted to the production payment and the Net Profit Overriding Royalty Interests hereby conveyed determined in accordance with the

Petroleum Consultants, Inc. report of March 1, 1961. From and after the date of such return the interest of Johns Hopkins in the property interest lost shall pro tanto be deemed to have been reconveyed to Trice and the primary sum shall be reduced by the amount of such return with the same effect as if such reduced amount had been originally specified herein, and all subsequent calculations shall be made accordingly. The loss of a lease by reason of the cessation of production therefrom in paying quantities shall never be considered a loss or failure of title within the meaning of this Section 2.

Section 3. The Contract Properties and the rights and interests of Johns Hopkins therein may be assigned in whole or in part (and the interest of Trice therein may be assigned with the written consent of Johns Hopkins) and the covenants of Trice and all of the terms and provisions hereof shall be binding upon and shall inure to the benefit of Trice and Johns Hopkins and their respective successors and assigns, and each such covenant, term and provision shall run with and bind the portion of the Contract Properties to which each relates, constituting covenants running with such lands and leasehold estates. If Johns Hopkins, its successors or assigns, shall at any time execute a mortgage or deed of trust covering all or any part of the interests herein conveyed, the mortgagee or trustee shall, if and to the extent that such mortgage or deed of trust so provides, be entitled to exercise all the rights herein conferred upon Johns Hopkins, its successors and assigns.

Section 4. Trice for itself and its successors and assigns does hereby warrant and represent that it has good right, full power, and lawful authority to grant, bargain, sell, transfer, assign and convey the production payment and the Net Profit Overriding Royalty Interests hereby conveyed in the manner hereby done or intended; that Trice is the lawful owner and has good and merchantable title to the Contract Properties free and clear of all liens, encumbrances, adverse claims and burdens except as specifically mentioned in Annex I and Annex II; that the leases and interest described in Annex I and Annex II are valid and existing and that all rents and royalties due and payable under said leases have been duly paid and all conditions necessary to keep said leases in full force and effect have been duly performed; that Trice will warrant and forever defend the title to such interests hereby conveyed to Johns Hopkins against the claims of all persons whomsoever claiming or to claim the same or any part thereof; that Trice will on request of Johns Hopkins promptly correct any defect, error or omission which may be discovered in the contents of this instrument or in the execution or acknowledgment thereof, and will execute and deliver such further instruments and do such further acts as may be necessary or as may be reasonably requested by Johns Hopkins to carry out more effectively the purpose of this instrument and to make subject hereto the interest hereby conveyed or intended to be conveyed.

Section 5. Each covenant, agreement, term and provision is expressly declared to be severable from the remaining covenants, agreements, terms, and provisions hereof and the invalidity of any one shall not affect, impair or invalidate any other covenant, agreement, term,

or provision nor shall the invalidity or unenforceability of any covenant, agreement, term, or provision in any jurisdiction affect the validity or enforceability thereof in any other jurisdiction.

Section 6. Any notice required by the provisions hereof shall be sufficient if sent to the parties hereto by regular mail, postage prepaid, at the following addresses, respectively:

> Trice Production Company
> P. O. Box 1471
> Longview, Texas

> The Johns Hopkins University
> Homewood
> Baltimore 18, Maryland

Section 7. It is understood and agreed that Johns Hopkins shall never be personally liable for the payment of any sum with respect to the Contract Properties or otherwise (except to pay Trice the original purchase price, receipt of which is hereby acknowledged) and it is not the intention of the parties to create, nor shall this instrument be construed as creating, a mining or other partnership or association or joint venture, or to render them liable as partners.

Section 8. This instrument shall be effective as of 7:00 a.m., the 1st day of March, 1961, which date shall be the "effective date" hereof.

THUS DONE AND EXECUTED by TRICE PRODUCTION COMPANY, after due reading of the whole as of February 23, 1961, at _Longview_, Texas, in multiple counterparts, each of which shall for all purposes be deemed to be an original and all of which shall together constitute but one and the same instrument, before me _Barbara B. Holland_, a duly qualified and commissioned Notary Public in and for the County of _Gregg_, State of Texas, on this the _23rd_ day of _February_, 1961, in the presence of the undersigned competent witnesses.

ATTEST:

_____ M. Farmer
Secretary

TRICE PRODUCTION COMPANY

BY_____
President

Witnesses to Both of the Above Signatures:

_Margaret Henry_

_LaRue C. Dorsey_

_Barbara B. Holland_ BARBARA B HOLLAND
Notary Public in and for Gregg
County, Texas

My Commission expires June 1, 1961.

THE STATE OF TEXAS }

COUNTY OF _Gregg_ }

#### Oklahoma

BEFORE ME, the undersigned Notary Public in and for said County and State, on this _24th_ day of _February_ , 1961, personally appeared CLIFFW. TRICE, to me known to be the identical person who subscribed the name of the maker thereof, TRICE PRODUCTION COMPANY, to the foregoing instrument as its President, and acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of such corporation, for the uses and purposes therein set forth.

#### Texas

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared CLIFF W. TRICE, President of TRICE PRODUCTION COMPANY, a corporation, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same as the act and deed of such corporation for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _24th_ day of _February_ , 1961.

BARBARA B. HOLLAND

_Barbara B. Holland_
Notary Public in and for _Gregg_
County, Texas.

My Commission expires June 1, 1961.

---

### EXHIBIT B

### ASSIGNMENT

Pursuant to Decree of the United States District Court for the District of Maryland, entered December 10, 1968, in proceedings entitled "The Johns Hopkins University, Plaintiff, v. James M. Hutton, Jr., et al., Defendants", Civil Action No. 15098, and for good and valuable consideration, receipt of which is hereby acknowledged, The Johns Hopkins University (Assignor) does hereby assign, set-over and transfer to W. E. Hutton & Co. all of Assignor's right, title and interest in, to and under a certain letter from Trice Production Company, Cliff W. Trice, President, to Assignor, dated February 23, 1961, copy of which is attached hereto.

Assignor warrants that there have been no contracts or agreements executed by Assignor or affirmative acts by Assignor or its agents with respect to the undertakings embodied in said letter, except the following:

Letter from William Patterson, Assistant Treasurer of The Johns Hopkins University, to Trice Production Company, attention Clyde Ford, dated August 6, 1962.

**1256**

[There shall be added to the Assignment before execution a list of acts subsequent to the date of the entry of the decree up to the date of the actual transfer.]

Upon written request of W. E. Hutton & Co., its successors or assigns, Assignor, its successors or assigns, will execute and deliver such further instruments and documents as W. E. Hutton & Co., its successors or assigns, may reasonably request in order to make this Assignment fully effective.

This Assignment shall be effective from and after the date hereof.

IN WITNESS WHEREOF, Assignor has caused these presents to be executed by its Vice President for Administration and its corporate seal to be affixed, duly attested, this day of , 196 .

THE JOHNS HOPKINS UNIVERSITY

By:_____

Vice President for Administration

ATTEST:

_____

[Corporate Seal]

STATE OF MARYLAND
CITY OF BALTIMORE

BEFORE ME personally appeared , of THE JOHNS HOPKINS University, a corporation, and acknowledged the foregoing Assignment to be the act and deed of said THE JOHNS HOPKINS UNIVERSITY, and that he is duly authorized to execute the same.

GIVEN UNDER MY HAND AND OFFICIAL SEAL, this day of , 196 .

_____
Notary Public in and for
Baltimore City, Maryland.

## TRICE PRODUCTION COMPANY

P. O. BOX 1471
LONGVIEW, TEXAS
TELEPHONE PLAZA 3-3331

February 23, 1961

CLIFF W. TRICE
PRESIDENT

The Johns Hopkins University
Homewood
Baltimore 18, Maryland

Gentlemen:

The undersigned, Trice Production Company, has this day sold you a production payment and certain net profit overriding royalty interests out of certain oil and gas properties located in the States of Louisiana, Oklahoma and Texas under an Assignment of Production Payment and Net Profit Overriding Royalty Interests dated February 23, 1961, (hereinafter sometimes called the Assignment).

Such production payment, which is in the primary sum of $1,300,000.00, bears interest at the rate of six per cent (6%) per annum. As part of the consideration for your purchase of such production payment and net profit overriding royalty interests we have agreed and do now agree as follows:

(1) . The undersigned guarantees that the amounts actually received by you under the terms of the Assignment will be sufficient to pay you six per cent (6%) per annum on the monthly unpaid balance of the primary sum of $1,300,000.00 until Oilco Production Payment is liquidated and terminated and the undersigned agrees that in the event that in any month until the Oilco Production Payment is liquidated and terminated the amounts payable to you under the Assignment do not equal six per cent (6%) on the unpaid balance of the primary sum, then the undersigned will at once and without demand pay you each month the amount necessary to increase the amount receivable by you under such Assignment to six per cent (6%) per annum on the unpaid balance of the primary sum.

(2) The undersigned has warranted to you that under the laws of the State of Oklahoma as now in force you will not be required to pay the State of Oklahoma any income tax and in

The Johns Hopkins University
February 23, 1961

the event you are required to pay any income tax (or penalties or interest thereon) to the State of Oklahoma under the laws now in force, then the undersigned will pay to you the amount of such tax as it presently exists or may be hereinafter increased by legislative act; it is understood that this undertaking will not be applicable in the event that you are not taxable under the laws of the State of Oklahoma now in force and in particular will not be applicable in the event of an amendment to the laws of Oklahoma removing the exemption which we warrant you presently enjoy under Section 912 of Title 68 of the Oklahoma Statutes Annotated.

(3) The F. W. Dollar Well No. 1 in Rusk County, Texas, is now being worked over and the undersigned may find it necessary to drill a new well on the land described in Item (12) of Annex I to the Assignment or on a unit in which such land is included. In any event, unless the undersigned establishes production of oil or gas in commercial quantities from the land described in Item (12) of such Annex I (or other land unitized therewith) above 7275 feet from the surface on or before August 23, 1961, the undersigned will pay you the sum of $1,500.00, which shall be applied against the primary sum of $1,300,000.00, and you will in that event reconvey to the undersigned all of your right, title and interest in and to the land and lease described in Item (12) of such Annex I.

It is understood that this entire undertaking is in consideration of your purchase of the production payment and net profit overriding royalty interests and that you would not consummate such purchase unless the undersigned entered into the agreements contained in this letter.

Very truly yours,

TRICE PRODUCTION COMPANY